# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

James and Lorie Jensen, as parents,                  Civil No. 09-1775 (DWF/FLN)
Guardians and next friends of Bradley J.
Jensen, et al.,

                     Plaintiffs,

v.                                                                      **ORDER**

Minnesota Department of Human Services,
an agency of the State of Minnesota, et al.,

                     Defendants.

---

Margaret Ann Mullin, Esq., Mark R. Azman, Esq., and Shamus P. O'Meara, Esq.,
Johnson & Condon, PA, counsel for Plaintiffs.

P. Kenneth Kohnstamm and Steven H. Alpert, Assistant Attorneys General, Minnesota
Attorney General's Office, counsel for State Defendants.

Samuel D. Orbovich, Esq., and Christopher A. Stafford, Esq., Fredrikson & Byron, PA,
counsel for Defendant Scott TenNapel.

---

The parties in this class action reached a Stipulated Class Action Settlement

Agreement, Doc. No. 104 (June 23, 2011) ("Settlement Agreement"), which was

approved by the Court. *Final Approval Order for Stipulated Class Action Settlement*

*Agreement.* Order of December 5, 2011, Doc. No. 136 ("Approval Order"). The

Settlement Agreement is Exhibit A to the Approval Order. That order "reserves

continuing jurisdiction for the time period set forth in the Agreement to enforce

compliance with the provisions of the Agreement and the Judgment, as well as assuring

proper distribution of the Settlement payments."  ¶ 2.

The Settlement Agreement created a $3,000,000 fund covering distributions to

Class Members, fees and expenses and also established requirements for systems

improvements and changes which are intended to benefit present, future, and potential

members of the class.[1] Prior orders of the Court addressed the allocation and distribution

of the fund.  *E.g.,* Orders of July 22, 1011, Doc. No. 111; February 14, 2012, Doc. No.

141.

This order addresses the service system elements of the Settlement Agreement

adopted by the Approval Order.  The systems elements provisions include, for example:

- The closure of the institution called METO, and requirements for any
  successor to METO.[2]

- Addition of professional staff (15 new staff = 14 FTE).[3]

- Staff training.[4]

- Community Services.

---

[1]     *See* Settlement Agreement at ¶ 4 (a State goal is to "extend the application of the
provisions in this Agreement to all state operated locations serving people with
developmental disabilities with severe behavioral problems or other conditions that
would qualify for admission to METO" or its institutional or community successors.).

[2]     Section IV.  The Settlement Agreement also has provisions related to the
Minnesota Security Hospital and the Anoka Metro Regional Treatment Center.  Section
X.D & E.

[3]     Section X.A.2.

[4]     Section IX.

- Transition planning for moves to community, and placement alternatives.[5]

- Limits on placements/transfers to Minnesota Security Hospital and Anoka Metro Regional Treatment Center, on *Olmstead* standards.

- Placements from Minnesota Security Hospital and Anoka Metro Regional Treatment Center, to occur based on *Olmstead* standards.[6]

- Creation of *Olmstead* Plan and expansion of community services.  State Operated Community Support Services ("CSS") "will be expanded" to deliver right care at right time in most integrated setting for people with developmental disabilities "in accordance with the U.S. Supreme Court decision in *Olmstead v. L.C.*"[7]

- Prohibitions on Seclusion and Room Time Out, and Prone Restraint and Chemical Restraint.

- Limits on other restraint (not prohibition) under new policy with documentation and review.[8]

- Prohibition of chemical restraint and PRN ("as is necessary") psychotropic medication for the purpose of managing behavior or restricting movement; limits on the use of restraints.[9]

- Provisions for both internal review of restraint use and engagement of an "External Reviewer" on compliance.[10]

---

[5]   Section VIII.

[6]   Section X.D. and X.E.

[7]   Section X.A.  Also, Section X.B.  *Olmstead v. L.C.,* 527 U.S. 581 (1999).

[8]   Sections V, VI, and VII.

[9]   Section VII.

[10]   Section VII.

