# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, guardians and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian and next friend of Jason R. Jacobs; and others similarly situated, | Civil No. 09-1775 (DWF/FLN) |

Plaintiffs,

v.

Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually, and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and State of Minnesota,

Defendants.

**AMENDED ORDER
AND MEMORANDUM**

---

Margaret Ann Santos, Esq., Mark R. Azman, Esq., and Shamus P. O'Meara, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Steven H. Alpert and Scott H. Ikeda, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

Samuel D. Orbovich, Esq., and Christopher A. Stafford, Esq., Fredrikson & Byron, PA, counsel for Defendant Scott TenNapel.

---

The above-entitled matter was last before this Court on March 25, 2013, for a status conference. David Ferleger, the Court's independent advisor and monitor (the "Monitor") was not in attendance at that status conference. Prior to the status conference, the Court filed an Order and Memorandum dated March 19, 2013 ("March 19 Order"). (Doc. No. 205.)

As the Court noted in its March 19 Order and in a January 9, 2013 letter to the parties in response to the agenda that the Court had received and reviewed for the January 14, 2013 meeting of all of the parties with the Monitor, the Court urged the parties to utilize their best efforts to develop an implementation plan that would include tasks, deadlines, persons responsible, and possible amendments to extend the jurisdiction of the Court for an additional period of time, consistent with the discussions that occurred at the December 11, 2012 status conference. (Doc. No. 192.) The Court stressed that the parties should utilize their best efforts to develop and agree on the Monitor's role as well as the budgetary implications of that role. (*Id.*) The Court also offered, in its letter, to get together with the parties if the parties felt that a follow-up status conference would be in everyone's best interests. (*Id.*) Then, on January 23, 2013, the Court sent a follow-up letter, respectfully directing the parties to send a report to the Court as to the status of the case and how to move forward, including any agreements that they anticipated or had

reached.  (Doc. No. 196.)  The Court specifically directed and invited Steven Alpert, Shamus O'Meara, Colleen Wieck, Ph.D., Executive Director of the Minnesota Governor's Council on Developmental Disabilities, and Roberta Opheim, Ombudsman, Office of the Ombudsman for Mental Health and Developmental Disabilities, to make any recommendations or observations about the current status of the case, with or without proposals, including issues of compliance and noncompliance with the Settlement Agreement.  (*Id.*)  At the request of counsel for Plaintiffs and counsel for Defendants, the Court met with the parties on January 24, 2013.  The Monitor was not in attendance.

Much has happened and continues to happen, not only since December 11, 2012, but since the Court's March 19 Order and the status conference held on March 25, 2013. Executive Order 13-01, signed by Governor Mark Dayton, was filed on January 28, 2013. The Court notes that, although an Executive Order was filed four days after counsel met with the Court, there was no discussion of it with the Court by any of the parties prior to its entry, and there has been no explanation since its entry as to its relationship to, or its impact on, the Settlement Agreement, if any.  The Executive Order purports to address *Olmstead* issues, which means that the issuance of the order must have been discussed sometime prior to January 28, 2013, with a number of individuals and departments, including the Minnesota Department of Human Services ("DHS"), as well as perhaps Plaintiffs' counsel.

On January 29, 2013, the day after the issuance of the Executive Order, the Court received a letter from Plaintiffs' counsel, which addressed not only the Monitor's role and Plaintiffs' recommendations for a change in procedural protocol to include quarterly

3

reports, but also recommended that monthly meetings with the Monitor be discontinued as unnecessary.  In response to the January 29, 2013 letter from Plaintiffs' counsel, the Court received a letter dated January 30, 2013, bearing the signature of Steven Alpert, which objected to Plaintiffs' proposal as it related to the Monitor's role.  The Court was then provided with an order drafted by the Monitor entitled "Correction Order," dated February 1, 2013, which involved a November 27-30, 2012 licensing review of the Minnesota Specialty Health System at Cambridge, the purpose of which was to determine its compliance or noncompliance with state and federal laws and rules governing the provision of residential services to persons with developmental disabilities, including not only Minnesota Chapter 245B, but also the licensing variance, effective January 3, 2012. The Court received a stipulation of the parties, dated February 4, 2013, and a proposed order, on or about February 19, 2013, which adopted in substantial part, the parties' stipulation.

