# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, guardians and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian and next friend of Jason R. Jacobs; and others similarly situated, | Civil No. 09-1775 (DWF/FLN) |
| Plaintiffs, | |
| v. | **AMENDED ORDER AND MEMORANDUM** |
| Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually, and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and State of Minnesota, | |
| Defendants. | |

Margaret Ann Santos, Esq., Mark R. Azman, Esq., and Shamus P. O'Meara, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Steven H. Alpert and Scott H. Ikeda, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

Samuel D. Orbovich, Esq., and Christopher A. Stafford, Esq., Fredrikson & Byron, PA, counsel for Defendant Scott TenNapel.

---

On April 25, 2013, the Court issued an Amended Order and Memorandum ("Order of April 25, 2013") in this matter and again expressed its continued concern over the status of the case and its ongoing concern with noncompliance with the Settlement Agreement by the Defendants. (Doc. No. 212.) The Court remains concerned with the status of compliance or noncompliance by the Defendants with the provisions of the Stipulated Class Action Settlement Agreement ("Settlement Agreement"), (Doc. No. 104), and its impact on the individuals with developmental disabilities who are Class Members and, in light of the promises made by the parties at the December 1, 2011 hearing for final approval of the Settlement Agreement, the promises and representations to all individuals with developmental disabilities.

Based upon the presentations and submissions of the parties since the Court's Order of April 25, 2013, including the submissions of the Court Monitor, and given the continued concerns of this Court, as noted above, relating to the status of the case and ongoing concerns with noncompliance with the Settlement Agreement by the Defendants; the Court having again reviewed the procedural history of the case; and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

**ORDER**

1.  **Extension of Jurisdiction**

The Court, having been advised by the Court Monitor that the parties have agreed that the Court's retention of jurisdiction over the above-entitled matter may be extended for an additional year to December 4, 2014, beyond the current December 4, 2013 date, pursuant to Section XVIII.B. of the Settlement Agreement, the Court hereby extends its jurisdiction over this matter to December 4, 2014. However, the Court expressly reserves the authority and jurisdiction to order an additional extension of jurisdiction, depending upon the status of compliance by the Defendants with the specific provisions of the Settlement Agreement, absent stipulation of the parties.

2.  On or before October 15, 2013, the Minnesota Department of Human Services ("the DHS") shall submit a proposed Implementation Plan for the Court's review and approval, having first submitted by October 4, 2013 a draft of the proposed plan to the Court Monitor and the Plaintiffs. The Implementation Plan shall encompass the Settlement Agreement requirements (aside from Rule 40 and the *Olmstead* Plan), shall be keyed to the Evaluation Criteria as set or amended by the Court Monitor, and shall include: tasks, specific deadlines for each task, persons responsible, anticipated obstacles or challenges, actions to be taken to overcome such obstacles or challenges, and resources required. The Implementation Plan shall also include a separate chronological timetable of tasks and deadlines to facilitate tracking and reporting. The Implementation Plan format shall be subject to approval by the Court Monitor and submitted to him forthwith. Monthly updates to the Implementation Plan shall include activities

undertaken pursuant to the Plan, documentation of such activities, and any requests for modification of the Plan's deadlines or other elements.

3. With regard to the replacement of the Cambridge facility with community-based services, the Implementation Plan required above shall separately include: (a) a timetable for all tasks and activities; (b) identification of resources to be reallocated to the community services, including funding and staffing for such services; (c) the nature, quantity and location of the community-based services (residential and non-residential), sufficient to serve current Cambridge clients and those who would otherwise be served if the Cambridge facility had been maintained; and (d) a description of the mechanisms through which the DHS will carefully track and monitor the replacement process. The monthly updates to this section of the Implementation Plan shall provide the above information, as then current, together with information, including Settlement Agreement-required Transition Plans, for each person who leaves the Cambridge facility on or after the date of this Order. The monthly updates shall also include activities undertaken pursuant to the Plan, documentation of such activities, and any requests for modification of the Plan's deadlines or other elements.

