UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, Guardians and next friends of Bradley J. Jensen, *et al.*, | Civil No. 09-1775 (DWF/FLN) |
| Plaintiffs | |
| v. | |
| Minnesota Department of Human Services, an agency of the State of Minnesota, *et al.*, | |
| Defendants. | |

**RECOMMENDATION TO THE PARTIES:
TRANSITION PLANNING AND THE RE-PURPOSING OF MSHS-CAMBRIDGE**

/s David Ferleger
Court Monitor

Archways Professional Building
413 Johnson Street
Jenkintown, PA 19046
Phone: (215) 887-0123
Fax:    (215) 887-0133
david@ferleger.com

September 23, 2013


TABLE OF CONTENTS

I.   PURPOSE                                                              3

II.  INTRODUCTION                                                         3

III. THE SETTLEMENT AGREEMENT                                             4

IV.  THE MONITOR'S *STATUS REPORT ON COMPLIANCE*                          6

     A.   County Case Management and
          State Court Involvement                                         6

     B.   Further Findings                                                7

V.   DHS' FINDINGS REGARDING CAMBRIDGE AND
     TRANSITION PLANNING                                                  8

VI.  CONCLUSION                                                          10

**Schematic:**
**Settlement Agreement Provision on Transition Planning**           f. 4

# RECOMMENDATION TO THE PARTIES:
## TRANSITION PLANNING AND THE RE-PURPOSING OF MSHS-CAMBRIDGE

### I. PURPOSE

The Department of Human Services has announced that it is "re-purposing" MSHS-Cambridge and will provide community residences, protections, supports and services to the individuals current at Cambridge. About eight individuals currently live at Cambridge.

This recommendation is intended to serve as a resource for the Department as it implements the evaluation criteria and Cambridge Closure implementation plan under the Order to August 28, 2013. This report is also intended to encapsulate past and current Transition Plan concerns.

Extreme care is required in fulfilling the Department's transformation of Cambridge to its re-purposed role in the community. MSHS-Cambridge replaced METO which was established 15 years ago in 1998. A transformational outlook would be beneficial. Clients leaving Cambridge must not "fall through the cracks" or enter a revolving door to another institution. Section VI below offers some suggestions.

### II. INTRODUCTION

As the Court Monitor has previously advised the Court, it is critical that placement planning and implementation be accomplished appropriately. Whatever timeline the Department adopts for these placements must provide for such planning. Whatever implementation mechanisms the Department adopts, they should ensure involvement and cooperation of any involved counties and provider agencies, stat courts, as well as adequate staff and other resources.

The Court recently highlighted non-compliance with Transition

Planning requirements[1] and described the "critical" need that the Department's closure plan

> ensure that current Cambridge residents and the residents of replacement services will be served in compliance with the requirements of Section IV of the Settlement Agreement, the Transition Plan requirements at Section VIII, and the other relevant provisions of the Settlement Agreement.[2]

The concerns are not new:

- About a month after his 2012 appointment, the Court Monitor expressed concerns regarding transition planning for Cambridge clients. The Court Monitor raised questions regarding "Transition Planning" about a number of clients.[3] The concerns included, among other things, three individuals with readmissions to METO and/or MSHS-Cambridge.

- Four months ago, the Court Monitor found DHS to be deficient with regard to Transition Planning.[4]

- DHS, through its Internal Reviewer, has repeatedly found Transition Planning deficiencies with regard to individuals admitted and discharged from MSHS-Cambridge, including his most recent July and August 2013 monthly reports.

### III.   THE SETTLEMENT AGREEMENT

Section VIII of the Settlement Agreement, titled "Transition Planning," speaks to entitlements of "each individual" regarding how and where they are served. That provision speaks to the need for "adequate and appropriate <u>transition plans, protections, supports, and services</u>" (that is, <u>not</u> solely transition plans), and also to elements of the process for securing what is

---

[1] *See* Order of April 28, 2013 at 9-10 and n. 4 (Defendants do not contest non-compliance findings with Transition Planning requirements, and quoting
[2] *Id.* at 12 (notes omitted).

[3] Court Monitor, *Query: Coverage of Residents Under Section IX • Transition Planning*, For discussion 8/21/12.

[4] Court Monitor, *Status Report on Comp*liance (June 22, 2013).

4

# Schematic:
# Settlement Agreement Provision on Transition Planning





required. (emphasis added).[5]

Even the best person-centered written plan is insufficient for compliance. The transition plan and its process are a means to assure a quality of life for the individual. The State "shall provide" adequate and appropriate protections, supports, and services.

After placement, the Court expects there to exist "mechanisms through which the DHS will carefully track and monitor the replacement process."[6] Order of August 28, 2013 at ¶3(d).

