## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, guardians and next friends of Bradley J. Jensen, et. al,<br><br>Plaintiffs,<br><br>vs.<br><br>Minnesota Department of Human Services, an agency of the State of Minnesota, et. al,<br><br>Defendants. | Court File No.: 09-CV-1775 DWF/FLN<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS** |

This motion seeks to hold the State Defendants accountable for their bad-faith conduct and lack of candor to the Court, Court Monitor, consultants and Settlement Class. This matter initially arose from Defendants' routine, widespread, severe and cruel restraint and seclusion imposed upon people with developmental disabilities, including Settlement Class Members, at Minnesota Extended Treatment Options ("METO"), a program that the Minnesota Department of Human Services ("DHS") operated in blatant disregard of Class Members' civil and constitutional rights. At the hands of DHS, Plaintiffs and Class Members suffered irreparable harm from the abusive, inhumane and cruel use of seclusion and restraint while involuntary residents at METO, including forcing Plaintiffs and Class Members into law enforcement-type metal handcuffs and leg hobbles as a means of behavior modification, coercion, discipline, convenience and retaliation for conduct as benign as touching a pizza box, spitting, laughing and hand-

washing.  *See generally,* Complaint [Doc. No. 3]; Answer of State Defendants ¶ 39 [Doc. 24] (admitting to the use of restraints); *Just Plain Wrong* [Doc. No. 3-1].[1]

The parties ultimately entered into a Stipulated Class Action Settlement Agreement in June 2011, which provided monetary compensation to Class Members and real substantive changes to improve the lives of individuals with developmental disabilities and how they are treated by the State of Minnesota. The Settlement Agreement was approved by the Court on December 5, 2011. [Doc. No. 136].  From the Court's approval of the Settlement Agreement to date, Settlement Class Counsel, the Court, the Court Monitor, the Executive Director of the Minnesota Governor's Council on Developmental Disabilities, and the Ombudsman for Mental Health and Developmental Disabilities have tirelessly engaged in efforts to assist the State of Minnesota and DHS with implementing the substantive relief provided by the Settlement Agreement, with the largest obstacle to successful implementation often the conduct of DHS.  *See, e.g.,* Court Orders and Letters Regarding Compliance [Doc. Nos. 147, 155, 159, 179, 188, 223, 224].

Now, over two and a half years after the parties entered into the Settlement Agreement, little of the substantive relief provided by the Agreement has been

---

[1] *See, e.g., Just Plain Wrong* at p. 17 ("Documents in individual records revealed that people were being routinely restrained in a prone face down position and placed in metal handcuffs and leg hobbles.  In at least one case, a client that the metal handcuffs and leg hobbles were secured together behind the person, further immobilizing the arms and legs, reported it to the Ombudsman staff.  Some individuals were restrained with a waist belt restraint that cuffed their hands to their waist.  An individual with an unsteady gait was routinely placed in this type of restraint, putting that person at risk of injury if they should fall.  Others were being restrained on a restraint board with straps across their limbs and trunk.").

implemented. *See, e.g.,* Independent Consultant and Monitor Status Report on Compliance, dated June 11, 2013 [Doc. No. 217]; Monitor's Response to Court's January 23, 2013, Letter (expressing overall concern regarding lack of compliance: *"Simply put, Defendants have not yet put sufficient shoulders to the Jensen wheel."*).  In fact, the State Defendants' failure to timely implement the Settlement Agreement and lack of compliance has caused the Court to issue several Orders expressing concern with the status of the State Defendants' implementation of the Settlement Agreement and ongoing noncompliance therewith, redefining the role of the Court Monitor and directing the involvement of the Department of Justice. *See, e.g.,* Orders: [Doc. Nos. 159, 179, 205, 211, 212, 223, and 224].

Moreover, Settlement Class Counsel recently learned that DHS operated MSHS-Cambridge ("Cambridge"), the successor facility to METO, without a required operational license in violation of explicit state law[2] and the Court Order approving the Stipulated Class Action Settlement Agreement. [Doc. Nos. 136 and 136-1].  Despite its obligations of candor, neither DHS, the State of Minnesota, nor counsel for the State

---

[2] Minnesota Statutes Section 144.50, subd 1((a) ("No person, partnership, association, or corporation, nor any state, county, or local governmental units, nor any division, department, board, or agency thereof, shall establish, operate, conduct, or maintain in the state any hospital, sanitarium or other institution for the hospitalization or care of human beings without first obtaining a license therefor in the manner provided in sections 144.50 to 144.56 . . . ; (b) A violation of this subdivision is a misdemeanor punishable by a fine of not more than $300 . . . ; (c) The sanctions in this subdivision do not restrict other available sanctions."); *see also* Minnesota Administrative Rules, Chapter 4665 (Supervised Living Facilities), subd.4665.0200 subd. 5 (licensee must show that "functional services are provided in safe, healthful, and sanitarily operated and maintained buildings"); *id.* at 4665.0300 (license issuance).

Defendants disclosed to the Court or Settlement Class Counsel the license violation.

DHS did not inform the Court or Settlement Class that Cambridge was unlicensed despite DHS's affirmative obligation to make such an important disclosure and several opportunities to do so, including explicit requests by Settlement Class Counsel regarding the status of Cambridge's licensure and party meetings where licensing (relating to a variance issue) was a specific agenda topic. O'Meara Decl. Ex. 2 (numerous agendas for meetings with Court Monitor with licensing as an agenda item).  DHS did ultimately admitted to operating the Cambridge facility in violation of the law for ten months from its establishment on July 1, 2011, until it was licensed by the Minnesota Department of Health on April 24, 2012, labeling its conduct "inexcusable."[3]

In addition to its intentional and willful operation of Cambridge in direct violation of the law and Court Order approving the Settlement, the State Defendants fraudulently

_____

[3]  O'Meara Decl. Ex 16 (March 7, 2012, email from DHS to MDH) (bolding in original; underlying supplied):

> As a result of a litigation settlement, Minnesota Extended Treatment Options was completely terminated as a business on 6/30/2011. On July 1 2011 a new program was established under the name **Minnesota Specialty Health System-Cambridge (MSHS-Cambridge).** Unfortunately, it appears that staff from MSHS-Cambridge and State Operated Services inadvertently failed to notify your Department [Minnesota Department of Health] of this change within the 10 day requirement outlined in Minnesota Statues [sic]. In fact it appears that you first became aware of this name change was at the end of December 2011 during the 2012 SLF license renewal process. This error is <u>inexcusable</u>, and we [DHS] apologize for the subsequent problems that have resulted from this error on our [DHS's] part. We will try to ensure that this never happens against in the future.

