## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, Guardians and next friends of Bradley J. Jensen, *et al.*, | Civil No. 09-1775 (DWF/FLN) |
| Plaintiffs, | |
| v. | |
| Minnesota Department of Human Services, an agency of the State of Minnesota, *et al.*, | |
| Defendants. | |

**RATIONALE FOR DOCUMENT REQUEST**

**Restraint Chair and Seclusion Use at AMRTC and MSH:
Phase 1 Review**

David Ferleger
Court Monitor
Archways Professional Building
413 Johnson Street
Jenkintown, PA 19046
Phone: (215) 887-0123
Fax:    (215) 887-0133
david@ferleger.com

October 17, 2013

TABLE OF CONTENTS

I. INTRODUCTION 3

II. SETTLEMENT AGREEMENT, RULE 40 AND OLMSTEAD 4

III. ANOKA METRO REGIONAL TREATMENT CENTER AND MINNESOTA SECURITY HOSPITAL 6

IV. RESTRAINTS AND SECLUSION AT AMRTC AND MSH 7

V. AMRTC AND MSH RESTRAINT REVIEW • PHASE 2 9

VI. CONCLUSION 10

Tables: f.8

 Minutes Monthly: Restraint Chair & Seclusion

 Per Patient: Number of Hours in Restraint Chair or Seclusion by Month

Attachment A: *DHS Respect and Dignity Practices Statement*

## Restraint Chair and Seclusion Use at AMRTC and MSH: Phase 1 Review

### I. INTRODUCTION

The intent of this report, and its planned Phase 2, is to provide information which will examine 2012 and 2013 restraint/seclusion use, consider compliance issues, and encourage DSH's continued, positive and prompt attention to these important issues.

This report is Phase 1 of the Court Monitor's review of the use of Restraint Chairs and Seclusion at Anoka Metro Regional Treatment Center and Minnesota Security Hospital subsequent to the approval of the Settlement Agreement.[1]

Section II presents the context for this review and its foundation in the Settlement Agreement, the Rule 40 modernization, several court orders, and *Olmstead* requirements.  Section III describes the standards and principles which apply to the use of mechanical restraints and seclusion generally and at AMRTC and MSH. The extent to which the Restraint Chair and Seclusion are used at these institutions is presented in Section IV, calculated from the aggregate data provided by the Department of Human Services.

While mechanical restraints and seclusion have been eliminated at MSHS-Cambridge, they continue to be used to a significant degree at AMRTC and MSH. For example, one client at AMRTC was kept in the Restraint Chair for 85 hours, over 35 uses, in one month. One client was kept in Seclusion at MSH for a total 43 hours in one month, over three uses. Most uses of the Restraint Chair and Seclusion are for fewer hours, but the they are used often and with many clients. Generally,

- AMRTC uses the Restraint Chair often, on many clients and sometimes many uses per client per month. AMRTC uses Seclusion far less often than the Restraint Chair.
- MSH rarely uses the Restraint Chair. MSH uses Seclusion more often than the Restraint Chair, although not as much as AMRTC.

---

[1] Other categories of restraint include "ambulatory" and "holding." These are used rarely at ANOKA and MSH and are not addressed in this report. However, their use is governed by the requirements set forth in Section III

3

The Monitor has not calculated the rate of use of the procedures based on the census of each facility. However, with MSH roughly three times the size of AMRTC, it would appear that AMRTC's rate is much higher than that at MSH. AMRTC, it is noted, has 8 living units and each has its own Seclusion Room and Restraint Chair; 1 unit (the unit for clients with Developmental Disabilities) has 2 Restraint Chairs.

DHS recently committed to the elimination of these procedures however, and has adopted principles to support forbidding the procedures in the near term.

## II.   SETTLEMENT AGREEMENT, RULE 40 AND OLMSTEAD

The initial impetus for this litigation was the excessive use of mechanical restraints at the Minnesota Extended Treatment Option (METO) at Cambridge, MN. In addition to closing METO, the 2011 court-approved settlement in this case prohibited all but emergency restraints; mechanical restraints and seclusion became things of the past.

