# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, guardians and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian and next friend of Jason R. Jacobs; and others similarly situated, | Civil No. 09-1775 (DWF/FLN) |
| Plaintiffs, | |
| v. | **ORDER** |
| Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually, and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and the State of Minnesota, | |
| Defendants. | |

Mark R. Azman, Esq., and Shamus P. O'Meara, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Aaron Winter, Scott H. Ikeda, and Anthony R. Noss, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

Samuel D. Orbovich, Esq., and Christopher A. Stafford, Esq., Fredrikson & Byron, PA, counsel for Defendant Scott TenNapel.

## INTRODUCTION

Before the Court are the Court Monitor's *Report to the Court: Community Compliance Review* ("*Community Compliance Review*") (Doc. No. 327), the Minnesota Department of Human Services' ("DHS") *Response to the Community Review* (Doc. No. 324), the Plaintiff Class' *Response to the Community Review* (Doc. No. 332), and the DHS' *Reply to the Plaintiff Class' Response to the Community Review* (Doc. No. 338). Also before the Court is the Plaintiff Class' request for sanctions (Doc. No. 230), left unresolved in the Court's December 17, 2013 Order (Doc. No. 259). The Court's December 17, 2013 Order reserved the issue of additional sanctions pending review and scrutiny of Defendants' compliance with the existing Orders of the Court, including the implementation plan required pursuant to the Court's August 28, 2013 Order (Doc. No. 224), as well as the Stipulated Class Action Settlement Agreement ("Settlement Agreement") (Doc. No. 104), which was approved and adopted by the Court in its December 5, 2011 Order (Doc. No. 136).

While asserting progress and promising improvements, the DHS does not contest the Court Monitor's findings of non-compliance with regard to adequacy of care and planning for clients who have moved from the Minnesota Extended Treatment Option ("METO") or Minnesota Specialty Health Systems ("MSHS")-Cambridge facilities into

the community.  (*See* Doc. No. 324 at 1.)  The DHS identifies those assessments with which it agrees as follows:

> When [] clients are placed in community settings via county case managers or licensed providers, the transition plans are often not being adhered to. Furthermore, county staff have not been adequately trained in person centered planning and many county staff are unfamiliar with the Jensen Settlement Agreement and Minnesota's *Olmstead* Plan.  Finally, the Court Monitor has suggested that DHS has not provided adequate oversight of counties with regard to the use of person-centered planning concepts, as well as transition plans and both of these are neither created nor used by county staff.

(*Id.*)

The Plaintiff Class also accepts the Court Monitor's findings of non-compliance and requests the Court "to direct DHS compliance on transition and person-centered support and services."  (Doc. No. 332 at 1-2.)  The Plaintiff Class argues that "we are now faced with continuing, fundamental non-compliance by DHS with important aspects of the Settlement as bluntly set forth by the Court Monitor in his Community Compliance Review."  (*Id.*)  The Plaintiff Class requests the Court to do the following:  (1) require "[i]mmediate remedial action" requiring "a comprehensive person-centered planning process for all affected class members which should include the counties being held accountable"; (2) "consider extending its jurisdiction over the Settlement by a sufficient time period to ensure sufficient compliance"; and (3) "consider converting the status of the Court Monitor to a Special Master for the transition and person-centered compliance areas of the Settlement."  (Doc. No. 332 at 8.)

In addition, the Plaintiff Class expresses its concern regarding the current status and lack of progress with the State's *Olmstead* Plan.  (*Id.* at 10.)  Specifically, the

3

Plaintiff Class observes that despite efforts to correct what it refers to as "DHS *Olmstead* Plan misdirection and delay," important issues remain, requiring recommitment and focus to complete and implement an *Olmstead* Plan with measurable goals and meaningful transitional services that are truly centered on the person, rather than driven by the DHS. (*Id.*)  In addressing these issues, the Plaintiff Class requests that the DHS begin to listen to and act on suggestions expressed by individuals such as Dr. Colleen Wieck, Executive Director, Minnesota Governor's Council on Developmental Disabilities, and Roberta Opheim, Ombudsman, Office of the Ombudsman for Mental Health and Developmental Disabilities.  (*See, e.g.*, Doc. No. 274, Dr. Colleen Wieck's Feb. 18, 2014 Comments Regarding the *Olmstead* Plan; Doc. No. 275, Roberta Opheim's Feb. 21, 2014 Comments Regarding the *Olmstead* Plan.)