The Approval Order provides that the "Court shall retain jurisdiction over this matter for two (2) years from approval of this Agreement" both to receive reports and information and also "as the Court deems just and equitable."[11]

The subject matter encompassed by the Settlement Agreement is specialized and its implementation is admittedly complex, involving intricate and interlocking activities by multiple state agencies, state officials, and others, over many months.  As the Court stated at the settlement approval hearing, the credibility and reliability of the judicial process is at stake when an order such as this is entered and, therefore, the Court intended to ensure that it was fully informed on the progress of implementation.  The First Circuit Court of Appeals expressed this view in a systemic education case, explaining that "the monitoring process is a basic responsibility of the court.  To the extent that the myriad of minor problems which will arise can be resolved without the necessity of resorting to the district judge, the process of implementation will be facilitated."  *Morgan v. Kerrigan*, 530 F.2d 401, 429 (1st Cir. 1976), *cert. denied*, 426 U.S. 935 (1976).

Defendants,[12] on May 14, 2012, provided the Court with a report on the status of compliance.  That report included some positive elements and also conceded non-compliance with some elements.  Of concern to the Court is that the report failed to

---

[11]    "The Court shall retain jurisdiction over this matter for two (2) years from approval of this Agreement for the purposes of receiving reports and information required by this Agreement, or resolving disputes between the parties to this Agreement, or as the Court deems just and equitable."  Section XVIII.B.

[12]    The word "Defendants" herein refers to the State Defendants.

mention (and thus failed to report on) a number of important requirements.[13]   The report

does not provide any documentation or references which would demonstrate or facilitate

verification of its representations.

By letter of May 4, 2012, the Court suggested to the parties that it was

contemplating appointing a monitor to provide assistance and advice to the parties with

respect to the implementation process.  The Court also noted that the monitor's role

would be to take a balanced approach in a nonadversarial manner.  The May 15, 2012

status conference included this topic.  Having had no reply from either side to the May 4

letter, the Court wrote again on May 31, 2012 on Mr. Ferleger's role.  (Doc. No. 151.)

Defendants responded to the Court's May 31 letter on June 6, 2012, stating that they

wished to contract with Mr. Ferleger for his assistance solely regarding the *Olmstead*

Plan element of their obligations, not the settlement generally; their letter did not

reference the proposed monitoring role.  (Doc. No. 152.)

On June 7, Plaintiffs responded to the Court that limiting consultation by

Mr. Ferleger to just one issue was unacceptable, given the Defendants' multiple other

obligations under the Settlement Agreement.  Plaintiffs wrote:

> Rather, because the Settlement Agreement covers several important areas,
> including prohibition on the use of restraints, seclusion and painful
> techniques, training and the dissemination of positive behavioral supports,

---

[13]      Among the requirements not mentioned in Defendants' report are:  compliance
with *Olmstead* standards and person-centered planning for METO successors (Section IV
of the Settlement Agreement); action on abuse and neglect discipline and reporting
(Section V.G.); training of facility treatment staff on positive behavioral supports (Section
IX.A.); visitor policy (Section IX.C.); bill of rights posting (Section IX.E.); community system
expansion to deliver *Olmstead*-consistent care (Section X.A.).

implementation of best practices for the care and treatment of people with developmental disabilities, Rule 40 Committee, transitioning people with developmental disabilities from the Minnesota Security Hospital, and several other items, Mr. Ferleger's national expertise would be very helpful to facilitate the Settlement in a number of areas.

(Doc. No. 153.)[14]

The Court remains concerned with Defendants' continued non-compliance with the External Reviewer requirements.  Sec. VII.B.4 of the Settlement Agreement requires: "The external reviewer shall issue quarterly reports to the Court for the duration of this Agreement."  The Settlement Agreement was approved by the Court December 5, 2011. These reports were thus due March 5 and June 5, 2012.  No reports were filed.  As noted above, a status report by Defendants' counsel, dated May 14, 2012, stated with regard to the External Reviewer, "Admittedly, the Department is not in compliance with this requirement."  Regarding the quarterly reporting, Defendants' counsel noted that no report was filed in March, and stated:

> The next report is due in early June. The Department is hopeful that this report will be completed within the required time lines.  However, in the event there is another delay the Department will file an updated status report.

After Defendants failed to file the required report in June, or to update the May status report, the Court, on June 26, 2012, wrote to the parties noting the non-compliance

---

[14]    On June 8, 2012, Defendants responded to Plaintiffs' Class Counsel's letter, acknowledging disagreement on "the role that Mr. Ferleger should have in this matter" and requesting a status conference.  (Doc. No. 154.)  Given this order, there is no need for another status conference.

regarding the External Reviewer, and stating that "the purpose of this letter is to inquire as to the progress on the Settlement Agreement."[15]  (Doc. No. 155.)