In addition to the parties' submissions, the Court received the Monitor's response to the Court's January 23, 2013 letter referenced above.  The Court also received a letter from Deputy Commissioner Ann Barry dated February 19, 2013, which not only asserted compliance with the parties' Settlement Agreement, but also addressed budgetary issues with respect to the Monitor's role as well as objections to his most recent invoice (which the Court addressed in a separate order).  On February 22, 2013, the Court received a Preliminary Report on Client and Staff Safety from the Monitor.  Then, on February 24, 2013, the Court received a letter from Plaintiffs' counsel asserting that they did not concede that the stipulation represented the parties' view of compliance with the

4

Settlement Agreement. The Court received a request on March 4, 2013, from Plaintiffs'
counsel to schedule a conference with the Court to discuss resolution of Plaintiffs'
Motion to Enforce Settlement, as well as the status of the case. At that time, the Court
was informed that counsel for Defendants also agreed to scheduling a conference to
discuss the status of Plaintiffs' Motion to Enforce Settlement. At the March 25, 2013
status conference, the Court agreed to issue an order addressing the role of the Monitor
and to set up a process to promote substantial compliance with the Settlement Agreement
entered in this case on December 1, 2011.

Finally, the Court has learned there is an omnibus DHS bill moving through the
state legislature. Surprisingly to this Court, and without explanation or notice to the
Court as to its relationship to the Settlement Agreement, it appears that DHS has
proposed a ban on all restraint and seclusion, EXCEPT for individuals with
developmental disabilities. Of additional concern in the same bill, there is a proposal to
gather data about emergency use of retraint and seclusion, but rather than release it
simultaneously to DHS and the Ombudsman's Office, it will be reviewed first by DHS.

Based upon the presentations and submissions of the parties, prior to the March 25,
2013 status conference and since that time, including the submissions of the Monitor, and
given the continued concern of this Court relating to the status of the case and ongoing
concerns with noncompliance with the Settlement Agreement of the parties, the Court
having again reviewed the procedural history of this case, and the Court being otherwise
duly advised in the premises, the Court hereby enters the following:

## ORDER

1.     **Role of David Ferleger**

The external reviewer function, as set forth in the Stipulated Class Action Settlement Agreement at paragraph VII.B (External Reviewer) will be subsumed within the Monitor's role as originally set forth in the Court's July 17, 2012 Order, at which time the Court appointed David Ferleger as the Court's independent consultant and monitor.

2.     **Monitor's Investigation and Reports**

The Monitor will independently investigate, verify, and report on compliance with the Settlement Agreement and the policies set forth therein on a quarterly basis.  Those quarterly reports shall inform the Court and the parties whether the Monitor believes, based upon his investigation, without relying on the conclusion of the DHS, that Defendants are in substantial compliance with the Settlement Agreement and the policies set forth therein.  The Court expects the reports to set forth the factual basis for any recommendations and conclusions.

Further, the reports shall set forth whether the DHS is operating consistent with the best practices pursuant to the Settlement Agreement.

Consequently, the Court respectfully declines to accept the parties' stipulation to limit the role of the Monitor.

3.     **Protocol for Status Report**

The first status report shall be submitted on June 5, 2013, with the Monitor leading the effort and all parties assisting in providing input and reports to the Monitor as set forth below:

a.     All parties shall submit their comments to be included in a single document, with any differences to be noted by the Monitor.  The status report will cover all parts of the Settlement Agreement, including the overall goal of settlement.  Further, the status report should provide a full description of whether time lines have been met.  The status report shall also describe any quantitative indicators of compliance, as well as any qualitative issues of compliance, and list any related or collateral issues that directly affect the quality of life of individuals with developmental disabilities.  The Monitor will be the final decision-maker as to what will be included in the status report to be submitted to the Court on June 5, 2013.

b.     The status report shall also review the accuracy of the previous status reports submitted by the DHS that were not reviewed as they relate to the current status of compliance with the Settlement Agreement.  In this regard, the Court is obligated to scrutinize the exhibits containing client records to determine completeness and accuracy.

c.     The status report should also include findings from other groups such as DHS licensing, the Office of Legislative Audit Findings, and the Office of the Ombudsman for Mental Health and Developmental Disabilities.

d.     The Court expects that the individuals who have been previously designated as consultants, namely, Roberta Opheim and

Dr. Colleen Wieck, will provide their comments through Settlement Class

Counsel and be so identified in the status report.