4. With regard to implementation of the Rule 40 modernization, on or before October 30, 2013, the DHS shall submit a proposed Rule 40 Implementation Plan for the Court's review and approval, having first submitted by October 15, 2013 a draft of the proposed plan to the Court Monitor and the Plaintiffs. The Rule 40 Implementation Plan shall comply with the DHS' own commitment, that is, that it will "[d]evelop an implementation plan that adopts the recommendations of the Advisory Committee,

including a phased implementation plan that provides for the necessary training and technical assistance to support best practices, and a plan for the oversight, and monitoring of provider practices and any emergency use of restraint or seclusion."[1]  It shall include: tasks, specific deadlines for each task, persons responsible, anticipated obstacles or challenges, actions to be taken to overcome such obstacles or challenges, and resources required.  The Rule 40 Implementation Plan shall also include a separate chronological timetable of tasks and deadlines to facilitate tracking and reporting.  The Rule 40 Implementation Plan format shall be subject to approval by the Court Monitor.  Monthly updates to the Implementation Plan shall include activities undertaken pursuant to the Plan, documentation of such activities, and any requests for modification of the Plan's deadlines or other elements.

     5.     With regard to implementation of the *Olmstead* Plan, which is due from the State and the DHS by November 1, 2013 for the Court's review and approval, the State and the DHS shall submit a proposed Implementation Plan within the *Olmstead* Plan.  The *Olmstead* Plan shall also include a separate chronological timetable of tasks and

---

[1] From the "Department's Closing Words," *Rule 40 Advisory Committee Recommendations on Best Practices and Modernization of Rule 40, Final Version* (July 2, 2013) at 36 (Doc. No. 219):

> Among other steps, the Department will seek legislative and rule changes pursuant to the Recommendations, and will "[d]evelop an implementation plan that adopts the recommendations of the Advisory Committee, including a phased implementation plan that provides for the necessary training and technical assistance to support best practices, and a plan for the oversight, and monitoring of provider practices and any emergency use of restraint or seclusion."

deadlines to facilitate tracking and reporting and for regular updates to the Court setting forth the status and progress in implementation.  Updates to the *Olmstead* Implementation Plan shall include activities undertaken pursuant to the Plan, documentation of such activities, and any requests for modification of the Plan's deadlines or other elements.

6.	Any requests for modification of due dates under the above provisions of this Order and Memorandum, or for modification of the Plans' deadlines or other elements, shall be in writing, for good cause shown, and shall, in the first instance, be addressed and resolved by the Court Monitor, subject to review by the Court on written application by any party.

7.	In light of the pending replacement of the Cambridge facility, and the submission by Defendants of implementation plans under this Order and Memorandum, the Court Monitor need not submit a comprehensive quarterly report this Fall, 2013, but may submit compliance or other reports which may advise the Court on matters of concern.  After submission of the DHS's Implementation Plan under Paragraphs 2 and 3 above, the Court Monitor is requested to provide the parties and the Court with a monitoring plan, which may address resumption of quarterly and other reports.

8.	The Court specifically and respectfully directs the Court Monitor and Deputy Commissioner Anne Barry to discuss and seek an agreement on the amount of an additional deposit to the Court's Registry to not only accommodate the additional responsibilities of the Court Monitor, as described herein, but to carry out the provisions

of the Settlement Agreement in the best interests of all parties concerned, absent stipulation of the parties and approval of the Court.

Dated: August 28, 2013        s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      United States District Judge

## MEMORANDUM

The historic settlement in this litigation was hailed by Plaintiffs and Defendants alike as one which would fundamentally improve the lives of individuals with disabilities in Minnesota and serve as a national model. The settlement's innovations were both with regard to replacement of mechanical and other restraints with positive behavioral supports and development of a comprehensive all-disabilities plan to implement the Supreme Court's decision under the Americans with Disabilities Act in *Olmstead v. L.C.,* 527 U.S. 581 (1999).

While there has been some progress, the results thus far have been disappointing and have been attended by non-compliance with the order approving the settlement. This Order and Memorandum sets forth some of the background, summarizes elements of the non-compliance and Defendants' failure to fulfill their obligations in a timely manner, and, in lieu of contempt and other sanctions, requires the submission of specific implementation plans for the Court's review and approval.