---

[5] Section VIII states:

> The State shall undertake best efforts to ensure that each resident is served in the most integrated setting appropriate to meet such person's individualized needs, including home or community settings. The State shall actively pursue the appropriate discharge of residents and provide them with adequate and appropriate transition plans, protections, supports, and services consistent with such person's individualized needs, in the most integrated setting and where the individual does not object. Each resident and the resident's family and/or legal representative shall be permitted to be involved in the team evaluation, decision making, and planning process to the greatest extent practicable, using whatever communication method he or she prefers. To foster each resident's self-determination and independence, the State shall use person centered planning principles at each stage of the process to facilitate the identification of the resident's specific interests, goals, likes and dislikes, abilities and strengths, as well as support needs. Each resident shall be given the opportunity to express a choice regarding preferred activities that contribute to a quality life. The State shall undertake best efforts to provide each resident with reasonable placement alternatives. It is the State's goal that all residents be served in integrated community settings with adequate protections, supports, and other necessary resources which are identified as available by service coordination. This paragraph shall be implemented in accord with the U.S. Supreme Court's decision in *Olmstead v. L.C.,* 527 U.S. 582 (1999).

[6] Order of August 28, 2013 at ¶3(d). The implementation plan is to describe those mechanisms.

5

IV.   THE MONITOR'S *STATUS REPORT ON COMPLIANCE*

A.   **County Case Management and State Court Involvement**

Among the overarching issues identified in the Court Monitor's *Status Report on Compliance* is "Integration with County Case Management." The Monitor found, "Gaps between the County service systems and DHS hinder effective and timely transition planning and the development of appropriate individual placements"[7] The report's executive summary stated:

> There is a pressing need for resolution of inadequacies in community services which result in a) referrals and commitments to MSHS-Cambridge which may not be necessary, and b) additional time in residence at Cambridge after Cambridge staff refer the client for community placement.[8]

For those clients to be placed from Cambridge in the coming months, such county involvement "is essential," the report stated.[9]

Implementation of Transition Planning also implicates the role of state courts. State courts commit individuals to the Department's Commissioner who is responsible for the individual's care. The state judicial system is cognizant of MSHS-Cambridge's current role and needs to be educated in the changes planned by the Department. The Monitor's June 2013 report noted the need for immediate outreach to the state courts:

> Outreach to the judicial system to inform judges of possibilities for positive change in Cambridge clients' lives, and to explain the *Jensen* and *Olmstead* mandates, can occur now, and need not await an *Olmstead* Plan.

With regard to the Cambridge re-purposing, the Monitor's status

---

[7] *Status Report on Compliance* at 104, ¶5.

[8] Court Monitor, *Status Report on Compliance* at 17 (June 22, 2013).

[9] "With the re-purposing of the Cambridge facility, strengthening the counties' involvement in the person-centered *Olmstead* compliance efforts is essential." *Status Report on Compliance* at 17 (June 22, 2013).

6

report urged DHS to address the County and state court concerns in advance of the *Olmstead* Plan's issuance. The *Olmstead* obligations for residents of Cambridge and its successors were effective upon the approval of the settlement agreement.[10] "While the *Olmstead* Plan will surely address these issues state-wide, the Monitor urges DHS to begin now to consider how it will move on this proactively."[11]

### B.     Further Findings

The *Status Report on Compliance* also offered suggestions for orientation of individual transition plans to successful community outcomes:

> For transition plans, we recommend goal statements be made in terms of measureable outcomes, such as: "Bill will obtain competitive employment in the hotel industry." "Jeremy will live with two compatible roommates in house in Cambridge given staff support for...." From these goal statements, all other treatment plans can be derived. For example, functional assessments and behavior support plans can be linked to long-term outcomes and activities to support a preferred quality of life could be identified. Transition plans can identify services that will promote access to these goals.  Making  person-centered planning principles the focal point,  will facilitate the integration of all plans toward common outcomes in integrated  community  settings.[12]

Also, the report highlighted the relationship between transition plans and positive behavior support plans:[13]

---

[10]  Section IV ("Any successor to METO shall: (1) comply with the U.S. Supreme Court decision in *Olmstead v. L.C.*, 527 U.S. 582 (1999); . . . .").

[11]  *Status Report on Compliance* at 44 (June 22, 2013).

[12] Dr. Linda Bambara and Dr. Fredda Brown, *Report Regarding Use of Positive Behavior Supports and Person-Centered Planning at MSHS-Cambridge,* appendix to David Ferleger, Status Report on Compliance (June 22, 2013).

[13]  *Id.*

7

> To the extent that individuals need positive behavior support plans (and not just person-centered life plans for community life), be sure that support plans include all key elements according to the APBS' standards of practice. This includes functional behavioral assessments and individualized interventions and supports that are clearly linked to hypotheses for problem behaviors and quality of life outcomes. Interventions should be driven by hypotheses for problem behaviors informed by functional assessments and individual's preferred life, and not driven by available treatment programs. Decisions about program development and modification should be data-based.