*See also* Independent Consultant and Monitor Status Report on Compliance, dated June 11, 2013, at p. 18 [Doc. No. 217].

and intentionally misrepresented the status of their compliance with the Settlement Agreement in contempt of Court. This bad-faith, contemptuous conduct warrants that sanctions be imposed upon the State Defendant, which the Settlement Class respectfully suggest should include: (1) payment of $150,000 into the *cy pres* fund established by the Court in this matter for the benefit of people with developmental disabilities and their families ($15,000 per month for the ten-month non-licensure period); or alternatively, an amount the Court deems to be fair and equitable for the time period of non-disclosure by the State Defendants, (2) payment of $50,000 to Settlement Class Counsel for reimbursement of extensive time and resources relating to licensure issues, this motion, and continued monitoring and investigation into the State Defendants' non-compliance and  representations concerning the status of the provisions of the Settlement Agreement, and to help ensure the protection of Class Members and people with developmental disabilities affected by the Settlement Agreement or, alternatively, an amount the Court deems to be fair and equitable for the time expended by Settlement Class Counsel to discover, address and move the Court relative to the conduct of the State Defendants at issue in this Motion, and (3) any other sanction the Court deems just and equitable.

## FACTUAL BACKGROUND

On June 30, 2011, the METO facility was closed.  On July 1, 2011, its successor, MSHS-Cambridge, was opened.[4] Under the Court's Order approving the Settlement

---

[4] *See* O'Meara Decl. Ex. 3 (May 9, 2013 communication from Settlement Class Counsel to Court Monitor, with Ombudsman's May 7, 2013, comments attached thereto) ("DHS did cease to operate the program known as METO on June 30, 2011 and issued discharge summaries for all of the clients in the program. The following day the program

Agreement, any successor facility to METO must be properly licensed to serve and care

for people with developmental disabilities. Final Approval Order for Stipulated Class

Action Settlement, [Doc. Nos. 136 and 136-1], Exhibit A, Settlement Agreement at p. 6

("Any successor to METO shall: * * * (3) be licensed to serve people with developmental

disabilities …").  Despite this specific Court ordered requirement, DHS failed to obtain

the statutorily required Supervised Living Facility ("SLF") license from the Minnesota

Department of Health ("MDH") prior to opening the Cambridge facility, and continued to

operate Cambridge without a SLF license until April 24, 2012, when it finally obtained

the SLF license from the MDH.[5]  *See* O'Meara Decl. Ex. 1 (OLA Report at p. 65)

---

reconstituted under a new name MSHS Cambridge (successor program) and all clients
had a new admission sheet for the new facility. None of the clients left the program and
they continued to operate under the same DHS license as METO as a Non ICF residential
program for persons with developmental disabilities.")

[5] DHS did not even submit a completed application for a Supervised Living Facility
license to the MDH until February 27, 2012. *See* O'Meara Decl. Ex. 4 (February 27,
2012, letter from DHS to MDH, enclosing application). Moreover, when the MDH
surveyed the Facility for purposes of assessing compliance with the MDH Supervised
Living Facility Rules, the survey team noted several violations of these rules, including
the fact that the only window in residents' bedrooms was sealed shut in violation of
Minn. R. 4665.1800, subp. 11, which requires a facility to have a least one bedroom
window that easily opens to the outside; all residents' bedrooms lacked appropriate
furniture, private storage space and individual racks for drying washcloths and towels in
violation of Minn. R. 4665.2100;  the Facility maintained "stock supply" of psychotropic
drugs from which doses had the potential to be administered to residents, versus
individual prescription ordered by a physician, in violation of Minn. R. 4665.4300; the
Facility failed to have an operating telephone and posting of emergency telephone
numbers that were accessible to residents in violation of Minn. R. 4665.5000. O'Meara
Decl. Ex. 5 (April 12, 2012, letter from MDH to DHS outlining violations, with
Corrective Order).  Egregiously, instead of having to abide by the MDH Supervised
Living Facility Rules, DHS received, and the MDH granted, at least five waivers,
including a waiver excusing the Facility from having at least one window in residents'
bedrooms that opens to the outside, a waiver excusing the Facility from having a

("Health Department staff began obtaining the necessary licensing information and approvals from SOS and the State Fire Marshal, issuing the Cambridge facility its first supervised living facility license in April 2012 — almost ten months after the first residents had moved in."); *see also* Independent Consultant and Monitor Status Report on Compliance, dated June 11, 2013, at pp. 18, 61 [Doc. No. 217].  Importantly, at no time during this clear and admitted lapse in licensure did the State Defendants disclose to Settlement Class Counsel that Cambridge was not properly licensed or otherwise not in compliance with the licensing provision of the Settlement Agreement.  O'Meara Decl. ¶ 23.

As early as January 9, 2012, Settlement Class Counsel began to inquire from State Defendants' counsel about the status of the State Defendants' implementation of the Settlement Agreement, including licensure. A January 9, 2012, email communication from the undersigned to counsel for the State Defendants asked for confirmation of compliance with certain items and deadlines under the Settlement Agreement and also requested that counsel advise as to dates and items of compliance that the undersigned might have missed:

> In follow up to our recent discussions, here's a list of deadline and other issues to be completed from the Settlement Agreement. [C]an you please follow up with me on the items referenced. If I have missed some dates/items please advise. Thanks.

---

telephone available to residents for emergency use, and a waiver exempting the Facility from the prohibition against stock supplies of legend drugs, including psychotropic drugs. *See* O'Meara Decl. Exs. 6, 7, and 8 (April 17, 2012, letter from MDH to DHS approving waiver request regarding windows; April 24, 2012, letter from MDH to DHS approving waiver request regarding emergency use telephone; April 24, 2012, letter from MDH to DHS approving waiver request regarding stocky supply of legend drugs).