The Settlement Agreement did more than forbid non-emergency restraints and seclusion at Cambridge. Referencing the 1987 rule which permitted aversive treatment such as restraints and seclusion, the State of Minnesota declared that "its goal is to utilize the Rule 40 Committee" process "to extend the application of the provisions in this Agreement to all state operated locations serving people with developmental disabilities with severe behavioral problems or other conditions that would qualify for admission to METO, its Cambridge, Minnesota successor, or the two new adult foster care transitional homes." Settlement Agreement, ¶7, Recitals.

Under the settlement, the State is to

> modernize Rule 40 to reflect current best practices, including, but not limited to the use of positive and social behavioral supports, and the development of placement plans consistent with the principle of the "most integrated setting" and "person centered planning, and development of an *'Olmstead* Plan'" consistent with the U.S. Supreme Court's decision in *Olmstead v. L.C,* 527 U.S. 582 (1999).[2]

In response to the *Rule 40 Advisory Committee Recommendations on Best Practices and modernization of Rule 40* (July 2, 2013) (Dkt. 219), the

---

[2] Settlement Agreement, ¶10.C.

4

Department of Human Services committed to establishment of a plan to eliminate seclusion and restraints:

> To that end, DHS will prohibit procedures that cause pain, whether physical, emotional or psychological, and establish a plan to prohibit use of seclusion and restraints for programs and services licensed or certified by the department. It is our expectation that service providers, including state operated services, will seek out and implement therapeutic interventions and positive approaches that reflect best practices.[3]

The settlement also requires the State to develop and implement a plan to comply with the requirements of the Americans with Disabilities Act as enunciated in the Supreme Court's 1999 decision in *Olmstead* v. *L.C.*[4] The Rule 40 Advisory Committee cites *Olmstead* as among current "best practices" incorporated into the settlement.

Accepting the Advisory Committee report, the Department adopted the principle for services which are licensed or certified by the Department that "[p]rohibit[s] techniques that include any programmatic use of restraint, punishment, chemical restraint, seclusion, time out, deprivation practices or other techniques that induce physical, emotional pain or discomfort."[5] The principle is to be implemented by December 31, 2014.[6]

In June 2013, the Department adopted a DHS *Respect and Dignity Practices Statement (*attached to this report) which similarly endorses the prohibition of techniques including restraint and seclusion and "other techniques that

---

[3] *Rule 40 Advisory Committee Recommendations on Best Practices and modernization of Rule 40* (July 2, 2013) at 1 (Dkt. 219) ("Introduction by the Department of Human Services").

[4] Settlement Agreement, ¶10.B. ("the State and the Department shall develop and implement a comprehensive *Olmstead* plan that uses measurable goals to increase the number of people with disabilities receiving services that best meet their individual needs and in the "Most Integrated Setting," and is consistent and in accord with the U.S. Supreme Court's decision in *Olmstead* v. *L.C., 527* U.S. 582 (1999.).")

[5] *Advisory Committee Recommendations* at 2.

[6] During a transition period, the Commissioner "may allow use of emergency *seclusion* in limited programs, such as the Minnesota Security Hospital. . . ." *Op cit.*, n. 2, at 2 (emphasis added). Note that this discretionary exemption applies only to seclusion, not restraints.

5

induce physical, emotional pain or discomfort." The Statement commits DHS to "seek the inclusion of these concepts in the State *Olmstead* Plan and its implementation."

As indicated in the settlement agreement, and detailed in the Advisory Committee's report, the ban on seclusion and restraints is not established in a vacuum. Careful and compassionate treatment planning, addressing behavioral and other needs through best practice supports and person-centered planning are among the conditions which sustain the Department's move away from once common aversive measures.

### III. ANOKA METRO REGIONAL TREATMENT CENTER AND MINNESOTA SECURITY HOSPITAL

Anoka Regional Treatment Center and Minnesota Security Hospital are within the scope of the changes in restraint and seclusion policy and practice described above.