## BACKGROUND

From the outset, based on the Settlement Agreement's mandates, the Court has emphasized the dual nature of Defendants' obligations:  (1) protection of individuals while they live in an institution; and (2) assurance of transition to quality care in the community.  Nonetheless, the DHS has repeatedly failed to comply with these obligations. (*See, e.g.*, Doc. No. 223 at 10; Doc. No. 159 at 12-13.)  Whether this failure is due to the breadth of the necessary system changes, including training, coordinating, and holding accountable the State's eighty-seven counties, or the DHS' lack of a full-fledged *Jensen* oversight office until mandated in the Comprehensive Plan of Action (Doc. No. 283), or the DHS' indifference to or intentional non-compliance with the Settlement Agreement

and related Orders of the Court (Doc. No. 259 at 5; Doc. No. 251 at 3), the Court respectfully directs the DHS to comply with the terms of the Court's Orders.

The Court has expressed its concern with non-compliance on prior occasions. In its August 28, 2013 Order, the Court identified community integration as a particular concern regarding non-compliance: "The Court deems this an opportue and appropriate time to consider the pace of Defendants' implementation of the obligations they undertook both as to the facility and system-wide, including but not limited to community integration under *Olmstead v. L.C*." (Doc. No. 224 at 10.) The Court also expressed its concern "with the sluggish pace of implementation of the specific terms of the Settlement Agreement and the resulting noncompliance." (*Id.*)

The Court Monitor has similarly expressed concerns with non-compliance. In a June 11, 2013 *Status Report on Compliance*, the Court Monitor cited non-compliance in all areas under transition planning. (Doc. No. 217 at 103-08.) After finding that "[g]aps between the County service systems and the DHS hinder effective and timely transition planning and the development of appropriate individual placements," the Court Monitor reported that "County case management must be revised to enable compliance." (*Id.* at 104, 106.) The Court Monitor reiterated these "past and current Transition Plan concerns" in its September 23, 2013 *Recommendation to the Parties: Transition Planning and the Re-purposing of MSHS-Cambridge*. (Doc. No. 226 at 3.)

In response to the Court Monitor's June 11, 2013 *Status Report on Compliance*, the DHS commissioned an independent review of the transition planning by the University of Minnesota's Institute on Community Integration ("ICI"). On April 30,

2014, ICI issued its *Independent Review of Transitions: Three Individuals with Developmental Disabilities Who Moved from the Minnesota Security Hospital to the Community*, which concluded that transitions were not completed with a person-centered plan or an *Olmstead* analysis and that moves to the community failed to comply with the required transition planning pursuant to the Settlement Agreement. (Doc. No. 301-20.)

Regrettably, nothing in the record demonstrates meaningful, let alone best efforts, to train and educate the county systems. The Court can no longer tolerate continued delay in implementation of the Settlement Agreement. Adherence to the Court's Orders by the DHS officials and staff at all levels is essential, not discretionary. The interests of justice and fairness to each Class member and similarly situated individuals requires no less.

**DISCUSSION**

While acknowledging that there have been some recent positive developments, the Court Monitor finds that the DHS has failed to comply with regard to the support of individuals who moved from the METO and MSHS-Cambridge institutions into the community.[1] (Doc. No. 327 at 3-4.) The Court Monitor also finds that the State has failed to comply with the transition elements of the Settlement Agreement with regard to providing adequate and appropriate transition plans, protections, supports, and services consistent with each person's individualized needs. (*Id.* at 19.)

---

[1] METO "closed" on June 30, 2011, several days after the Settlement Agreement was filed with the Court. MSHS-Cambridge "opened" the next day with the same clients and staff, and in the same facilities.

6

The Court Monitor further finds that Minnesota counties[2] are not serving clients in compliance with the Court's Orders by failing to implement the person-centered planning and transition requirements of the Settlement Agreement. (*Id.* at 3.) Among other deficiencies, the Court Monitor finds that community support services are not individualized and do not meet professional standards as required by the Court's Orders. (*Id.* at 4.) As a consequence of these deficiencies, the Court Monitor concludes that "[f]or some, their services are more life-wasting than life-fulfilling." (*Id.*)

The Court Monitor also finds that providers and case managers "generally have no knowledge of the transition planning elements of the settlement, or what is required in transition, or that individuals discharged from MSHS-Cambridge have entitlements under the settlement, or the identities of the individuals who have those entitlements" and "have not been trained regarding these matters." (*Id.* at 14.) Counties, the Court Monitor observes, have not been informed by the DHS regarding the Settlement Agreement's requirements, the Court Monitor's findings, or the Court's Orders. (*Id.* at 15.)