On July 6, 2012, Defendants filed what they called "the Public Quarterly Report" under the Settlement Agreement.  (Doc. No. 156.)  The filing does not explain or seek to excuse the failure to submit timely reports.  The report is not by an External Reviewer engaged under the Settlement Agreement, but is an unsigned three-page document dated June 1, 2012 and titled, "Monitoring Visit – PUBLIC," by two Special Investigators for the Minnesota Department of Health.  (Doc. No. 156-1.)  The report states that it was on an "interim monitoring visit to this facility until an external examiner is hired in accordance with the (sic) *Jensen v. Minnesota Department of Human Services*."  The brief report, does not review all of the Settlement Agreement's requirements.  The report acknowledges at least some of its omissions.[16]

On July 9, 2012, Defendants responded to the Court's letter of June 26, with representations regarding compliance with selected Settlement Agreement requirements.  (Doc. No. 157.)  As with the May 14 status report, the report did not include the status of a number of requirements.  The Defendants' July 9 letter characterized the July 6 filing (Doc. No. 156-1) as the "first quarterly report" by the Minnesota Department of Health

---

[15]    The Court's letter also requested an update on whether the "Third Party Expert," with regard to prohibited techniques, a different role from the External Reviewer, had been retained.  Section V.E.

[16]    For example, review of the "facility's compliance with the *Olmstead* Plan was deferred until an external reviewer is hired and trained in these practices."  The publicity and marketing of the facility was not reviewed.

under the Settlement Agreement.  That letter also included responses to that report by the Plaintiffs and Defendant Department of Human Services ("DHS").  *See* Exhibits 1 – 5, Doc. No. 157-1.

Considered in full, Defendants' most recent filing presents serious questions and seemingly contradictory information regarding compliance.  DHS itself is highly critical of the "first quarterly report," repeatedly pointing out its weaknesses and omissions with regard to "core elements to the *Jensen* settlement."  (Doc. No. 157-1, Ex. 3.)  In two e-mails included with Defendants' filing, Plaintiffs' Class Counsel also found serious fault with the report, noting that it was "silent" on many issues, and stating, "We do not believe the Report meets the requirements of the Settlement Agreement."  (Doc. No. 157-1, Ex. 2 (June 19, 2012 e-mail).)  Class counsel also requested to be advised of "specific reasons why PRNs[17] are being used at Cambridge," raised "questions and concerns relating to the current license for Cambridge," and protested their not having been notified of a license variance for Cambridge, and expressed concern "involving inconsistency [of the variance] with the Settlement [listing multiple Settlement Agreement requirements as examples]."  (Doc. No. 157-1, Ex. 5 (July 5, 2012 e-mail).)

On July 10, 2012, Plaintiffs Class Counsel responded to the Court's June 26, 2012 letter, expressing concerns about the failure to fill the External Reviewer position and the

---

[17]     PRNs are described in a three-page document dated June 1, 2012, entitled, "Monitoring Visit – PUBLIC" by two special investigators for the Minnesota Department of Health (Doc. No. 156-1) as "a low dose of Ativan for anxiety."  The document went on to state, "[t]he only other PRNs at the facility were medications such as Imodium, ibuprofen, and topical creams."

failure of the Department of Health site visit to address the issues in the Settlement

Agreement.  (Doc. No. 158.)  Class Counsel also raised multiple compliance concerns in

his attachment, "Advocate Concerns Regarding Implementation of *Jensen* Settlement."

(Doc. No. 158-1.)  Several points made include:

- "There are significant advocate concerns about the lack of transfers of people with developmental disabilities at St. Peter and Anoka."

- On staff training, "it is impossible to determine if the training meets the requirements of the Settlement.  We are also advised that advocates have learned that some MSHS staff do not believe the training provided is adequate."

- "There is a noted disparity between the DHS position to the Court that there is no demand to open the second home identified in the settlement and the number of people with developmental disabilities at St. Peter whom advocates believe could possibly benefit from a transfer to this group home."

- "It is also unclear if DHS is using person centered planning and quality of life approaches in transition planning from St. Peter, Anoka, and MSHA-Cambridge as contemplated in the Settlement."

- "We are advised that behavior analysts (including an analyst with a high school diploma) were grandfathered in despite the Settlement requiring certain credentials."

- "We have been advised that some staff have expressed concerns about training documents supporting or condoning the use of chemical restraint, and that clinical directors are not present at the facility."

(Doc. No. 158-1.)