      e.     Further, to the extent prior DHS reports were submitted

without any review or comment by Settlement Class Counsel, in the event

the Monitor questions the integrity and accuracy of the records submitted,

the Monitor is directed to confer with Robert Opheim and Dr. Colleen

Wieck.

      f.     With input and cooperation from Plaintiffs and the DHS, the

Monitor shall set up a time frame for submissions from the parties, in

advance of the Court's final deadline of June 5, 2013.  Further, once a draft

report has been prepared consistent with this Order, the Monitor shall

provide Plaintiffs, the DHS, and the consultants with a copy of the draft

report, prior to issuing it to the Court.  The Plaintiffs and the DHS will then

have ten (10) business days to provide written comment, which will be

submitted to the Court as attachments to the Monitor's final report.  The

report shall be electronically filed on the Court's Electronic Court Filing

system, with appropriate redactions of identities of residents or other

personal data information that is statutorily protected from public

disclosure.  The notice and time line set up for exchange of information

between the Monitor, Plaintiffs and Defendants, and consultants may be

modified by stipulation of all parties concerned.

4.  *Olmstead* **Plan**

Pursuant to the stipulation of the parties as it relates to the *Olmstead* Plan, within sixty (60) days of the date of this Order and Memorandum, the DHS shall establish an Olmstead Planning Committee which will issue its public recommendations within ten (10) months of this Court's Order approving this Agreement.  By November 1, 2013, the State and the DHS shall develop and implement a comprehensive *Olmstead* Plan that: uses measurable goals to increase the number of people with disabilities receiving services that best meet their individual needs, in the "Most Integrated Setting"; and is consistent and in accord with the U.S. Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999).

5.  **Monthly conferences between Plaintiffs and Defendants, including Roberta Opheim, Ombudsman, Office of the Ombudsman for Mental Health and Developmental Disabilities, and Colleen Wieck, Ph.D., Executive Director, Governor's Council on Developmental Disabilities**

Pursuant to the agreement of the parties, explained to the Court at the March 25th status conference, the parties shall meet on a monthly basis to promote the implementation of the Settlement Agreement.  These meetings will not include the Monitor.

6.  **Budget for the Monitor through July 15, 2013**

The Court respectfully directs Deputy Commissioner Ann Barry and David Ferleger to meet and to utilize their best efforts to agree on a budget through July 15, 2013, in the context of the role of the Monitor.  Furthermore, in the event the parties want

to discuss further a budget for the balance of 2013, the Court so approves.  In the event the parties are unable to reach an agreement as to that budget at least for the time period through July 15, 2013, upon being so notified, the Court, without further delay, will establish that budget.

7.    Given the Court's continued concern with Defendants' compliance with the Settlement Agreement, as the Court noted in its December 19, 2013 Order, the Court expressly reserves the right to request the assistance of the United States Department of Justice Civil Rights Division with respect to compliance issues with the Settlement Agreement and the orders of this Court.

Dated:  April 25, 2013           s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge


## MEMORANDUM

The Court will not repeat the observations that it has made in its prior Orders and Memoranda.  (*See* Doc. Nos. 159, 188, 204.)

It is obvious by this Order and Memorandum that the Court continues to be extremely concerned that a large number of individuals with developmental disabilities, their families, friends, and loved ones will soon be before this Court proclaiming that nothing has changed significantly since December 1, 2011.  The Court remains hopeful that the parties are still willing to carry out the intent of the Settlement Agreement, which was to benefit a large number of individuals with disabilities in a truly meaningful and significant way.  Whether that is happening, or will happen, remains to be seen.

Unrelated to compliance issues and the status of this case, the Court will end its memorandum on a sad, but honorable and respectful note.  This is the first Order and Memorandum that this Court has entered in this case that does not identify P. Kenneth Kohnstamm as an attorney of record for the Defendants.  P. Kenneth Kohnstamm passed away on April 4, 2013.  Ken Kohnstamm was a true credit to the legal profession and a good, decent, and caring man who wanted to improve the world around him, which he did.  In doing so, he enhanced the image of the profession and served the interests of justice and the public in everything that he did, both in his personal and professional life.

Ken set an example for us all.  There is no more significant way that we could honor this true warrior of justice and his memory than to carry out the intent and spirit of this Settlement Agreement and, in doing so, improve the lives of individuals with developmental disabilities, and set an example for the rest of the country, as promised by the parties during the hearing on the Settlement Agreement on December 1, 2011.

D.W.F.