On July 17, 2012, seven months after approval of the Settlement Agreement in this case, the Court found that Defendants had not complied with an important element of its obligations and that there were gaps and deficiencies in Defendants' reporting and the

7

Court appointed David Ferleger as its "independent advisor to the Court to assess and monitor implementation of the Settlement Agreement." Order of July 17, 2012 at 11 (Doc. No. 159).

Almost a year later, on June 11, 2013, the Court Monitor filed the *Independent Consultant and Monitor: Status Report on Compliance* (June 11, 2013) (Doc. No. 217) (hereafter, "*Status Report on Compliance*," a 149-page report bound with 113 pages of appendices, together with a separate voluminous volume of exhibits). The Court Monitor rated 57 items as in compliance and 31 in non-compliance. Significantly, 59% of the items in the Quality of Life category were found in substantial non-compliance.

Plaintiffs responded to the *Status Report on Compliance* that Defendants have a "long history of non-compliance and failure to properly implement the Settlement Agreement" and that "further reliance on DHS to properly and timely implement the Settlement Agreement places at risk the Settlement Class and the rights of people with developmental disabilities affected by the Settlement Agreement." Defendants agreed that there is "still work to be done" to achieve compliance:

> The Department believes it has significantly improved the care and treatment provided to individuals with developmental disabilities, including but not limited to the individuals residing at Minnesota Specialty Health Services – Cambridge and MSOCS Transition Home (collectively "Cambridge"). However, the Department recognizes that there is still work to be done. As further discussed below, the Department is actively working to address the concerns raised in the Report, and strives to achieve and maintain substantial compliance with the terms of the Settlement Agreement in the coming months.[2]

---

[2] Defendants' letter to the Monitor, June 4, 2013, at 1, attached to *Monitor's Status Report on Compliance* at 215.

8

On non-compliance, Defendants candidly agree with the Monitor's non-compliance assessments with regard to their:

    a.      Failure to hire Behavior Analysts with the required professional qualifications (EC 84A).[3]

    b.      Failure to timely issue *Olmstead* Committee recommendations (EC 86).

    c.      Failure to have the Cambridge facility licensed for months, and failure to inform the Court and Plaintiffs of that status (EC 1A).

    d.      Failure to timely notify all parties of restraint use in January 2012 (EC 32-38 and EC 41).

    e.      Failure to document reasons for visitor restrictions for a Cambridge resident (EC 66 and 68).

    f.      Failure to eliminate references to the term "mental retardation" on its website (EC 99),

    g.      Failure to post the Health Care Bill of Rights, and to do so in understandable language (EC 72 and 73).

In addition, Defendants do not contest the Court Monitor's non-compliance findings with regard to (a) the fundamental quality of life indicators of compliance at the Cambridge facility with the requirements of the Supreme Court's decision in *Olmstead* and the settlement's requirement to consistently employ professional best practices in its

---

[3] Shortly after his appointment, the Court Monitor extracted 100 evaluation criteria from the Settlement Agreement text. The Court Monitor and the parties have utilized these numbered Evaluation Criteria ("EC") to identify specific topics through which compliance may be reported and assessed.

9

treatment and care of its residents (EC 2 and EC 3); and (b) the transition planning

requirements (EC 54-60).[4]

"As the Court expressed in its Order of July 17, 2012, appointing the monitor, the

Court expects its orders to be implemented fully and promptly." Order of November 5,

2012 (Doc. No. 178). Defendants are not free to defer or to pick and choose which

provisions and directives of the Settlement Agreement to comply with. The Court has an

"obligation to oversee, facilitate, and, yes, enforce compliance with the terms of this

Settlement Agreement that will benefit so many for years to come." Order of July 17,

2012 at 12. (Doc. No. 159). *See* Order of December 20, 2012 at 3 (Doc. No. 188) (same).

The Court continues to be extremely concerned with the sluggish pace of

implementation of the specific terms of the Settlement Agreement and the resulting

noncompliance.[5] Months ago and more recently, the Court critiqued the uncontested

deficits in compliance. Order of December 20, 2012 (Doc. No. 188) (setting status

conference on compliance); Order of March 19, 2013 at 6 (Doc. No. 205) ("lack of

---

[4] With regard to Transition Planning, the Court Monitor found that Defendants failed to (1) ensure the most integrated appropriate setting for each of its residents (EC 54); (2) actively pursue discharge with transition plans (EC 55); (3) ensure that each resident's family is actively involved in the transition planning (EC 56); (4) engage in person-centered planning at each transition stage (EC 57); (5) work to honor each resident's choice (EC 58); (6) demonstrate its best efforts for placement alternatives (EC 59); and (7) implement transition planning in accordance with Olmstead (EC 60).