The psychiatrist consultant's findings were similar, noting that absence of community services is contributing to prolonged unnecessary institutionalization:[14]

> The facility indicates that "Discharge planning begins at admission" and the available documentation supports this assertion. This planning also includes the individual and their family. However, the Treatment Team frequently concludes that the individual is ready for community placement several weeks to months prior to the identification of a community placement that will accept them. The deficits identified earlier in this report contribute to those delays, as does the lack of sufficient number of community programs that are designed to serve individuals with these profiles.

## V.  DHS' Findings Regarding Cambridge and Transition Planning

DHS, through its Internal Reviewer, has repeatedly found deficiencies with regard to individuals admitted and discharged from MSHS-Cambridge, including the most recent July and August 2013 situations.

The Internal Reviewer's reports repeatedly quote the Transition Planning settlement agreement requirement in full, and has consistently reported the failure of Cambridge to comply. For example, the Internal

---

[14] Dr. Edwin J. Mikkelsen, *Review of the Psychiatric and Habilitative Services: Minnesota Specialty Health Services*, Cambridge, Minnesota, , appendix to Court Monitor, *Status Report on Compliance* at 42 (June 22, 2013).

8

Reviewer's August 2013 report states:[15]

> There was one admission and one discharge during this reporting period. Neither the admission nor the discharge was processed within the parameters of *Olmstead*.

The August 2013 situations described by the Internal Reviewer exemplify the concerns expressed in the Court Monitor's June 22, 2013 *Status Report on Compliance.*

> **A.M.**
> MSHS-Cambridge was first contacted regarding A.M. in December 2012 following recommendations by her psychologist and psychiatrist for admission to METO. Although DHS knew of her needs for the 7 months until her August 14, 2013 admission, the system failed her:[16]
>
> The human services system failed to effectively support Ms. M during that opportunity, eventuating her discharge from the locked community private provider placement and her admission to a community-based psychiatric bed and then MSHS-Cambridge. There was ample opportunity to bring effective services to bear consistent with *Olmstead*, and it appears to have not happened.
>
> **M.R.**
> M.R. was discharged from MSHS-Cambridge on August 9, 2013. * * * Arranging his placement did not include a county focus on what is important to Mark. In this regard, the aspirations of *Olmstead* did not influence the design or development of Mark's community placement.

The absence of a mechanism to permit the responsible county to properly plan and implement is noted in the Internal Reviewer's report for July 2013:

> **M.D.**
> M.D. was sent to jail following his most recent hearing; he was

---

[15] Richard Amado, Ph.D., *Internal Reviewer Monthly Report, Reporting Period: August 2013*, at 1.

[16] Richard Amado, Ph.D., *Internal Reviewer Monthly Report, Reporting Period: August 2013*, at 1-2.

found competent under Rule 20. He had previously stated his preference to go to jail and be done with the courts. He will likely need some sort of support/assistance when he leaves jail. However, he is beyond the reach of MSHS-C at this time. The county now bears responsibility to begin planning for his discharge from jail on 26 December 2013. The period between now and December 26 provides the case management county an opportunity to engage in person centered planning; create a plan, and develop supports. However there is no mechanism to assure that is happening at this time.

## VI. CONCLUSION

The Settlement Agreement's Transition Planning requirements anticipate outcomes for Cambridge residents (and others) which will provide a positive and supportive quality of life. It is not simply a paper process. And the process is not fulfilled simply by person-centered meetings or completed forms. Implementation is key. Where a county and provider agency are involved, that involvement is expected to comply with the expectations set by the Court. However, as the DHS Internal Reviewer noted, at this time "there is no mechanism to assure" that the case manager county is engaged in person-centered planning, creating a plan, or developing supports.

The re-purposing and closure of the Cambridge facility should, of course, be driven by what works for people.  Community capacity is fostered not simply by building or leasing homes, but by such measures as use of local excess bed capacity for crisis situations, providing wrap-around staff to come into homes to support staff and clients when needed, mobile expert teams dedicated to prevent re-institutionalization, and the like.

The settlement agreement itself anticipates such mechanisms.[17] The

---

[17] Section X.A.a. ("long term monitoring of individuals with clinical and situational complexities in order to help avert crisis reactions, provide strategies for service entry changing needs, and prevent multiple transfers within the system"); Section X.A.b. (crisis management; "intervention and technical assistance will be provided where the consumer lives;" "wrap-

10

Department knows how to do this. For this particular Cambridge-focused undertaking, it is suggested that the Department make explicit how it will proceed.

*It is respectfully recommended that the Department of Human Services consider the observations and references above, and that the Plaintiffs consider their implications with regard to their role.*

---

around response teams will be located across the state for proactive response to maintain living arrangements" with a 3 hour response time).

11