O'Meara Decl. Ex. 9 (January 9, 2012, communication from Settlement Class Counsel to State Defendants' Counsel).  Since January 2011 and ongoing, Settlement Class Counsel has sent numerous requests to DHS and its counsel regarding Cambridge licensure and concerns related to proper licensing.  *See* June 11, 2013, Court Monitor Report, which incorporates June 4, 2013, correspondence from Settlement Class Counsel to the Court Monitor outlining numerous requests for information to the State Defendants regarding the status of Cambridge's licensure [Doc. No. 217 at pp. 231-37].  Counsel for the State Defendants never advised the undersigned that DHS had failed to obtain the proper licensing for Cambridge in violation of the Settlement Agreement.  O'Meara Decl. ¶ 23.[6]

---

[6] Importantly, while knowing it had did not have a SLF license and was illegally operating Cambridge, the State Defendants engaged Settlement Class Counsel, the consultants and Court Monitor in discussions about a DHS license *variance* for Cambridge, prompting us to address the variance as an issue of concern.  These discussions, communications and meetings related to DHS seeking to vary its DHS licensure of Cambridge from the original METO license, and not any issue relating to *SLF non-licensure*, an issue that was unknown to Settlement Class Counsel, the Court, Court Monitor and consultants.  Notably, as part of engaging the variance issue in July we directly asked DHS, "How does the variance compare with METO's prior license as a supervised living facility."), never receiving a response.  *See, e.g.,* O'Meara Decl. Ex. 11 (July 5, 2012, Settlement Class Counsel communication to DHS):

> We understand DHS received a license variance for Cambridge, effective January 3, 2012, license number 804294.  We do not have any record of being notified of this variance, asked for input concerning it, or what the variance means.  Please advise if DHS issued the variance for Cambridge. Did DHS work with federal licensing authorities for people with developmental disabilities concerning the variance.  How does it allow Cambridge to vary from the licensing requirements for serving people with developmental disabilities.  Is it a new category.  How does the variance facilitate Olmstead compliance.  Is it equivalent to ICF/DD certification allowing for federal auditing and inspections, and the protections of the federal bill of rights for people with developmental disabilities.  How does

In February 2013, the Office of the Legislative Auditor, State of Minnesota ("OLA") issued its Evaluation Report of State-Operated Human Services ("OLA Report"). O'Meara Decl. Ex. 1. The OLA Report included an evaluation of the MSHS-Cambridge facility. In addition to finding that Cambridge had problems with use of restraints in emergency situations – OLA Report at pp. 61-63 – OLA also determined that DHS opened Cambridge in 2011 without first obtaining the necessary approvals from the Minnesota Department of Health or the State Fire Marshal and operated Cambridge for ten months without proper licensure in violation of state law.

> In mid-2011, SOS closed a 48-bed facility (Minnesota Extended Treatment Options) in Cambridge and replaced it with a new 16-bed facility in the same location. The new facility is licensed under DHS's residential services rule for persons with developmental disabilities and is the only SOS facility of this particular type.

> To ensure compliance with health and safety requirements, state law requires that license applicants (including SOS) document compliance with applicable fire and life safety codes, as well as health rules, when opening a new facility. But SOS failed to notify MDH or obtain the department's approval before opening SOS's new facility on July 1, 2011. Likewise, SOS did not notify MDH that it was closing Minnesota Extended Treatment Options on June 30, 2011. Staff at MDH told us they contacted DHS in Fall 2011 about renewing the license for Minnesota Extended Treatment Options. State-Operated Services staff did not respond until January 2012, when they submitted an incomplete application for the MDH license. It was not until February 2012 that MDH learned that one SOS facility had closed and a new one had opened—slightly more than seven months after the fact.

> Minnesota Department of Health officials told us they do not approve any supervised living facility license until both engineering and licensing staff at MDH as well as the State Fire Marshal have determined that a building is fit for occupancy. Health Department staff began obtaining the necessary

---

the variance compare with METO's prior license as a supervised living facility.

licensing information and approvals from SOS and the State Fire Marshal, issuing the Cambridge facility its first supervised living facility license in April 2012—almost ten months after the first residents had moved in.

O'Meara Decl. Ex. 1 (OLA Report at pp. 65-66).

During his investigation of the issue, the Court Monitor found:

**The Court Was Not Informed that MSHS-Cambridge Operated Without a Department of Health License for 10 Months.** A facility serving people with disabilities cannot legally operate without licensure. MSHS-Cambridge requires a license issued by DHS and also by the Minnesota Department of Health ("MDH"). Cambridge operated in violation of the law for 10 months from its establishment July 1, 2011 until it was licensed by the Minnesota Department of Health April 24, 2012. DHS later called its lapse "inexcusable." The Court and Plaintiffs were not informed that Cambridge was not licensed. The settlement requires licensure. The recent revelation of this licensing/notice lapse has sharpened Plaintiffs' wariness of DHS' representations on other matters.

* * * *

10. Licensure. The Settlement Agreement requires that Cambridge "be licensed to serve people with developmental disabilities." When the Monitor developed the evaluation criteria in the summer of 2012, he assumed that Cambridge was, and had been, licensed to serve its clients. He has since learned that that was not the case. Licensing of DHS programs in Minnesota has two layers. The Department of Health licenses for fundamental standards, such as life safety and health. No license can be issued without compliance with Health Department standards and no program can open or serve clients without this license.

In addition, DHS has a Licensing division which licenses for compliance with standards for providing services to individuals being served. As shown above in Part Three, Section II.A. MSHS-Cambridge was not licensed for 10 months, and DHS failed to report this critical lapse to the Court or the Plaintiffs.

**DISCUSSION**

METO closed effective June 30, 2011 and MSHS-Cambridge opened the next day. Although Cambridge served clients from day one (METO clients remained in the facility at the turnover), Cambridge was not licensed by the

Department of Health for ten months thereafter. The failure to inform the Court and Plaintiffs that there was no MDH license was "inexcusable." This is the word used by DHS in acknowledging that DHS had not timely acted under the licensing statute. We add EC 1A on the licensure issue; when the Evaluation Criteria were established, it was assumed that licensure had not been an issue. The Monitor did not expect that there were any unknowns regarding licensure. That Cambridge was not licensed for many months, and that the Court and Plaintiffs were not informed, merits a finding of noncompliance. The recent revelation of the absence of a license has sharpened Plaintiffs' distrust of DHS.

Independent Consultant and Monitor Status Report on Compliance, dated June 11, 2013, at pp. 18, 61 [Doc. No. 217]; *see also id* at pp. 44-47.

In response to the Court Monitor's finding of noncompliance, DHS responded in a June 14, 2013, letter to the Court Monitor as follows:

### 8. *Cambridge Has Been Licensed (EC #1A)*

The Report states that as "Cambridge was not licensed for many months, and…the Court and Plaintiffs were not informed," a non-compliance finding for EC #1A is merited. (Report, p. 52.) The Department agrees with the Report's finding that Cambridge had a gap in licensure.

Cambridge is a dually-licensed facility:

☐   Cambridge holds a Department-issued license authorizing it to serve individuals with developmental disabilities. Cambridge has held this license without interruption since its inception.