When the parties requested the Court to approve the Settlement Agreement, they hailed it as one which was "unprecedented that will benefit hundreds of thousands of people in this state." (Plaintiffs Class Counsel, Shamus O'Meara).[7] The settlement would "set the tone for other states" as well (Defendants' Counsel, Steven Alpert).[8] Most recently, the Court referenced these expectations in referencing the replacement of restraints through both the Rule 40 modernization and the *Olmstead* Plan:

> The historic settlement in this litigation was hailed by Plaintiffs and Defendants alike as one which would fundamentally improve the lives of individuals with disabilities in Minnesota and serve as a national model. The settlement's innovations were both with regard to replacement of mechanical and other restraints with positive behavioral supports and development of a comprehensive all-disabilities plan to implement the Supreme Court's decision under the Americans with Disabilities Act in *Olmstead v. L.C.,* 527 U.S. 581 (1999).

---

[7] *Hearing on Final Approval of the Settlement and Attorney Fees*, December 1, 2011, Transcript at 13.

[8] Transcript at 27 ("And again, it will greatly improve the quality in care of the lives of a large number of persons with disabilities, not only in Minnesota, but we have people that come through Minnesota. And it will impact them, as well. And we think that this agreement will set the tone for other states, as well.") (Attorney Steven Alpert).

6

Order of April 28, 2013 at 8. *See* Order of July 17, 2012 at 2-3 (Dkt. 159) (appointing monitor; citing "service system elements of the Settlement Agreement).

The Court has recognized that "[t]he Rule 40 modernization and the *Olmstead* Plan, and other elements of the settlement agreement, will affect all persons served at state operated locations other than MSHS-Cambridge, including Anoka Regional Treatment Center and Minnesota Security Hospital among others." Direction Letter to the Court Monitor (Aug. 5, 2013) at 1 (Dkt. 220). The Monitor is to review compliance with regard to MSH and Anoka, and the Court expects Defendants to "provide full access" to the records of the residents of those institutions. *Id.*

## IV.  RESTRAINTS AND SECLUSION AT AMRTC AND MSH

Within the context described above, the Court Monitor has begun review the use of restraints and seclusion at the Anoka facility and Minnesota Security Hospital since the approval of the Settlement Agreement.[9]

---

[9] Mechanical restraint, such as a restraint chair, and seclusion are defined as follows:

> Use of mechanical restraint is a prohibited technique. Mechanical restraint means the use of a device to limit a person's movement or hold a person immobile as an intervention precipitated by the person's behavior. The term does not apply to devices used for medical restraint. Mechanical restraint includes the use of metal handcuffs, shackles, leg hobbles, cable tie cuffs, PlastiCuffs, FlexiCuffs, posey cuffs, Velcro soft cuffs, fabric straps, and any other mechanical means to restrain a person. Use of mechanical restraint is a prohibited technique. [repetition of last sentence in original]
>
> Seclusion is a prohibited technique. "The placement of a person alone in a room from which egress is:
>
> > (a) noncontingent on the person's behavior; or
> >
> > (b) prohibited by a mechanism such as a lock or device or by an object positioned to hold the door closed or otherwise prevent the person from leaving the room.

*Rule 40 Advisory Committee Recommendations on Best Practices and modernization of Rule 40* (July 2, 2013) at 41 (Dkt. 219) (internal quotations from Settlement Agreement, and footnotes omitted).

Both AMRTC and MSH define the Restraint Chair as their sole "non-ambulatory restraint."

7

The Monitor obtained from the Department monthly aggregate data on the use of restraints and seclusion at Anoka and MSH.[10] The data were shown by facility, by type of restraint/seclusion, and by diagnostic category (DD = developmental disabilities; MI = mental health; CD = chemical dependency).