The Court concludes that a remedy addressing the non-compliance is appropriate. Multiple admonitions to the DHS have been insufficient to secure effective action by the DHS to close the significant gaps between its stated intentions and actions. Continued

---

2   In Minnesota, counties are instruments of the State and have disability services responsibilities enmeshed with those of the DHS. The Commissioner of the DHS has extensive authority to supervise all non-institutional services to individuals with disabilities. Minn. Stat. § 256.01. County case managers coordinate and ensure compliance. Counties also monitor services provided to individuals and collaborate in the development and annual review of the individuals' coordinated service and support plan and habilitation plan. If a contracted provider fails to carry out its responsibilities, case managers are authorized to take action. *See* Minn. Stat. §§ 256B.092 and 245D.

implementation delays can no longer be tolerated.  More importantly, the dignity, quality of life, and best interests of every Class Member and similarly situated individuals with disabilities hinge on fulfillment of the promises made by Defendants at the fairness hearing in this matter.

When the Settlement Agreement was approved and adopted by this Court, the parties made promises and sweeping declarations that the settlement heralded widespread change for "hundreds of thousands of people in this state" and would "set the tone" nationally.  (Doc. No. 146, Dec. 1, 2011 Final Settlement Hearing Transcript, at 13:8-9, 27:24.)  The Plaintiff Class stated that the settlement's "unprecedented comprehensive positive changes" would benefit "not only Class members, but all people with developmental disabilities in this state." (*Id.* at 8:7-10.)  Defendants concurred with the Plaintiff Class, stating:  "[The Settlement Agreement] will greatly improve the quality in care of the lives of a large number of persons with disabilities, not only in Minnesota, but [for] people that come through Minnesota. . . ., [a]nd we think that this agreement will set the tone for other states, as well." (*Id.* at 10:20-25.)  The Court is quite certain that, if surveyed, the Plaintiff Class and their families, with few exceptions, would confirm that all of these well-intentioned proclamations have not occurred.

In refraining from issuing contempt and other punitive sanctions for the most recently established non-compliance, at least at this time, the Court acknowledges the Court Monitor's report of recent positive developments and the DHS' recognition "that it must do more to ensure that the counties comply with the court's mandates."  (Doc. No. 327 at 3.)

However, the Court is obligated to take some action with the objective of increasing the Court Monitor's responsibilities to: (1) oversee Defendants and ensure their accountability; and (2) expedite prompt and meaningful compliance. Consequently, the Court will extend its jurisdiction for a period of at least two additional years.

The Settlement Agreement provides that the Court's jurisdiction would be determined "as the Court deems just and equitable." (Doc. No. 104 at 39.) Last year, the Court extended its jurisdiction over this case for one year to December 4, 2014, "expressly reserve[ing] the authority and jurisdiction to order an additional extension of jurisdiction, depending upon the status of compliance by the Defendants with the specific provisions of the Settlement Agreement, absent stipulation of the parties." (Doc. No. 223 at 3.)

At this juncture, it is unlikely that the DHS will remedy the community non-compliance and also achieve substantial compliance with the Comprehensive Plan of Action, the *Olmstead* Plan, and the Rule 40 Modernization by December 4, 2014. For example, the DHS references the "long-term systemic county training and compliance issues" identified in the Court Monitor's *Community Compliance Review* and suggests that future deadlines be set in the multi-year *Olmstead* Plan. (Doc. No. 324 at 3.) Extending the term of the Court's jurisdiction is clearly necessary based on the significant delays in implementation as well as the non-compliance with the Settlement Agreement. The Court concludes that at least a two-year extension is necessary in order for the Court to oversee and direct the DHS to accelerate its efforts to comply with the Settlement Agreement and to fulfill the promises and proclamations made by the DHS at

the time of the fairness hearing when the Settlement Agreement was approved by the Court. Moreover, the Court concludes that individuals in the field, such as Dr. Colleen Wieck, Executive Director, Minnesota Governor's Council on Developmental Disabilities, and Roberta Opheim, Ombudsman, Office of the Ombudsman for Mental Health and Developmental Disabilities, must have significant input in implementing the Settlement Agreement.

The Court Monitor has continued to serve the Court, pursuant to the Court's July 17, 2012 Order, in substantial part because of the noncompliance of the DHS. With few exceptions, his findings and recommendations have generally been received by the parties with little or no objection. The Court Monitor's role has been to "assist and inform the Court on the implementation of the Settlement Agreement's requirements" and to report, monitor, and make recommendations to the Court and the parties. (Doc. No. 159 at 12.) Given the record since that appointment, and the circumstances described in the Court Monitor's *Community Compliance Review*, the Court finds that a more substantial role is necessary.