Of course, it is not for the Court to resolve these concerns and questions at this

time.  Consequently, the Court makes no findings of fact regarding the compliance

concerns raised by Plaintiffs.  There is, however, clearly a need for a process to

investigate potentially conflicting information, provide a coherent and complete presentation, and make recommendations to the Court.

The Court approved the Settlement Agreement more than seven months ago.  The External Reviewer has not been engaged, mandated reports have not been filed, and the Court has not been advised regarding the status of compliance with many of the systemic elements of the Settlement Agreement.[18]

More than two months ago, the Court suggested the appointment of a consultant or monitor.  Neither Plaintiffs nor Defendants have questioned Mr. Ferleger's qualifications to perform the monitor role if called upon to do so by the Court.  Significantly, Mr. Ferleger was brought to the Court's attention by the parties months ago as someone who had previously responded to Defendants' pre-settlement request for his advice on fund distribution in this case.  More recently, Defendants have requested Mr. Ferleger's consultation to advise the *Olmstead* Committee under the Settlement Agreement. Plaintiffs seek an expanded formal role for Mr. Ferleger, stating that "Mr. Ferleger's national expertise would be very helpful to facilitate the Settlement in a number of areas." (Doc. No. 153.)  Since that time, the Plaintiffs' Class has questioned the level of compliance in a number of respects.  (Doc. No.157-1, Ex. 5.)

Defendants acknowledge that they expect to have their compliance monitored. Anne Barry, Deputy Commissioner of the Defendant Minnesota Department of Human

---

[18]    *See* note 13 above noting some of the requirements which were not touched on in Defendants' May 14, 2012 report.

Services, affirmed at the settlement approval hearing that Defendants expected external scrutiny in this case:  "First of all, we fully expect that watchfulness and scrutiny.  We are in the business of public service, so we understand we will be watched.  We expect that we will be watched."  (Tr. at 72 (Dec. 1, 2011).)

Appointment of an independent advisor, consultant, or monitor is appropriate in light of the nature and complexity of the Defendants' obligations under the court-approved Settlement Agreement, the fact that Defendants admit they are already in non-compliance with an important element of their obligations (appointment of the "external reviewer"), the gaps and deficiencies in the Defendants' May 14 and July 9, 2012 compliance reports, the failure to file required reports by the External Reviewer, the compliance deficiencies raised by Plaintiffs' Class Counsel, and the special expertise required for effective review of the systemic elements of the Settlement Agreement.

## CONCLUSION

In the Court's view, not only will the interests of judicial economy be served by the appointment of an independent advisor, irrespective of what title is attached to Mr. Ferleger, but it will also serve the public interest as well as the interests of all parties in this case.  Therefore, the Court is appointing David Ferleger as an independent advisor to the Court to assess and monitor the implementation of the Settlement Agreement.  The role of Mr. Ferleger is viewed by the Court as a nonadversarial role and, as such, the Court assumes and expects the parties will cooperate and communicate with

Mr. Ferleger.[19]  The Court expects that David Ferleger, as the Court's independent advisor, will assist and inform the Court on the implementation of the Settlement Agreement's requirements.

The expectation of the Court is that the reporting and monitoring under this order will facilitate a non-adversarial implementation process.  That failing, Mr. Ferleger will make appropriate recommendations to the Court.  The Defendants, at least on the *Olmstead* Plan issue, acknowledge a need for "consultation," apparently not favoring "monitoring."  Mr. Ferleger will certainly provide advice, consultation, and recommendations to the parties, consistent with his role.  However, the Court does not hesitate, for reasons set forth in this order, to acknowledge and affirm its obligation to oversee, facilitate, and, yes, enforce compliance with the terms of this Settlement Agreement that will benefit so many for years to come.  The Court's obligation could not be appropriately fulfilled by relying on a consultant in a more narrow role, as envisioned

---

[19]     *In re Peterson,* 253 U.S. 300, 312-13 (1920) ("Courts have ... inherent power to provide themselves with appropriate instruments required for the performance of their duties.  This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties").  *See, e.g., In re World Trade Center Disaster Site Litigation*, 2008 U.S. Dist. LEXIS 23818 (S.D.N.Y. 2008) ("The importance of these cases is clear, to the litigants and to society.  The ability of the court and counsel to cause them to progress towards resolution with due speed, economy and fairness depend very much on the ways that complex information can be organized and reported, reliably,  responsively and consistently.").