[5] "The Court deems this an opportune and appropriate time to consider the pace of Defendants' implementation of the obligations they undertook both as to the facility and system-wide, including but not limited to community integration under *Olmstead v. L.C.*, . . . ." Order of November 5, 2012 at 2 (Doc. No. 179) (setting status conference). *See Letter to Parties*, November 12, 2012 (Doc. No. 184) (noting review of pace of implementation).

progress that has been made since the hearing on December 1, 2011" to approve the settlement); Order of April 25, 2013 at 10 (Doc. No. 212) (Court's continued concern with Defendants' compliance with the Settlement Agreement.").[6] Due to concern regarding Defendants' non-compliance, the Court informed the parties that the Court Monitor's focus would shift from a mediation approach to an evaluative approach of rendering opinions and conclusions on compliance. Order of March 19, 2013 at 5 (Doc. No. 205). This was confirmed the following month. Order of April 25, 2013 (Doc. No. 212) (directing compliance investigations and reports).

For months, the Court has, without success, sought Defendants' voluntary establishment of an implementation plan for the Settlement Agreement. *E.g.*, Court's Letter to the Parties of January 9, 2013 (Doc. No. 192) ("[t]he primary purpose of this letter is to urge all of the parties to do their best to develop an implementation plan. . . ."); Order of March 19, 2013 at 2 (Doc. No. 205) (urging development of implementation plan). The Court Monitor has echoed concern over the absence of such a plan. *Monitor's Response to Court's January 23, 2013 Letter* at 5 (Feb. 4, 2013) (Doc. No. 198) (no implementation plan exists; "Defendants have not yet put sufficient shoulders to the *Jensen* wheel."); *Status Report on Compliance* at 40 ("There is no roadmap for implementation of the settlement agreement.").

---

[6] Months before his June 11, 2013 *Status Report on Compliance*, the Court Monitor expressed concern. *See, e.g.*, *Monitor's Response to Court's January 23, 2013 Letter* at 4-6 (Feb. 4, 2013) (Doc. No. 198) (stating areas of non–compliance, including those conceded by Defendants).

11

For several reasons, it is evident that heightened supervision of Defendants' actions is appropriate at this time. Two reasons are set forth above: compliance continues to be insufficient and Defendants have not established a comprehensive implementation plan.[7] In addition, as explained below, Court must take into account the planned closure of the Cambridge facility and the implementation of the Rule 40 modernization and the *Olmstead* Plan.

The Cambridge facility's annual budget for FY 2013 is $4,123,678. Its FY 2013 *per diem* rate *per* client is $1,264 per day per client. Unlike other state-operated institutions, Minnesota does not receive any federal reimbursement for MSHS-Cambridge. *Status Report on Compliance* at 12. With the completion of the Court Monitor's June 11, 2013 *Status Report on Compliance*, Defendants announced that the Cambridge facility would be replaced with community services.[8] This is not a particular surprise. The Settlement Agreement itself contemplated that it would continue to apply to "any successor" to METO.[9] It is critical that Defendants set forth for the

---

[7] The "action plan," which Defendants promised in response to the monitor's *Status Report on Compliance*, is not described as comprehensive as to either the basic terms of the Settlement Agreement or the Rule 40 modernization and *Olmstead* Plan which the settlement incorporates.

[8] The Defendants intend to develop "individually tailored services and supports that safely support individuals in the most integrated setting" and to "repurpose Cambridge's campus-based facility." "This will be accomplished by reallocating resources to community- based services. . . ." Defendants' June 4, 2013 Letter to the Court Monitor, at 2 and 8, Appendix to Court Monitor's *Status Report on Compliance*.

[9] *E.g.,* Settlement Agreement, Section III (definition of "scope") and Section IV ("Any successor to METO shall . . . ." The Rule 40 changes and the *Olmstead* Plan, of course, apply to such successors.

Court's review a detailed plan for the closure which will ensure that current Cambridge residents and the residents of replacement services will be served in compliance with the requirements of Section IV of the Settlement Agreement,[10] the Transition Plan requirements at Section VIII, and the other relevant provisions of the Settlement Agreement. Additionally, Defendants will advise the Court whether and how the funds currently allocated to Cambridge, and/or other resources, will–in Defendants' own words–be "reallocated to community-based services."[11]

The settlement requires implementation of two state-wide initiatives: the *Olmstead* Plan and the Rule 40 modernization. Defendants will be required to submit implementation plans for these efforts. The *Olmstead* Plan was not completed by its original due date and is now due from the State and the DHS by November 1, 2013.[12] The all-disability state-wide changes under that plan are expected to be substantial. The Rule 40 blueprint was completed very recently and is yet to be implemented. It is titled

---

[10] Section IV requires compliance with *Olmstead*, person-centered planning principles and positive behavior support consistent with applicable best practices, licensure to serve people with developmental disabilities, and to only serve Minnesotans who meet the admission criteria set forth in that paragraph.

[11] The settlement provides that State Operated Community Support Services ("CSS") "will be expanded in an effort to deliver the right care at the right time in the most integrated setting for people with developmental disabilities" in accordance with the U.S. Supreme Court decision in *Olmstead v. L.C.*" Settlement Agreement, Section X.A. Also, Section X.B. *Olmstead v. L.C., id.*

[12] "By November 1, 2013, the State and the DHS shall develop and implement a comprehensive *Olmstead* Plan that: uses measurable goals to increase the number of people with disabilities receiving services that best meet their individual needs, in the "Most Integrated Setting"; and is consistent and in accord with the U.S. Supreme Court's decision in *Olmstead*. Order of April 25, 2013 at 9 (Doc. No. 212). The November 1, 2013 date is five months after the due date under the Settlement Agreement.

13

*Rule 40 Advisory Committee Recommendations on Best Practices and Modernization of Rule 40, Final Version* (July 2, 2013) ("Recommendations") (Doc. No. 219). A lengthy implementation effort is anticipated.[13]

The Court Monitor's responsibilities have changed in light of the Defendants' recent decision to close the Cambridge facility, together with the establishment of successor facilities, preparation for monitoring implementation of the Rule 40 initiative and the *Olmstead* Plan, and the related review of Anoka Regional Treatment Center and Minnesota Security Hospital and of former METO and Cambridge residents in the community recently directed by the Court. *Letter to Court Monitor*, August 5, 2013 (Doc. No. 220). Consequently, the Court directs the Defendants and the Court Monitor to discuss the current budget for 2013 with the goal of modifying that budget to accommodate the changes noted herein.

As the Court noted in its Order of April 25, 2013, it will not repeat the observations it made in prior orders and memorandums. (Doc. Nos. 159, 188, 204, 212.)

---

[13] From the "Department's Closing Words," *Rule 40 Advisory Committee Recommendations on Best Practices and Modernization of Rule 40, Final Version* (July 2, 2013) at 36 (Doc. No. 219).

> Among other steps, the Department will seek legislative and rule changes pursuant to the Recommendations, and will "develop an implementation plan that adopts the recommendations of the Advisory Committee, including a phased implementation plan that provides for the necessary training and technical assistance to support best practices, and a plan for the oversight, and monitoring of provider practices and any emergency use of restraint or seclusion.

The Court continues to be extremely concerned with the lack of progress in carrying out not only the provisions of the Settlement Agreement that were announced in the courtroom on December 1, 2011, but, frankly speaking, as the Court has noted before, large number of individuals with developmental disabilities, their families, friends, and loved ones have either lost faith in the Court and the parties involved in this case or will lose faith and trust in the immediate future if, for whatever reasons, the parties do not carry out the intent of the provisions of the Settlement Agreement which were truly intended, as everyone knows, to benefit individuals with disabilities in a truly sincere, meaningful, and significant way. Hopefully, that can be done without an order to show cause or contempt proceedings so that the resources of all parties concerned can be focused on individuals with developmental disabilities in the communities within which they are living or hope to be living. The intent and the spirit of the Settlement Agreement requires no less. Justice requires no less.

D.W.F.