☐   Cambridge also holds a Supervised Living Facility ("SLF") license issued by the Minnesota Department of Health ("MDH"). As highlighted in the Report and as acknowledged by the Department, Cambridge improperly operated without a SLF license until April 24, 2012. (Report, p. 6.) The Department has since rectified this oversight: since April 24, 2012, Cambridge has held a SLF license.

The Department recognizes the extreme importance of, and its legal obligation to maintain, proper licensure, and is committed to ensuring Cambridge is properly licensed now and in the future. In light of its

successful efforts to correct this licensure oversight, the Department believes that it is now in substantial compliance with EC #1A.

June 4, 2013, Correspondence from DHS to Court Monitor included in Court Monitor Status Report, dated June 11, 2013, at pp. 222-23 [Doc. No. 217] (highlighting added). This was the first time DHS expressly notified the Court Monitor and Settlement Class Counsel that it was operating Cambridge without proper licensure.

Incredulously, despite not being licensed, DHS continued to admit individuals to Cambridge from the time of its inception and ongoing during the period of non-licensure. *See, e.g.,* O'Meara Decl. Ex. 11 (June 24, 2011, Correspondence to Guardians/County Case Managers) ("As you were previously notified, effective 7/1/11, the program now known as Minnesota Extended Treatment Options will have the name Minnesota Specialty Health System (MSHS) – Cambridge. As part of this change and to meet standards/regulations, clients will be "discharged" from METO and "admitted" to MSHS."). However, it appears that for a time period just before it finally obtained the proper licensing, DHS was holding admissions to Cambridge at the request of the Minnesota Department of Health. *See, e.g.,* O'Meara Decl. Ex. 12 (May 2, 2012, communication regarding licensing issue) ("The reason Paula [Halverson, Cambridge Director] is so anxious is because they have been holding off on admissions pending a license approval."); Ex. 13 (April 6, 2012, inter-DHS communication regarding licensure issue) ("We are not brining any admissions in until we get a licenses from SLF.")

It also appears the State Defendants never notified the families and guardians of residents at Cambridge or those being admitted to Cambridge that it was unlicensed.

Such failure to notify of fundamental violations affecting the safety of the facility where loved ones reside flies in the face of the intent of the Settlement Agreement and the law, directly endangering people with developmental disabilities whom DHS and the State Defendants are required to protect.[7]

These failures to timely obtain the proper licensure and to notify residents and their families affected the care and treatment of individuals with developmental disabilities. For example, one individual was placed in an acute inpatient unit in Annandale despite that fact he would not receive the needed level of care at that facility:

> Alan-We have worked out a plan to transfer a patient from AMRTC unit D, [ ], to Cambridge MSHS tomorrow Friday 4/13.
>
> * * * *
>
> I know this may not change the decision made but I am concerned that we are taking an admission into Cambridge after DHS licensing requested that we not take any further admissions until the license from the MDH has been resolved.
>
> * * * *
>
> Unfortunately we had to place [ ] in CBHH-Annandale bed today. Historically he does not do well on an acute inpatient unit. [ ] needs a well supported behavioral plan as well as forced medication management. He

---

[7] *See, e.g.,* Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., 28 C.F.R. § 35; Minnesota Vulnerable Adult Act, Minn. Stat. § 626.557; Minnesota Human Rights Act, Minn. Stat. § 363A *et seq*; Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997 *et seq.*; Final Approval Order for Stipulated Class Action Settlement Agreement, Exhibit A, Stipulated Class Action Settlement Agreement at 3 ("The State of Minnesota further declares, as a top concern, the safety and quality of life of the Residents of the Facility. The State agrees that its goal is to provide these residents with a safe and humane living environment free from abuse and neglect.");  *Id.* at 5 ("Facility: Facility means the Minnesota Extended Treatment Options ("METO") program, its Cambridge, Minnesota successor, and the two new adult foster care transitional homes to which residents of METO have been or may be transferred.")

<mark>would be best served on AMRTC D unit. Without sending someone who no longer requires hospital [AMRTC D unit] level of care to MSHS-Cambridge, we will not have a [AMRTC] D [unit] bed for over a week. Waiting that long is not good for [ ] or Annandale.</mark>

O'Meara Decl. Ex. 14 (April 12, 2012, DHS inter-department email exchange) (highlighting added).

## ANALYSIS

## I.   STANDARD OF ANALYSIS

Federal judges have all of the judicial power necessary to manage their own proceedings and to control the conduct of those who appear before them, including the inherent power to sanction abuses of the judicial process.[8] *Chambers v. NASCO, Inc.*, 501

---

[8]   The Court has the inherent power to decide this motion and sanction the State Defendants for their bad faith conduct. Ancillary jurisdiction to enforce a settlement agreement exists "if the parties' obligation to comply with the terms of the settlement agreement is made part of the order of dismissal; either by…a provision retaining jurisdiction over the settlement agreement or by incorporation of the terms of the settlement agreement in the order." *Kokkonen v. Guardian Life Insurance Co. of America,* 511 U.S. 375 (1994).  Pursuant to the Final Approval Order for Stipulated Class Action Settlement Agreement and Judgment in a Civil Case, this Court retained jurisdiction for a period of two years from the date of its approval or until December 5, 2013, "for purposes of receiving reports and information required by this Agreement, or resolving disputes between the parties to this Agreement, or as the Court deems just and equitable.".  Dec. 5, 2011, Order ¶ XVIII.B. [Doc. No. 179 at p. 39]; Judgment [Doc. No. 137].  Here, because the Court incorporated the Settlement Agreement into its Order and retained jurisdiction to enforce the Settlement Agreement, the Court has jurisdiction to here this motion and impose sanctions. *See c.f. Adduono v. World Hockey Ass'n*, 824 F.2d 617, 621-22 (8th Cir. 1987) (although district court had jurisdiction under certain circumstances to enforce settlements, district court did not incorporate settlement agreement into its order or retain jurisdiction to enforce settlement agreement, so that sanctions for alleged violation of settlement agreement could not be justified by court's inherent authority as means employed by court to enforce settlement.). Additionally, the parties' settlement and stipulated dismissal does not deprive the Court of its power to impose sanctions under its inherent authority on motion of a party. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1568–1569 (11th Cir. 1991) (ruling that the parties'

U.S. 32, 42-44 (1991) (Scalia, J., dissenting) (providing an overview of courts' inherent power).

> [I]t is firmly established that the power to punish for contempts is inherent in all courts. This power reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.

*Chambers*, 501 U.S. at 44 (citations omitted). Federal judges have the authority to sanction lawyers and litigants virtually at will and without regarding to any limitations imposed by the Rules and statutes. *Id.* at 46.  The inherent power to sanction reaches the full range of litigation misconduct, and authorizes fee shifting for bad-faith conduct or willful disobedience of a court's orders. *Id.* at 45-47 ("[A] court may assess attorney's fees as a sanction for the willful disobedience of a court order.").

> [A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.

*Chambers*, 501 U.S. at 45-46; *see also Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266 (8th Cir. 1993). A federal court, as a matter of law, may impose attorney's fees as a

---

settlement and stipulated dismissal pursuant to Rule 41(a)(2) did not deprive the district of jurisdiction to impose sanctions on motion of a party).

sanction for bad-faith conduct, including in cases where the conduct at issue is not covered by one of the other sanctioning provisions of the Rules or statutes. *Chambers*, at 50.

## II.   THE STATE DEFENDANTS WILLFULLY AND INTENTIONALLY VIOLATED THE SETTLEMENT AGREEMENT AND MINNESOTA LAW AND ARE IN SUBSTANTIAL NON-COMPLIANCE WITH THE LICENSING PROVISION OF THE SETTLEMENT AGREEMENT

DHS knowingly, and without notice to the Court or Settlement Class Counsel, allowed Cambridge to operate for ten months without a Supervised Living License, in violation of the Settlement Agreement and Minnesota law.   *See* O'Meara Decl. Ex. 1 (OLA Report) (DHS opened Cambridge in 2011 without first obtaining the necessary approvals from the MDH or the State Fire Marshal and operated Cambridge for ten months without proper licensure in violation of state law); Court Monitor June 11, 2013, Report at p. 18 [Doc. No. 217] ("Cambridge operated in violation of the law for 10 months from its establishment July 1, 2011 until it was licensed by the Minnesota Department of Health on April 24, 2012."); June 4, 2013, Correspondence from DHS to Court Monitor at pp. 222-23 of Court Monitor's June 11, 2013, Report [Doc. No. 217] ("The Department agrees with the Report's finding that Cambridge had a gap in licensure."). As the State Defendants have admitted, this non-licensure is "inexcusable." O'Meara Decl. Ex. 16 (March 7, 2012, email from DHS to MDH) ("This error is inexcusable . . .").

DHS's failure to obtain the proper licensing directly resulted in problems that affected the care and treatment of individuals with developmental disabilities.   *Id.*

(apologizing for "the subsequent problems that have resulted from this error on our

[DHS's] part."). Because of DHS's failure to obtain the proper license for Cambridge,

one individual was placed in a setting that DHS knew was not good for the resident and

where the resident would not receive the proper level of care and treatment:

> Unfortunately we had to place [ ] in CBHH-Annandale bed today.
> Historically he does not do well on an acute inpatient unit. [ ] needs a well
> supported behavioral plan as well as forced medication management. He
> would be best served on AMRTC D unit. Without sending someone who no
> longer requires hospital [AMRTC D unit] level of care to MSHS-
> Cambridge, we will not have a [AMRTC] D [unit] bed for over a week.
> Waiting that long is not good for [ ] or Annandale.

O'Meara Decl. Ex. 14 (April 12, 2012, DHS inter-department email exchange).

The State Defendants' failure to obtain the proper licensing for Cambridge

constitutes willful and intentional conduct in violation of the Court Order approving the

Settlement Agreement.  The State Defendants are charged with knowing the law and its

requirements for licensure. *Matter of Westling Mfg., Inc.*, 442 N.W.2d 328, 333 (Minn.

Ct. App. 1989) ("Those who deal with Government are expected to know the law . . . ").

The State Defendants expressly knew of the licensure requirement and agreed to be

licensed on June 16, 2011, when they signed the Settlement Agreement.  They also

represented to the Court that they would adhere to the requirements of the Settlement

Agreement. *See* Transcript of Hearing on Final Approval of the Settlement and Attorneys

Fees at pp. 29:9-12 and 70:23-25 [Doc. No. 146] (Anne Barry, Deputy Commissioner:

"So, on behalf of the Commissioner and the entire Department of Human Services, we

are here to tell you that we are in full support of this Settlement.").  As early as May 26,

2011, (more than a month before Cambridge opened) DHS officials were well aware that

DHS needed to obtain proper licensing to operate Cambridge; however, despite this knowledge DHS did not obtain such licensure until ten months after Cambridge opened. *See* O'Meara Decl. Ex. 15 (May 26, 2011, DHS inter-department email discussing need to license Cambridge).  A review of the documents comprising the OLA Report and related sources shows that many State of Minnesota employees, including DHS and MDH employees, some in leadership and supervisory capacities, knew Cambridge was not properly licensed and failed to disclose it.  *See* O'Meara Decl. Exs. 12, 13, 14 and 15.

The Cambridge non-licensure for many months and failure to notify the Court and Plaintiffs of the non-licensure warranted a finding of non-compliance by the Court Monitor, *see* June 11, 2013, Court Monitor Status Report at pp. 61 and 62 [Doc. No. 217], and now warrants such a finding by the Court. The State Defendants should also be equitably estopped from stating otherwise and be deemed non-compliant with the licensing provision of the Settlement Agreement for the period of non-licensure and also the period of non-disclosure to the Court, Court Monitor and Settlement Class, by virtue of their false representations.

> The doctrine of estoppel in pais is founded in justice and good conscience and is a favorite of the law. It arises when one by his acts or representations, or by his silence when he ought to speak, intentionally or through culpable negligence, induces another to believe certain facts to exist, and such other rightfully acts on the belief so induced in such manner that if the former is permitted to deny the existence of such facts it will prejudice the latter.

*Transamerica Ins. Grp. v. Paul*, 267 N.W.2d 180, 183 (Minn. 1978). "The doctrine of equitable estoppel may be asserted to bar a litigant from denying the truth of representations of fact previously made where the following requirements are met:

(1) There must be a misrepresentation of a material fact;

(2) The party to be estopped must be shown to have known that the representation was false;

(3) The party to be estopped must have intended that the representation be acted upon;

(4) The party asserting the estoppel must not have had knowledge of the true facts; and

(5) The party asserting the estoppel must have relied upon the misrepresentation to his detriment.

*Id.; Noske v. Noske*, 73 F. Supp. 2d 1025, 1029 (D. Minn. 1999) aff'd, 208 F.3d 218 (8th Cir. 2000) (applying Minnesota law). Here, these requirements have been satisfied: (1) the State Defendants' violated the licensing provision of the Settlement Agreement and Minnesota law for ten months and then through their statements and silence lead Plaintiffs (and Court Monitor) to believe they had fully complied with the licensing provision of the Settlement Agreement, a fundamental material fact; (2) the State Defendants knew they were not properly licensed in violation of the Settlement Agreement; (3) had the State Defendants disclosed the violation, they undoubtedly knew enforcement efforts would be undertaken by the Settlement Class but by remaining silent could avoid such concerns; (4) Settlement Class had no reasonable means of knowing that Cambridge was not properly licensed, trusting that the State Defendants were acting in good faith and fair dealing and in their statements and silence to counsel and the Court; and (5) Plaintiffs relied upon the misrepresentations to their detriment – Settlement Class Counsel has tirelessly investigated, monitored and assisted with the implementation of the Settlement Agreement, spending numerous hours investigating and interacting with

the State Defendants on a DHS variance licensing issue and other compliance issues and concerns.  Had the State Defendants informed Plaintiffs and the Court that it did not have the requisite SLF license to operate, Cambridge would not have opened and the Settlement Class would not have expended such effort in ensuring Cambridge operated consistent with other provisions of the Settlement Agreement.  Additionally, had the State Defendants notified that of the Cambridge non-licensure rather than hiding this material fact and continuing to operate, Settlement Class Counsel would have brought a motion before the Court to immediately address the violation of the Settlement Agreement and Minnesota law. Accordingly, the State Defendants should be equitably estopped from stating they were in compliance with the licensing provision of the Settlement Agreement to avoid sanctions.

The State Defendants were in non-compliance with the Settlement Agreement and directly violated Minnesota law for ten months, and for a much longer period failed to disclose this illegal operation to the Settlement Class, Court Monitor or the Court despite a fundamental obligation to do so. Settlement Class Counsel, the Consultants, the Court Monitor and the Court have spent countless hours assisting with the implementation of the Settlement Agreement to for benefit of Class Members and Minnesotans with developmental disabilities.  The non-licensure of Cambridge, and intentional withholding of this critical information from residents, their families, the Court, Court Monitor, consultants and Settlement Class Counsel, exemplifies the marked distinction the State Defendants have drawn between the words of the Settlement Agreement and the actions

require to live by it.[9] Ignoring the State Defendants' non-licensure and non-disclosure would reward their egregious bad faith conduct and abuse of the judicial process. *See In re Corrugated Container Antitrust Litig.*, 752 F.2d 137, 141 (5th Cir. 1985) ("In a class action, the district court has a duty to class members to see that any settlement it approves is completed, and not merely to approve a promise, even in the form of a negotiable instrument, to pay the relief to which it has decided class members are entitled.") Accordingly, in efforts to ensure that the Class Members obtain the full benefits of the Settlement Agreement, the State Defendants should not be permitted to continually evade their duties under the Settlement Agreement. Rather, they should be sanctioned for their bad faith conduct as an appropriate and necessary means to facilitating conduct that will facilitate successful implementation of the Settlement Agreement.

## III. THE STATE DEFENDANTS ACTED IN BAD FAITH WHEN THEY KNOWINGLY MISREPRESENTED TO THE COURT AND SETTLEMENT CLASS COUNSEL THEIR COMPLIANCE WITH THE SETTLEMENT AGREEMENT

The State Defendants acted in bad faith when they willfully and intentionally withheld the fact that DHS was not licensed for ten months and had failed to timely obtain the necessary licensing to operate Cambridge. In order to encourage litigants to act in good faith, the Federal Rules of Civil Procedure specifically require parties to

---

[9] There are myriad examples of ongoing non-compliance and refusal to engage in the implementation of the Settlement Agreement. *See, e.g.,* May 4, 2012, Letter from Court to Counsel regarding consideration of Court Monitor due to lack of compliance [Doc. No. 147]; Additional Document to Monitor's Response to Court's January 23, 2013, Letter regarding Correction Order issued to Cambridge by DHS Licensing siting numerous violations of licensing statutes related to quality of care, programs, safety and other elements of Settlement Agreement compliance [Doc. No. 199]; Independent Consultant and Monitor Status on Report on Compliance (finding at least 24 areas of non-compliance).

affirmatively disclose all relevant information without the necessity of court orders compelling disclosure. *Malautea v. Suzuki Motor Company, Ltd.*, 987 F.2d 1536 (11th Cir. 1993); *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1521-23 (11th Cir.1986). These rules are designed to ensure that the ultimate resolution of disputed issues is based on a full and accurate understanding of the facts. *United States v. The Procter & Gamble Company*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077; *Hickman v. Taylor*, 329 U.S. 495, 500-01, 67 S.Ct. 385, 388-89, 91 L. Ed. 451 (1947).

As early as January 9, 2012, the undersigned began to inquire from the State Defendants' counsel concerning the status of the State Defendants' implementation of the Settlement Agreement, including licensure.  In an January 9, 2012, communication from the undersigned to counsel the undersigned asked DHS counsel to confirm compliance with certain items and deadlines under the Settlement Agreement and also requested that DHS counsel advise as to dates and items of compliance that the undersigned might have missed.  O'Meara Decl. Ex. 9 (January 9, 2012, communication from Settlement Class Counsel to State Defendants' Counsle) ("In follow up to our recent discussions, here's a list of deadline and other issues to be completed from the Settlement Agreement. [C]an you please follow up with me on the items referenced. If I have missed some dates/items please advise. Thanks.")  DHS never advised the undersigned that DHS had failed to obtain the proper licensing for Cambridge in violation of the Settlement Agreement despite the fact that many State of Minnesota employees, including DHS and MDH employees, some in leadership and supervisory capacities, knew Cambridge was not properly licensed. *See* O'Meara Decl. Exs. 12, 13, 14 and 15.

Throughout the last year and a half, Settlement Class Counsel, Dr. Colleen Wieck, Executive Director of the Minnesota Governor's Council on Developmental Disabilities, and Roberta Opheim, Ombudsman for Mental Health and Developmental Disabilities, repeatedly asked for information and sought clarification concerning DHS's licensure of Cambridge, and not once did the State Defendants disclose that Cambridge was operating for ten months without a SLF license in violation of the Settlement Agreement and Minnesota law.  *See, e.g.,* June 11, 2013, Court Monitor Report, which incorporates June 4, 2013, correspondence from Settlement Class Counsel to the Court Monitor that outlines numerous requests for information to the State Defendants regarding the status of Cambridge's licensure [Doc. No. 217 at pp. 231-37].

Notably, on September 17, 2012, the State Defendants filed a status report with the Court advising as to the status of their compliance with the Settlement Agreement from December 5, 2011, through August 31, 2012.  Defendants' Status Report [Doc. No. 165]. On pages 6 through 8 the State Defendants' reported on the status of compliance with Section IV of the Settlement Agreement, including the provision that any successor to METO shall "be licensed to serve people with developmental disabilities." *Id.* at pp. 6-8. Although the State Defendants' disclosed information regarding DHS seeking a licensing variance from DHS Licensing, they did not disclose DHS's failure to obtain a SLF license necessary to legally operate Cambridge, or that DHS had been operating Cambridge illegally without a SLF license.[10] *Id.*

_____

[10] *See, e.g.,* O'Meara Decl. Ex. 10 (July 5, 2012, communication from Settlement Class Counsel to State Defendants' Counsel) (quoted, *supra* at 8, discussing license variance).

Unbelievably, during all of this interaction DHS never notified Settlement Class Counsel, the consultants, the Court or Court Monitor that it was illegally operating Cambridge without a SLF license. High level DHS and State Defendant representatives were present and engaged in these variance discussions with every opportunity to disclose this fundamentally important information. Rather than choosing disclosure, the State Defendants chose silence about the non-SLF licensure. Later, after Cambridge obtained the license, DHS responses included statements that it was operating with a SLF license but never disclosed the 10 month period of non-licensure. *See, e.g.* O'Meara

---

*See also* O'Meara Decl. Ex. 17 (September 20, 2012, Settlement Class Counsel communication to Court Monitor) ("We would like to receive a response to the licensing concerns involving Cambridge as expressed in our July 5, 2012, e-mail to counsel, enclosed. This is an important issue. The license for the facility drives the description of rights, protection of rights, and type of programming that people at MSHS-Cambridge receive. We understand the idea of IRTS was proposed and not accepted because it was not a license for people with developmental disabilities and the settlement required the successor program to return to its original purpose of serving people with developmental disabilities with severe behavioral issues."); O'Meara Decl. Ex. 18 (October 8, 2012, Settlement Class Counsel communication to Court Monitor and State Defendants' counsel) ("We have not received any response to these questions and concerns. We reiterate our request for this information, and the questions and concerns about the Cambridge license referenced in our September 20 e-mail to the monitor. Without receiving this information, preferably a few days before the next meeting, it will be difficult to have a meaningful dialog on the subject [of the license variance]."); O'Meara Decl. Ex. 19 (November 14, 2012, correspondence from Settlement Class Counsel to Court Monitor) ("On November 6, in response to the DHS November 5 e-mail on licensing of Cambridge, we asked DHS to augment its response to address the several questions and concerns we have raised concerning the license in our July 5, 2012, e-mail, reiterated in our September 20 and October 8 communication to the monitor; O'Meara Decl. Ex. 3 (May 9, 2013 communication from Settlement Class Counsel to Court Monitor, with Ombudsman's May 7, 2013, comments attached thereto) ("The program also requested a waiver to their DHS license to operate the program consistent with the practices the same as other MSHS facilities. They adopted a mental health model of programing which is not best practices for individuals with developmental disabilities.")

Decl. Ex. 20 (November 5, 2012, communication from State Defendants' Counsel to

Settlement Class Counsel and Court Monitor):

> The MSHS Cambridge program is operating under a Supervised Living
> Facility (SLF) license issued by the Department of Health and a DHS
> program license (245b) which governs programs serving individuals with
> developmental disabilities. MSHS Cambridge does not carry an ICF/DD
> certification because it has been determined that most people in the target
> population for the program do not qualify for these services. The variance
> request was initiated in an effort to recognize the complex co-occurring
> conditions (developmental disabilities and mental illness) and to recognize
> that the program was designed to provide intensive short term 90-180 days
> of service. It was not intended to be a long term residential placement as
> was the practice of the previous program. After reviewing the concerns
> regarding the variance the Department desires to reevaluate the need for a
> license variance for the program."

The State and DHS silence and concealment of the Cambridge non-licensure to the

Court and Settlement Class Counsel is intentionally misleading and a blatant

misrepresentation of material facts concerning the State Defendants' non-compliance

with the Settlement Agreement. *See Anderson v. Alorica, Inc.*, 2004 U.S. Dist. LEXIS

8852, 15 (D. Minn. May 18, 2004) (citing *M.H. & J. v. Caritas Family Servs.*, 488

N.W.2d 282, 289 (Minn. 1992) ("A false representation may be made either (1) by an

affirmative statement that is itself false or (2) by concealing or not disclosing certain facts

that render the facts that are disclosed misleading.").

This is not the first time the State Defendants have lacked candor and

misrepresented their compliance with the Settlement Agreement. For example, DHS

previously reported to the Court that it had completed the training required by the

Settlement Agreement and was in compliance with the training provisions of the

Settlement Agreement. It was later discovered by the Court Monitor, however, that this

representation was not true – training had not been complete in violation of the

Settlement Agreement.  In its May 14, 2012, report to the Court, DHS stated:

> **Section IX.B.1 (Page 14): Staff at the Facility shall receive specified hours of training by December 31, 2011 (therapeutic intervention, personal safety tech., medically monitored restraint)**
>
> The Department completed the training for facility staff prior to December 31, 2011.
>
> **Section IX.B.2 (Page 15): Staff at the facilities shall receive the specified training by March 31, 2012 (person centered planning/positive behavioral supports, post crisis evaluation)**
>
> The Department has completed the specified training

May 14, 2012, *Jensen Settlement Agreement Status Report by Minnesota Department of

Human Services* at p. 4 (not filed on ECF).  Once the Court Monitor was appointed and

began investigating the issue, it was determined that in fact DHS had not completed all of

the required training under the Settlement.  *See Independent Consultant and Monitor

First Quarterly Report to the Court* at pp. 12-20 [Doc. No. 175] ("The monitor concludes

that Defendants are not in compliance with the training requirements [of the Settlement

Agreement]").  DHS knew before December 2011 that it had not completed the required

number of hours under the Settlement Agreement, yet reported to the Court and

Settlement Class Counsel that it had completed the required training.  *Id.* at p. 17 ("Dr.

Amado explained that 'we first became aware of the [training] problem' before

December 2011.  He did not know whether Plaintiffs had been informed.").  In addition,

recent conduct by DHS relating to a proposed statutory variance to continue restraining

people with developmental disabilities during a so called "transition" period highlights

ongoing attempts by DHS to circumvent the settlement process and place at risk the civil rights of people with developmental disabilities. *See, e.g.,* O'Meara Decl. ¶ 24  ("The 245D process was engaged outside of the Settlement Agreement implementation process and now seeks to dramatically alter the protections afforded people with developmental disabilities by continuing to allow unabated restraint and seclusion of people with developmental disabilities under the guise of 'transition' without due process or other fundamental protections that should have been the first and most important issues addressed and ensured in any process seeking to regulate and infringe on the rights of citizens who are vulnerable. … There is no application of the fundamental prohibition against restraint and seclusion and other prohibited techniques which is a hallmark of the Jensen Settlement Agreement.   Instead, there are inconsistent provisions, ongoing questions and tensions between Rule 40 final recommendations and the 245 proposals and waivers, continued violation of the  Settlement Agreement and the civil rights of people with developmental disabilities, rejection of  due process, rejection of Rule 40 final recommendations, and the use of a process to achieve these results that is not collaborative nor consistent with the rights of people with developmental disabilities and the best practices for their care."); *see also* O'Meara Decl. Ex. 21 (September 30, 2013, correspondence from Court Monitor to Court).

The State Defendants' willfully and intentionally acted in substantial non-compliance with the Settlement Agreement and violated Minnesota law when they failed to obtain proper licensing for Cambridge.  The State Defendants' then engaged in bad faith conduct when they knowingly misrepresented to the Court and Settlement Class

Counsel the status of their compliance with the licensing provision of the Settlement Agreement. *See Gas Aggregation Servs. v. Howard Avista Energy, LLC*, 458 F.3d 733, 739 (8th Cir. Minn. 2006) (finding party acted in bad faith when it concealed and misrepresented terms of settlement).

As the Court is aware, Settlement Class Counsel, the Court Monitor, Dr. Colleen Wieck, and Roberta Opheim, and the Court itself, have all expended enormous amounts of time and effort into ensuring that the Settlement Class receives the full benefit of the Settlement Agreement.  Given the State Defendants repeated misrepresentations and lack of candor, Settlement Class Counsel has lost trust in the State Defendants' representations.  June 11, 2013, Court Monitor Report at p. 61 [Doc. No. 217]

The State Defendants have acted in bad faith through their overall abuse of the judicial process, by defrauding the Court, and by hampering the implementation of the Court approved Settlement Agreement to the detriment of Plaintiffs and the entire Settlement Class. The State Defendants' bad faith, contemptuous conduct may be properly sanctioned, including the award of attorneys' fees.[11] *Id.*  (district court awarded attorney's fees as a sanction following a finding of bad faith).

## CONCLUSION

The Supreme Court has found the inherent power of district courts to include the ability to dismiss actions, assess attorneys' fees, and to impose monetary or other

---

[11] Should the Court require additional facts to decide this Motion an evidentiary hearing would be warranted to obtain additional relevant information, including from those State Defendant employees involved in the SLF licensure non-compliance, and those with knowledge of the non-disclosure.

sanctions appropriate "for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45.  The imposition of monetary sanctions and attorneys' fees against the State Defendants in this case clearly falls within the ambit of this Court's inherent power.  Not only did the State Defendants' willfully and intentionally act in substantial non-compliance with the Settlement Agreement for ten months when they failed to obtain the proper licensure for Cambridge, they also acted in bad faith when they concealed it from the Court and Settlement Class Counsel and knowingly misrepresented their compliance with the licensing provision of the Settlement Agreement.  This bad-faith, contemptuous conduct warrants sanctions, which the Settlement Class respectfully suggests should include: (1) payment of $150,000 into the *cy pres* fund established by the Court in this matter for the benefit of people with developmental disabilities and their families ($15,000 per month for the ten-month non-licensure period); or alternatively, an amount the Court deems to be fair and equitable for the time period of non-disclosure by the State Defendants, (2) payment of $50,000 to Settlement Class Counsel for reimbursement of extensive time and resources relating to licensure issues, this Motion, and continued monitoring and investigation into the State Defendants' non-compliance and representations concerning the status of the provisions of the Settlement Agreement and to help ensure the protection of Class Members and people with developmental disabilities affected by the Settlement Agreement; or, alternatively, an amount the Court deems to be fair and equitable for the time expended by Settlement Class Counsel to discover, address and move the Court relative to the conduct of the State Defendants at

issue in this Motion, and (3) any other sanction the Court deems just and equitable.[12] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 55-57, 111 S. Ct. 2123, 2138-39, 115 L. Ed. 2d 27 (1991) (upholding sanction for litigant's bad-faith conduct in the amount of opposing party's entire attorney fees, approximately $1 million); *In re Kujawa*, 270 F.3d 578, 583 (8th Cir. 2001) (upholding award of attorney's fees in the amount of $66,656.33 as a sanction for unethical behavior).   The Court should impose such sanctions as they have become necessary to ensure that the offending conduct stops.   *See Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 808 (8th Cir. 2005) ("the cornerstone of imposing a monetary sanction ... should be the selection of an amount no greater than sufficient to deter future misconduct by the party."); *E.E.O.C. v. Original Honeybaked Ham Co. of Georgia, Inc.*, No. 11-CV-02560-MSK-MEH, 2013 WL 752912 (D. Colo. Feb. 27, 2013) (citing *Mulvaney v. Rivair Flying Serv., Inc.*, 744 F.2d 1438 (10th Cir.1984)). The requested sanctions are necessary to ensure that the State Defendants' pattern of noncompliance and bad faith is halted.

---

[12] Settlement Class Counsel has expended an enormous amount of time in an effort to help ensure that the Settlement Class receives the full benefit of the Settlement Agreement.  The State Defendants' conduct has resulted in Settlement Class Counsel having to expend large amounts of time, apart from reasonable settlement implementation issues, to investigate the Cambridge non-licensure issue and to obtain, request and review documents and information from several State departments and from and between DHS counsel pertaining to the licensure matters, substantial wasted time on a DHS variance issue, interaction with consultants, the Court Monitor and Court on the issues, and this Motion, among other efforts. Should the Court award attorneys fees, Settlement Class Counsel is prepared to provide the Court  with an itemization of  the substantial time incurred  by Settlement Class Counsel caused by the conduct and statements of the State Defendants that are the subject of this Motion.

Respectfully submitted,

**O'MEARA, LEER, WAGNER & KOHL, P.A.**

s/ *Shamus P. O'Meara*

Dated: October 7, 2013

_____

Shamus P. O'Meara (#221454)
Margaret Ann Santos (#0389206)
7401 Metro Boulevard, Suite 600
Minneapolis, MN 55439-3034
(952) 831-6544

**SETTLEMENT CLASS COUNSEL**