The examination of the aggregate data indicates that there is significant use of the Restraint Chair and of Seclusion at Anoka and MSH. (DHS' data includes some years prior to the filing and settlement approval dates (respectively, June and December 2011; we have not included the earlier data).[11]

Taking three examples from the blue-shaded table on the next page:

- At AMRTC for clients with DD and MI, the average use of the Restraint Chair for months in which this restraint was used was 556 minutes (9 hours). The high month use was 1,460 minutes (24 hours).
- At AMRTC for clients with DD, MI and CD, the average use of the Restraint Chair for months in which this restraint was used was 556 minutes (9 hours). The high month use was 5,109 minutes (85 hours).
- At MSH for clients with DD and MI, the average use of Seclusion for months in which seclusion was used was 539 minutes (9 hours). The high month use was 2,602 minutes (43 hours).

It is perhaps more meaningful to consider how the numbers apply to individual patients. The green-shaded tables on the following three pages show, for example,

- One AMRTC client was held in the Restraint Chair for 27 hours over January 2012, in 10 uses of the device. Another client's total was 85 hours over 35 times in February 2012.
- For other AMRTC clients, individual patients were held in the Restraint Chair for monthly totals ranging from less than an hour to

> AMRTC uses the Restraint Chair often, on many clients and sometimes many uses per client per month. AMRTC uses Seclusion far less often than the Restraint Chair.
>
> MSH rarely uses the Restraint Chair. MSH uses Seclusion more often than the Restraint Chair, although not as much as AMRTC.

---

[10] Monitor Request to Defendants of August 30, 2013; Defendants' Response of October 1, 2013.

[11] The reader will notice that not all months are included

## MINUTES MONTHLY: RESTRAINT CHAIR AND SECLUSION

| | High | Average | Low | |
|---|---|---|---|---|
| **AMRTC: DD & MI: Total Minutes** | | | | |
| Non-amulatory Restraint (Restraint Chair) | 1,460 | 566 | 47 | January 2012 to August 2013 |
| Seclusion | 470 | 148 | 20 | January 2012 to August 2013 |
| **AMRTC: DD, MI & CI: Total Minutes** | High | Average | Low | |
| Non-amulatory Restraint (Restraint Chair) | 5,109 | 759 | 60 | December 2011 to June 2013 |
| Seclusion | 155 | 85 | 45 | December 2011 to June 2013 |
| **MSH: DD & MI: Total Minutes** | High | Average | Low | |
| Non-amulatory Restraint (Restraint Chair) | 115 | 91 | 73 | April 2012 to June 2013 |
| Seclusion | 2,602 | 539 | 33 | April 2012 to June 2013 |
| **MSH: DD, MI & CD: Total Minutes** | High | Average | Low | |
| Non-amulatory Restraint (Restraint Chair) | 0 | 0 | 0 | April 2012 to June 2013 |
| Seclusion | 5 | 5 | 5 | July 2012 |

DSH Data. Average counts non-zero months.

# PER PATIENT: NUMBER OF HOURS IN RESTRAINT CHAIR OR SECLUSION BY MONTH

## AMRTC • DD & MI

### NON-AMBULATORY RESTRAINT (RESTRAINT CHAIR)

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN RESTRAINT IN MONTH |
|---|---|---|---|
| 2011-12 | 2 | 3 | 4.96 |
| 2012-01 | 1 | 10 | 27.57 |
| 2012-02 | 1 | 35 | 85.15 |
| 2012-03 | 1 | 4 | 5.25 |
| 2012-05 | 1 | 1 | 1.50 |
| 2012-06 | 3 | 7 | 5.53 |
| 2012-07 | 0 | 0 | |
| 2012-08 | 1 | 1 | 1.00 |
| 2012-10 | 1 | 4 | 7.25 |
| 2012-11 | 1 | 2 | 2.58 |
| 2012-12 | 2 | 2 | 2.21 |
| 2013-01 | 1 | 2 | 2.75 |
| 2013-02 | 2 | 5 | 6.17 |
| 2013-03 | 1 | 3 | 6.42 |
| 2013-04 | 1 | 4 | 6.08 |
| 2013-06 | 1 | 1 | 1.00 |

## AMRTC • DD, MI & CD

### NON-AMBULATORY RESTRAINT (RESTRAINT CHAIR)

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN RESTRAINT IN MONTH |
|---|---|---|---|
| 2011-11 | 2 | 2 | 1.46 |
| 2012-01 | 2 | 2 | 1.33 |
| 2012-02 | 2 | 5 | 3.71 |
| 2012-03 | 3 | 13 | 5.96 |
| 2012-04 | 5 | 13 | 4.42 |
| 2012-05 | 2 | 6 | 4.18 |
| 2012-06 | 2 | 5 | 3.00 |
| 2012-07 | 3 | 12 | 6.87 |
| 2012-08 | 5 | 7 | 1.52 |
| 2012-09 | 4 | 12 | 3.21 |
| 2012-10 | 0 | 0 | |
| 2012-11 | 2 | 11 | 8.21 |
| 2012-12 | 2 | 5 | 3.08 |
| 2013-01 | 4 | 12 | 6.08 |
| 2013-02 | 2 | 7 | 4.71 |
| 2013-03 | 3 | 7 | 3.00 |
| 2013-04 | 1 | 1 | 2.00 |
| 2013-05 | 2 | 2 | 0.75 |
| 2013-06 | 2 | 3 | 1.43 |
| 2013-07 | 1 | 1 | 0.78 |
| 2013-08 | 1 | 1 | 1.42 |

PER PATIENT: NUMBER OF HOURS IN RESTRAINT CHAIR OR SECLUSION BY MONTH

### AMRTC • DD & MI

#### SECLUSION

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN SECLUSION IN MONTH |
|---|---|---|---|
| 2011-12 | 0 | 0 | |
| 2012-01 | 0 | 0 | |
| 2012-02 | 1 | 1 | **0.75** |
| 2012-03 | 0 | 0 | |
| 2012-05 | 0 | 0 | |
| 2012-06 | 0 | 0 | |
| 2012-07 | 0 | 0 | |
| 2012-08 | 0 | 0 | |
| 2012-10 | 1 | 1 | **1.58** |
| 2012-11 | 0 | 0 | |
| 2012-12 | 0 | 0 | |
| 2013-01 | 1 | 1 | **0.92** |
| 2013-02 | 2 | 2 | **0.63** |
| 2013-03 | 1 | 1 | **2.58** |
| 2013-04 | 1 | 1 | **1.42** |
| 2013-06 | 0 | 0 | |

### AMRTC • DD, MI & CD

#### SECLUSION

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN SECLUSION IN MONTH |
|---|---|---|---|
| 2011-11 | 1 | 1 | **1.17** |
| 2012-01 | **0** | **0** | |
| 2012-02 | 0 | 0 | |
| 2012-03 | 0 | 0 | |
| 2012-04 | 0 | 0 | |
| 2012-05 | 0 | 0 | |
| 2012-06 | 0 | 0 | |
| 2012-07 | 1 | 1 | **0.33** |
| 2012-08 | 1 | 2 | **2.08** |
| 2012-09 | 2 | 3 | **1.50** |
| 2012-10 | 2 | 2 | **0.75** |
| 2012-11 | 2 | 6 | **3.92** |
| 2012-12 | 0 | 0 | |
| 2013-01 | 1 | 1 | **1.42** |
| 2013-02 | 2 | 2 | **0.54** |
| 2013-03 | 0 | 0 | |
| 2013-04 | 0 | 0 | |
| 2013-05 | 0 | 0 | |
| 2013-06 | 0 | 0 | |
| 2013-07 | 0 | 0 | |
| 2013-08 | 0 | 0 | |

# PER PATIENT: NUMBER OF HOURS IN RESTRAINT CHAIR OR SECLUSION BY MONTH

## MSH • DD & MI

### NON-AMBULATORY RESTRAINT (RESTRAINT CHAIR)

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN RESTRAINT IN MONTH |
|---|---|---|---|
| 2012-04 | 0 | 0 | |
| 2012-05 | 0 | 0 | |
| 2012-06 | 0 | 0 | |
| 2012-07 | 0 | 0 | |
| 2012-08 | 0 | 0 | |
| 2012-09 | 0 | 0 | |
| 2013-01 | 0 | 0 | |
| 2013-02 | 0 | 0 | |
| 2013-03 | 0 | 0 | |
| 2013-04 | 1 | 1 | **1.92** |
| 2013-05 | 1 | 1 | **1.22** |
| 2013-06 | 1 | 1 | **1.43** |

### SECLUSION

| Year & Month | PATIENT COUNT (UNDUPLICATED) | NUMBER OF USES | EACH PATIENT: # HOURS IN SECLUSION IN MONTH |
|---|---|---|---|
| 2012-04 | 1 | 1 | **2.37** |
| 2012-05 | 1 | 3 | **43.37** |
| 2012-06 | 1 | 4 | **9.45** |
| 2012-07 | 1 | 6 | **11.17** |
| 2012-08 | 1 | 1 | **1.42** |
| 2012-09 | 0 | 0 | |
| 2013-01 | 0 | 0 | |
| 2013-02 | 0 | 0 | |
| 2013-03 | 0 | 0 | |
| 2013-04 | 0 | 0 | |
| 2013-05 | 1 | 4 | **17.42** |
| 2013-06 | 1 | 1 | **0.55** |

Note: Data for Dec 2011 - March 2012 is zero.

NO CHART IS PRESENTED FOR MSH • DD, MI & CD: There are no instances of restraint chair for this period. For seclusion, there was 1 instance, for 1 client lasting 0.08 hours in December, 2011.

> more than 8 hours.
- Seclusion use at AMRTC ranged from totals of less than an hour to nearly 4 hours per person per month.
- At MSH, the Restraint Chair is used very rarely (3 instances over 12 months) and for between 1 and 2 hours each time.
- However, at MSH, Seclusion is used more often than the Restraint Chair, though on many fewer clients than at AMRTC. Individual clients were put into Seclusion for as many as 43 hours in one month for one client, and 17, 11 and 9 hours for other clients.

The Monitor has not calculated the rate of use of the procedures based on the census of each facility. However, with MSH roughly three times the size of AMRTC, it would appear that AMRTC's rate is much higher than that at MSH. AMRTC, it is noted, has 8 living units and each has its own Seclusion Room and Restraint Chair; 1 unit (the unit for clients with Developmental Disabilities) has 2 Restraint Chairs.

## V.     AMRTC AND MSH RESTRAINT REVIEW • PHASE 2

Phase 2 of this will focus on individuals' experiences in each instance of the use of Seclusion or the Restraint Chair at AMRTC and MSH. Each use of the Restraint Chair or Seclusion will be considered.

1.     The Department of Human Services is respectfully requested to provide the Court Monitor with the following for each use of the Restraint Chair or Seclusion:[12]

   a. The restraint/seclusion order.
   b. Documentation of the restraint/seclusion (*e.g.*, duration, checks of status of the individual, timing of start/finish and of checks, etc.)
   c. The Progress Notes for the 24 hours prior to, and 24 hours subsequent to, each use of restraint/seclusion.
   d. Any Incident Report generated as a result of, or in connection with, the restraint/seclusion.
   e. Any report of any injury to the individual as a result of, or in connection with, the restraint/seclusion.
   f. Any Investigation generated as a result of, or in connection with, the restraint/seclusion.

---

[12] The request involves a total of no more than 97 individuals. It is likely that the number is fewer due to overlap between the Restraint Chair and Seclusion categories.

9

2.      The information will be organized first by patient/client (alphabetized by last name) and then, within each patient/client folder, by each instance of Restraint/Seclusion in chronological sequence with the material ("a" to "f" above) in a folder or stapled together for each such instance.

3.      For each patient/client, DSH will provide a cover sheet to the patient/client folder which will state the person's name, MMIS number, hospital number, birthdate and age, admission date and (if applicable) discharge date.

4.      Two sets of the above material will be sent to the Court Monitor by DHS.

5.      In fulfilling this request, DHS shall ensure that no requested or related material is altered, redacted, created, or omitted.

6.      DHS will assemble the material for two sample individuals (one from AMRTC and one from MSH) and provide it to the Court Monitor within 15 days. The remainder of the material will be provided after the Court Monitor's approval of the format/organization of the two sample files.

## VI.    CONCLUSION

The Court Monitor notes at the outset of this report that DHS has embraced the Settlement Agreement prohibitions on seclusion and restraint. DHS' adoption of the Rule 40 Advisory Committee recommendations and the Commissioner's "privacy and dignity" declaration aim to move the system to and end to use of seclusion and restraints.

Unlike MSHS-Cambridge, at which Seclusion and mechanical restraint, such as the Restraint Chair, is prohibited, AMRTC and MSH continue to implement these procedures, as documented in this Phase 1 report.

Phase 2 will consider the documentation of each specific use of the procedures. The Department of Human Services will shortly provide the Court Monitor with that documentation.

Respectfully submitted,

/s David Ferleger
David Ferleger

October 17, 2013

## DHS Respect and Dignity Practices Statement

Ensuring the Minnesotans we care for are treated with respect and dignity is a key element of our agency's mission. Practices around seclusion and restraint have not always been consistent with these principles. The Minnesota Department of Human Services, as an agency with responsibilities in the administration and oversight of services, and as a provider of services, is committed, in words and in actions, to achieving these goals.

To that end, it is our goal to prohibit procedures that cause pain, whether physical, emotional or psychological, and prohibit use of seclusion and restraints for all programs and services licensed or certified by the department. It is our expectation that service providers will seek out and implement therapeutic interventions that reflect best practices.

We commit not only to following legal and regulatory requirements limiting the use of seclusion and restraint as a provider of service, but also to creating a broader culture that honors the trust placed in us both as a provider and as a department responsible for the administration and oversight of many of the services that support citizens. Such a culture will help the agency and providers regulated by the agency adapt to best practices that continue to evolve over time.

In December 2011, the Jensen Settlement Agreement[1] set a new course toward best practices in how people with disabilities are treated. The Jensen Agreement resulted from unhealthy conditions in the Minnesota Extended Treatment Options (METO) program. One key provision of the Jensen Agreement was a requirement that the Department of Human Services (DHS or Department) empower a committee to examine the issues of seclusion and restraint as they pertain to persons with developmental disabilities. In particular, the Agreement called for a review, and possible update, of a DHS administrative rule commonly known as Rule 40. However, while abiding by the Jensen's Agreement directive on Rule 40, it is DHS's belief that there is a great opportunity to create broader policies on positive supports, prohibited practices, training, monitoring and reporting across the programs we regulate. Therefore, with recognition that there are some providers and advocacy groups whose opinions differ, DHS, along with a growing number of our clients, advocates, and providers, support a change in Department policy to prohibit procedures that cause pain, whether physical, emotional or psychological and prohibit programmatic use of seclusion and restraints for all programs and services licensed or certified by the Department.

Each person comes to the system with unique needs, and may have co-occurring conditions that draw on multiple services. Best practice standards have changed and will continue to evolve. Punishment is not only non-therapeutic but the consequences of punishment are counter to therapeutic intervention and are unacceptable. Consistent use of best practices will lead to enhanced effectiveness in services and better outcomes for people.

**DEPARTMENT COMMITMENT TO PRINCIPLES**
It is the intent of the Department of Human Services to adopt the following principles for all programs and services licensed or certified by the Department:

- Prohibit techniques that include any use of restraint, punishment, chemical restraint, seclusion, time out, deprivation practices or other techniques that induces physical, emotional pain or discomfort.

---

[1] *The true measure of a civilized and democratic society is the way each of us treats those individuals most in need and the most vulnerable amongst us. That, of course, means that all people are entitled to be treated with patience, dignity, and respect, and to be extended kindness, whoever they may be, regardless of their social standing in the community and especially if they have special needs. Jensen Settlement Agreement December 5, 2011*

## DHS Respect and Dignity Practices Statement

- Emergency use of restraint can only occur if a person's *"conduct poses an imminent risk of physical harm to self or others and less restrictive strategies would not achieve safety. Client refusal to receive/participate in treatment shall not constitute an emergency."*[2] All use of emergency restraint will require monitoring and oversight by the appropriate regulatory authority, advocacy and expert clinical resources and will be tracked and analyzed. Emergency use of restraint and seclusion may need to be continued in the Minnesota Security Hospital until alternatives are in place.
- DHS is committed to protecting the rights of all individuals in accordance with applicable Bills of Rights.[3]
- Standards for services transcend diagnostic labels, although must remain sensitive to the unique needs of each person and their presenting conditions.
- DHS, with consumer and stakeholder input, will create a common set of standards across all providers which include:
    - Positive supports and practices
    - Trauma informed care practices
    - Person centered thinking/planning, and
    - Analysis and review of all use of emergency restraints or emergency seclusion.
- DHS will appropriately adjust and align resources to make these changes.

**IMPLEMENTATION**
- DHS will examine the feasibility and rule making authority to adopt best practices in person-centered planning and positive supports.
- DHS will consult with advocates, providers, case managers, persons receiving services and their families and consultants who have demonstrated success and expertise on best practices.
- DHS will disseminate this position statement widely.
- DHS will adopt and promote the use of positive practices, social supports and the development of plans consistent with the most integrated setting and person centered planning.[4]
- DHS will implement strategies to achieve the agreed upon practices in the most expeditious manner.
- DHS will include consumers and stakeholders in the phased development of the statute, rule, bulletins, waiver plans/amendments and any policy or practices manual that addresses these standards.
- DHS will undertake to achieve these objectives by January 15, 2015.
- DHS will seek the inclusion of these concepts in the State Olmstead Plan and its implementation.

The Minnesota Legislature authorized the Department to develop new provider and service standards for all home and community based services. DHS plans to use these new standards, section 245D that will replace 245B licensing standards, as a method to ensure consistency in the principles outlined in this document across all MN Department of Human Service licensed or certified providers who deliver home and community based services through the five Minnesota home and community based waiver programs, and other services previously licensed under 245B. In addition, these standards will meet guidelines from the Centers for Medicare and Medicaid Services, which directed all states to create standards on safeguards and regulation of seclusion and restraints and oversight activities in its home

---

[2] Jensen Settlement Attachment A

[3] Bills of Rights: Minnesota Patient Bill of Rights (Hospitals), Resident Bill of Rights (Nursing Homes), Minnesota Home Care Bills of Rights Including for Assisted Living Clients and Home Care Services, Minnesota Hospice Bill of Rights, Combined Bill of Rights for Hospice, Minnesota Outpatient Surgical Center Patient's Bill of Rights, Bill of Rights For Wards And Protected Persons

[4] To study, review and advise the Department on how to modernize Rule 40 to reflect current best practices, including, but not limited to the use of positive and social behavioral supports, and the development of placement plans consistent with the principle of the "most integrated setting" and "person centered planning ... Jensen Settlement Agreement

## DHS Respect and Dignity Practices Statement

and community based service waiver programs.[5]

Each administration within the Department with program and policy responsibility for services will evaluate its service regulations against the principles outlined in this document and the recommendations from the Advisory Committee for the modernization of Rule 40, and determine what changes are necessary to assure consistency with the principles adopted by the DHS.

Dated: 6/20/13

Lucinda Jesson
Commissioner, Minnesota Department of Human Services

---

[5] CMS Appendix G-2: Safeguards Concerning Restraints and Restrictive Interventions