Regarding the DHS' failure to ensure licensure of MSHS-Cambridge, the Court, in its December 17, 2013 Order, "reserve[d] ruling on what sanctions are appropriate" pending receipt of information on the DHS' compliance with implementation plans. (Doc. No. 259 at 7.) While the extension of jurisdiction may be considered a sanction related to the circumstances described in this Order, the Court also reserves the right to entertain a motion by the Plaintiff Class to recover attorney fees that have been incurred directly related to the non-compliance of the DHS as well as to evaluate an increased role

for the Minnesota Governor's Council on Developmental Disabilities as well as the Office of the Ombudsman for Mental Health and Developmental Disabilities. The Court will also consider whether any additional funding will be necessary given justifiable reliance by a number of individuals, including the Court Monitor and the DHS officials, on these two offices.

Based upon the presentations and submissions of all parties, including the Court Monitor's *Community Compliance Review*, the Court having again reviewed the history of the case, and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

## ORDER

1. The Court **APPROVES** the Court Monitor's *Report to the Court: Community Compliance Review* (Doc. No. [327]).

2. The Court Monitor shall make findings of compliance concerning the Defendants' activities under the Settlement Agreement, the Comprehensive Plan of Action, which includes, among other things, the *Olmstead* Plan, the rules proposed or adopted under the Rule 40 Modernization requirement, and other Orders of the Court. In addition, the Court Monitor shall make recommendations that will facilitate the goals and objectives of the Court's Orders, including recommendations for contempt, sanctions, fines or additional relief. The Court Monitor may continue to issue reports on compliance and other issues in this case in his discretion; in light of the requirements in this Order, quarterly compliance reports by the Court Monitor are no longer required. The Internal Reviewer, Dr. Richard Amado, shall continue to issue his reports to the Court Monitor.

The Court Monitor shall also continue to issue reports on compliance and other issues in this case at his discretion.

3. The Court Monitor has the authority necessary to facilitate and assist Defendants to achieve substantial compliance with Defendants' obligations under the Court's Orders.

4. The Court Monitor shall:

a. Oversee the timely implementation of all procedures and activities related to all outstanding obligations under the Court's Orders.

b. Oversee the activities of the Defendants in order to ensure and affirm that the service system provides services and support that comply with the Court's Orders.

c. Oversee the activities of the Defendants, including their oversight and monitoring, in order to ensure that their supervision and regulation of counties, contractors, providers, and agents results in substantial compliance with the Court's Orders.

d. Oversee the activities of the Defendants related to their communications with other state agencies necessary to achieve substantial compliance with the existing Court's Orders.

e. Review existing data collection mechanisms, information management, performance standards, provider review, and quality improvement systems, and, if necessary, identify specific improvements to achieve substantial compliance with the Court's Orders.

  f. Supervise compliance activities by the Defendants with respect to the Court's Orders.

  g. Facilitate efforts of the Defendants to achieve substantial compliance with the Court's Orders at the earliest feasible time.

  h. Evaluate the adequacy of current activities and the implementation of remedial strategies to facilitate substantial compliance with the existing Court's Orders.

  i. Propose to the Court actions that could be taken to more rapidly achieve substantial compliance, including the need for any additional Court Orders. In developing these actions, to the extent the Court Monitor deems appropriate, he may:

   (1) Develop specific outcome measures or standards of compliance for those areas in which such outcome measures or standards would assist in the determination of substantial compliance;

   (2) Encourage and allow the Defendants in the first instance to propose timelines, outcome measures, or standards of compliance, should they desire to do so; and

   (3) Include, when he deems appropriate, timetables for implementation, descriptions of measures necessary to bring the Defendants into substantial compliance or to overcome obstacles to substantial compliance.

5. The Court Monitor may make formal, written recommendations if the Court Monitor: (a) determines that any action necessary to achieve substantial compliance with an outstanding obligation under the Court's Orders is not being implemented or is inadequately implemented; (b) finds that Defendants are violating any provision of the Court's Orders; or (c) acts on a party's submission or a *sua sponte* consideration of a dispute. Such recommendations shall include consideration of the appropriateness of contempt, sanctions, fines, or additional relief. Such recommendations may also include timetables for implementation and descriptions of measures necessary to bring the Defendants into substantial compliance or to overcome obstacles to substantial compliance.

6. The Court Monitor shall serve for as long as necessary for Defendants to achieve substantial compliance. However, it is expected that Defendants will substantially comply with the Court's Orders by December 4, 2016. Pursuant to the Settlement Agreement § XVIII.B and § XVIII.E, and the Court's August 28, 2013 Order, the Court's jurisdiction is extended to December 4, 2016, and the Court expressly reserves the authority and jurisdiction to order an additional extension of jurisdiction, depending upon the status of the Defendants' compliance and absent stipulation of the parties.

Dated: September 3, 2014                    s/Donovan W. Frank  
                                                              DONOVAN W. FRANK  
                                                              United States District Judge