Courts often use monitors or advisors with regard to compliance with complex decrees. *E.g., Labor/Community Strategy Ctr. v. Los Angeles County Metro. Trans. Auth*., 263 F.3d 1041, 1045 (9th Cir. 2001), *cert. denied*, 535 U.S. 951 (2002) (oversight of compliance with Settlement Agreement).  *Harris v. Philadelphia*, 137 F.3d 209, 214 (3d Cir. 1998) (master to monitor city's compliance with consent decree).

by the Defendants, given the current status of noncompliance with important aspects of

the Settlement Agreement and the serious compliance issues that have been raised by the

Plaintiff Class.

    Accordingly, **IT IS HEREBY ORDERED:**

    1.    David Ferleger[20] is hereby appointed as an independent advisor and

monitor pursuant to this order.[21]  The parties shall cooperate fully with David Ferleger,

---

[20]    Mr. Ferleger is highly qualified.  He is a seasoned attorney and author in the field of disability rights, disability class actions (having represented both state defendants and plaintiffs), and in serving the federal courts in several cases as special master, court-appointed monitor, and guardian ad litem. In the guardian ad litem case, he has advised the court regarding a settlement (relevant to this one) involving a monetary payment and systemic change related to institutional abuse, and currently serves as technical advisor for implementation.  He has argued disability rights cases five times in the Supreme Court of the United States and participated in other Supreme Court litigation on disability issues.  Mr. Ferleger is familiar to the parties and the Court; as noted above, he was introduced to the Court by Defendants' counsel during the Settlement Agreement negotiation process and attended the settlement approval hearing.  Also familiar with Mr. Ferleger are Colleen Wieck, Executive Director, Minnesota Governor's Council on Developmental Disabilities, and Roberta Opheim, Ombudsman Office for Mental Health and Developmental Disabilities.  Both assisted the parties in negotiating the Settlement Agreement and both are state officials.  In fact, Mr. Ferleger recently completed for Dr. Wieck's agency suggestions for an outline for the *Olmstead* Plan under the Settlement Agreement.

[21]    In the near future, the Court will enter an order regarding compensation for Mr. Ferleger and the mechanism for payment for his time, expenses, and any consultants. Mr. Ferleger's usual hourly rate for non-contingent work is $450 (it is higher for work in the United States Supreme Court).  However, given the Court's appointment, and the public interest his appointment will serve, he has agreed to a rate of $225.

    Typically, courts impose such costs on any party or parties who have not complied with their obligations in a systemic class action such as the one before the Court.  The Court believes that, at this time, there is an alternative to imposing the independent advisor's initial cost on a party.  The Settlement Agreement reserved $50,000 of the $3,000,000 for "advising counsel" for Class Members and the Court, with regard to safeguarding eligibility for government benefits.  The Court was able to address the

(Footnote Continued on Next Page)

and provide him with access to the facilities, services, programs, data, and documents relevant to the Settlement Agreement.  He may convene meetings, meet relevant individuals and groups, attend case-related court proceedings and review pleadings, motions, and documents submitted to the court.[22]  The parties shall serve Mr. Ferleger with all such papers.  He shall have *ex parte* access to the parties, their counsel and to the Court.  However, in the event there is any information provided to the Court by David Ferleger which is utilized or otherwise relied upon by the Court for any reason relating to compliance with the Settlement Agreement, the Court will provide such information to counsel for the parties.

2.      Defendants shall file within sixty (60) days a status report on implementation of the Settlement Agreement (apart from the fund distribution).  The format and structure for the report shall be developed in cooperation with, and determined by, David Ferleger.

---

(Footnote Continued From Previous Page)
attorney issue without expenditure of any of the $50,000.  The Court expects to utilize this "advising counsel" allocation for costs under this order.
        In the event that the $50,000 is insufficient to fulfill the purposes of this order, the Court reserves the right to allocate the costs of the independent advisor to one or both parties.

[22]      As noted above, Defendants requested Mr. Ferleger to assist them with regard to the *Olmstead* Plan they are drafting.  In his capacity as monitor and advisor, Mr. Ferleger may provide input, recommendations and feedback to the *Olmstead* Committee (which includes both plaintiff and defendant representatives) on its planning, but will not be responsible for the *Olmstead* report content.

3.      The format and structure for the reports of the External Reviewer shall also

be developed in cooperation with, and determined by, David Ferleger.

Dated:  July 17, 2012                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge