# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| James and Lorie Jensen, as parents, guardians, and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians, and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian, and next friend of Jason R. Jacobs; and others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and the State of Minnesota,<br><br>                    Defendants. | Civil No. 09-1775 (DWF/BRT)<br><br><br><br><br><br>**ORDER** |

___

Shamus P. O'Meara, Esq., and Mark R. Azman, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Nathan A. Brennaman, Deputy Attorney General, Scott H. Ikeda, Aaron Winter, and Anthony R. Noss, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

Samuel D. Orbovich, Esq., and Christopher A. Stafford, Esq., Fredrikson & Byron, PA, counsel for Defendant Scott TenNapel.

John W. Ursu, Esq., Karl C. Procaccini, Esq., and Katherine M. Swenson, Esq., Greene Espel PLLP, counsel for Amicus Ivan M. Levy.

## INTRODUCTION

Before the Court is the State of Minnesota's August 10, 2015 proposed revisions to Minnesota's *Olmstead* Plan ("*Olmstead* Plan"). (Doc. No. 486-1.) For the reasons discussed below, the Court approves the revised *Olmstead* Plan.

## BACKGROUND

The Supreme Court's landmark decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), provided a basis for this class action litigation and the resulting *Olmstead* Plan before the Court. The *Olmstead* case involved two women with mental disabilities who were forced to reside in state-run segregated institutions even though their treatment providers agreed that they could be appropriately treated in the community. *Id.* at 593. These women sought to live and receive treatment in an integrated community-based setting and argued that their confinement violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"). *Id.* at 593-94. The Supreme Court considered the ADA and its implementing regulations, including the requirement that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to

the needs of qualified individuals with disabilities." *Id.* at 592 (quoting 28 C.F.R. § 35.130(d) (1998)). It held:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607. This decision gave individuals with disabilities throughout the country hope to believe that they could one day be truly integrated into society and given the same dignity and respect afforded to all persons.

In June 2011, the parties to this class action litigation entered a Stipulated Class Action Settlement Agreement ("Settlement Agreement"). (Doc. No. 104.) One of the Settlement Agreement's "System Wide Improvements" was a commitment to develop a comprehensive *Olmstead* Plan to improve the lives of individuals with disabilities. The State and the Department of Human Services ("DHS") committed to the following:

> Within eighteen (18) months of the Court's approval of this Agreement, the State and the Department shall develop and implement a comprehensive *Olmstead* plan that uses measurable goals to increase the number of people with disabilities receiving services that best meet their individual needs and in the "Most Integrated Setting," and is consistent and in accord with the U.S. Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 582 (1999).

(*Id.* at 18.)  Based upon the presentations and submissions of the parties, including counsel's remarks at the Final Approval Hearing,[1] the Court approved the Settlement Agreement on December 5, 2011.  (*See* Doc. No. 136.)

On May 6, 2015—more than three years after the Court's approval of the Settlement Agreement—the Court addressed the State and DHS's fourth revised version of the *Olmstead* Plan.[2]  The Court declined to approve the State's modified *Olmstead* Plan after finding that it did not comply with the "comprehensive standards and requirements set forth in the Settlement Agreement, *Olmstead v. L.C.*, 527 U.S. 581 (1999), and in numerous prior orders of this Court."  (Doc. No. 435 at 6.)  The Court directed the State to file a revised *Olmstead* Plan by July 10, 2015, and to attend status conferences scheduled by the Court regarding the revised *Olmstead* Plan.  (*Id.* at 9.)

Between June 10, 2015 and August 10, 2015, the parties participated in mediation meetings with Magistrate Judge Becky R. Thorson regarding the revised *Olmstead* Plan.

---

[1]   At the Final Approval Hearing on December 1, 2011, both Plaintiffs and Defendants alike hailed the Settlement Agreement as one that would fundamentally improve the lives of individuals with disabilities in Minnesota and serve as a national model.  (*See* Doc. No. 146 at 7 ("Perhaps the most important aspect of this Settlement . . . is that it is going to benefit not only all Class Members, but the approximate 100,000 people with developmental disabilities in this state and their families." (Attorney Shamus P. O'Meara, representing the Plaintiffs)); *id.* at 27 ("[T]his is an important settlement.  It will make a huge difference for people in a positive manner. . . . And we think that this agreement will set the tone for other states, as well." (Assistant Attorney General Steven H. Alpert, representing the Minnesota Department of Human Services)).)

[2]   For a complete procedural history of the *Olmstead* Plan and the Court's prior Orders respecting the plan, see the Court's May 6, 2015 Order.  (Doc. No. 435 at 2-4.)

Based on the status of the mediation proceedings, the Court extended the July 10, 2015 filing deadline to August 10, 2015. (Doc. No. 472.)

On August 10, 2015, the State filed the *Olmstead* Plan that is now before the Court for review. (Doc. No. 486-1.) In response to the *Olmstead* Plan, the Plaintiff Class submitted letter objections to the Court on August 19, 2015. (Doc. No. 493.) On August 27, 2015, the State filed a letter response to the Plaintiff Class' objections. (Doc. No. 503.) Ivan M. Levy submitted a Brief of Amicus Curiae on September 14, 2015. (Doc. No. 506.) On September 18, 2015, the State filed a response to Mr. Levy's submission. (Doc. No. 508.) The Court has received and considered all of these submissions.

## DISCUSSION

The Court has previously set forth the standards against which the State's *Olmstead* Plan should be measured. As the Court has stated in prior orders, "the Proposed *Olmstead* Plan must contain concrete, reliable, and realistic commitments, accompanied by specific and reasonable timetables, for which the public agencies will be held accountable." (Doc. No. 344 at 5; Doc. No. 435 at 5.) "Vague assurances of future integrated options is insufficient; to be effective, the Proposed *Olmstead* Plan must demonstrate success in actually moving individuals to integrated settings in furtherance of the goals." (Doc. No. 344 at 5; Doc. No. 435 at 5-6.) The Court has provided numerous illustrative examples of the application of these standards in previous orders. (*See, e.g.*, Doc. No. 344 at 4-7; Doc. No. 378 at 4-14.)

The Plaintiff Class asserts that the State's submission is deficient in some respects. (*See* Doc. No. 493.)  For example, the Plaintiff Class objects to the revised *Olmstead* Plan to the extent that it fails to expressly prohibit the use of restraint and seclusion for individuals with disabilities with a single emergency exception.  (*Id.* at 5.)  The Plaintiff Class also objects to the waiver waiting list provisions of the *Olmstead* Plan.  (*Id.*)  The Plaintiff Class further expresses concerns regarding the State's funding commitment and implementation plan to "ensure [the State and DHS] bring about actual tangible achievements rather than empty statements on a piece of paper." (*Id.* at 6.)

The State, on the other hand, asserts that its revised *Olmstead* Plan meets, and in certain respects exceeds, the requirements set forth by the Court.  (*See* Doc. No. 503 at 4 ("[T]he Plan is not only consistent with the Olmstead decision and the Court's orders, but in several respects, goes above and beyond what is required.").)  In response to the Plaintiff Class' objections, the State contends that its existing accomplishments and proposed advancements in the area of restraint and seclusion meet the State's obligations under the Settlement Agreement and the Comprehensive Plan of Action.  (*See id.* at 1-3.)  In particular, the State emphasizes that it "continues to press forward on this topic, with goals that aim to further reduce the use of restraint and seclusion even in . . . limited emergency circumstances." (*Id.* at 2.)  The State also asserts that its redesigned waiting list process and ambitious goals in this area meet its responsibilities under the Settlement Agreement, the Court's prior orders, and "the reasonable pace standard as set forth in the Olmstead decision." (*Id.* at 4.)  The State contends that it is "committed to ending the waiting list at the briskest pace possible within available resources." (*Id.*)  With respect

to the Plaintiff Class' funding concerns, the State asserts that "[f]or the most part, there is sufficient funding to implement the goals set forth in the Plan," and reiterates its commitment to secure funding not yet obtained, as outlined in the *Olmstead* Plan.  (*See id.* at 3; *see also* Doc. No. 486-1 at 99.)

After carefully reviewing the State's proposed revisions to the *Olmstead* Plan, the Court concludes that the State's *Olmstead* Plan substantially complies with the comprehensive standards and requirements set forth in the Settlement Agreement, *Olmstead v. L.C.*, 527 U.S. 581 (1999), and in prior orders of this Court.  In approving this version of the *Olmstead* Plan, the Court emphasizes three key changes that make it a substantial improvement over prior submissions to the Court:  (1) the addition of concrete baseline data and specific timelines to establish measurable goals; (2) improvements to each goal that make the *Olmstead* Plan not only measurable, but strategically tailored to make a significant impact in the lives of individuals with disabilities across the state; and (3) added commitments to make the *Olmstead* Plan an evolving document that will continue to respond to the changing needs of individuals in the state over time.

First, the Court finds that the State's revised *Olmstead* Plan meets the requirement of having concrete, measurable goals with corresponding time lines.  The *Olmstead* Plan's inclusion of specific measurable goals and timetables represents a marked improvement from prior versions of the *Olmstead* Plan.  These goals are supported by adequate baseline data and are accompanied by concrete and reasonable deadlines for completion. The new *Olmstead* Plan replaces vague assurances of future integrated options with verifiable commitments tied to specific metrics.  (*See, e.g.*, Doc. No. 486-1

7

at 45 (identifying a numeric baseline and annual goals to increase the number of individuals with disabilities living in the most integrated setting); *id.* at 50-51 (identifying numeric baselines and annual goals to increase the number of individuals with disabilities working in competitive, integrated employment).)  In this *Olmstead* Plan, the State provides a rationale for each of the metrics used, explains why each metric was chosen, and explains how each metric will adequately reflect improvement over time.  (*See id.* at 21.)  The State also clearly identifies those areas where additional data is needed to ensure accurate measurement moving forward and commits to obtaining such data in a timely manner.  (*See, e.g.*, *id.* at 52.)

Second, the Court finds that the revised *Olmstead* Plan includes strategic and significant goals.  Unlike prior submissions to the Court, the revised *Olmstead* Plan includes specific and realistic strategies for achieving each goal, along with a clear indication of the agencies responsible for ensuring that the goals are met.  In particular, the revised *Olmstead* Plan includes a commitment to utilizing detailed and strategic workplans in accomplishing the State's goals.  (*Id.* at 16; 95; 124-30.)  The State has committed to developing such workplans for all areas of the *Olmstead* Plan and commits to reviewing and updating these plans as needed to effectively achieve the *Olmstead* Plan's laudable goals.

Third, the revised *Olmstead* Plan includes several components that will ensure continued improvements for individuals with disabilities into the future.  The State views the *Olmstead* Plan as "a dynamic roadmap, determining its direction from information gained by experience implementing the Plan." (Doc. No. 486 at 1.)  To put this vision

into practice, the State has committed to establishing an annual review process and formal amendment process for the *Olmstead* Plan. (*See* Doc. No. 486-1 at 97.) These processes will allow the State to ensure that the plan is both meeting its goals and responding to the public's needs and choices regarding any new goals that should be included in the implementation of the plan. Key to the plan's successful implementation into the future is the central role of the Olmstead Implementation Office ("OIO") with the dual roles of "(1) quality assurance and accountability, including compliance evaluation, verification and oversight; and (2) engagement with the community, especially people with disabilities, including on-going management of communications and the Quality of Life survey." (*Id.* at 95.) These interrelated components of the revised *Olmstead* Plan represent an ambitious commitment by the State to continually improve the lives of individuals with disabilities many years into the future.

Finally, the Court approves the State's *Olmstead* Plan over the objections of the Plaintiff Class. The *Olmstead* Plan contains sufficient and reasonable measurable goals intended to eliminate the use of restraint and seclusion in compliance with the parties' Settlement Agreement. (*See id.* at 76-78.) These goals include specific numeric goals for reducing the use of restrictive procedures by disability service providers, reducing the number of Behavior Intervention Reporting Form reports of restrictive procedures, completely prohibiting the use of mechanical restraint by disability service providers with

9

limited exceptions to prevent serious injury,[3] and reducing the emergency use of restrictive procedures in schools with a strategy directed at the eventual elimination of all seclusion in schools. (*See id.* at 76-78, 81.) Particularly with respect to the latter, these goals reflect the State's desire to reasonably reduce the use of restraint and seclusion while avoiding "serious unintended consequences" that may result from an immediate and complete prohibition. (*See* Doc. No. 503 at 2.) The Court finds this approach reasonable under the circumstances. The State's comprehensive strategy to reduce restraint and seclusion also reflects a collaborative effort of the Department of Human Services, the Department of Education, the Department of Health, and the Department of Corrections. (Doc. No. 486-1 at 81.) The Court finds that these agencies have taken critical and appropriate steps toward eliminating the use of restraint and seclusion, and the Court expects the progress in this topic area to continue upon the full implementation of the *Olmstead* Plan.

Also, the Court finds that the State's measurable goals related to the waiver waiting lists are reasonable.[4] Under these goals going forward, the waiting lists will

---

[3]   These goals specifically apply to individuals and service providers governed by Minnesota Statute Chapter 245D or Minnesota Rule Chapter 9544. (*See* Doc. No. 486-1 at 76-77.)

[4]   The Court notes the filing of a related case on the topic of the State's waiting lists for waiver services: *Guggenberger, et al. v. State of Minnesota, et al.*, 15-CV-3439 (D. Minn. Aug. 28, 2015). (*See* Doc. No. 504.) The Court does not express any opinion on the merits of that case through this Order.

either be eliminated or move at a reasonable pace within a reasonable timeframe.[5] (*See id*. at 59-60.) The State has committed to implementing initiatives to increase the pace of the waiting lists, and it has taken critical steps to prioritize access to waiver funding according to an individual's urgency of need. (*Id.* at 61-62.) The State has committed to eliminating the Community Access for Disability Inclusion ("CADI") waiver waiting list by October 1, 2016. (*Id.* at 59.) The State has also committed to eliminating the Developmental Disabilities ("DD") waiver waiting list by March 1, 2017 for persons leaving an institutional setting and for persons with immediate need[6] and by June 30, 2020 for persons with a defined need.[7] (*Id.* at 60.) The *Olmstead* Plan details the State's rationale for these timelines, noting where funding has been authorized and describing funding growth that may impact the DD waiver waiting list goals. (*See id.* at 61.)

In addition, the Court finds that the State has adequately addressed the possibility that the proposals it is committing to may require additional funding. (*See id.* at 99.) The Court expects the State to not only follow through on these commitments, but to make them a top priority in order to promptly address the pressing needs of individuals with

---

[5] In reaching this conclusion, the Court is operating under the assumption that the State's baseline data is current, complete, and accurate. The Court further assumes that the State's metrics and data collection systems will accurately reflect the progress of the waiting lists going forward.

[6] "[P]ersons with immediate need" is defined by Minnesota Statutes, Section 256B.49, subdivision 11a(b) and Section 256B.092, subdivision 12(b). (*See* Doc. No. 486-1 at 60.)

[7] The goal concerning the elimination of the DD waiver waiting list for persons with a defined need specifies that the waiting list is to be eliminated "within available funding limits." (Doc. No. 486-1 at 60.)

disabilities throughout the state. The Court wishes to strongly emphasize that the State must prioritize its allocation of funding to meet and achieve the *Olmstead* Plan's goals. The State may not rely on the excuse of insufficient funding to avoid following through on the important commitments it has made in this version of the *Olmstead* Plan.

## CONCLUSION

The Court concludes that the State's revised *Olmstead* Plan substantially complies with the requirements established by this Court and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999). The *Olmstead* case provides an opportunity for hope and inclusion for individuals with disabilities throughout the country. Through this *Olmstead* Plan, the State commits to making that hope a reality for individuals with disabilities in the State of Minnesota.

In approving the revised *Olmstead* Plan, the Court also takes this opportunity to respond to those who have expressed fears about the plan's purported harmful effects. The Court has received numerous submissions from concerned community members, parents, and advocates expressing fears that the *Olmstead* Plan will lead to fewer choices and diminished respect for individuals who choose not to fully integrate into community-based settings.[8] Many individuals with disabilities in this state value living

---

[8] *See, e.g.*, Amicus Brief of Ivan M. Levy (Doc. No. 506 at 6-8) (expressing fears about the *Olmstead* Plan's employment provisions and raising "concerns that the State will not fully respect [an individual's] decision not to integrate"). The Court has also received and read individual letter submissions from parents concerned for the well-being of their children with disabilities.

and working alongside other individuals with disabilities in settings such as group homes and sheltered workshops.

The Court emphasizes that the *Olmstead* decision is not about forcing integration upon individuals who choose otherwise or who would not be appropriately served in community settings.  Indeed, the Supreme Court's holding in *Olmstead* explicitly incorporates this vision, requiring states to provide community-based treatment only when "the affected persons do not oppose such treatment."  *Olmstead*, 527 U.S. at 607.  The Supreme Court emphasized that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it."  *Id.* at 602 (citing 28 C.F.R. § 35.130(e)(1) (1998) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept.")).  The goal of placing individuals with disabilities in the most integrated setting must be balanced against what is appropriate and desirable *for the individual*.

The Court finds that the revised *Olmstead* Plan upholds this central feature of the *Olmstead* decision by respecting and prioritizing an individual's informed choice.  The concepts of individual choice and person-centered decisionmaking are central to the *Olmstead* Plan's effective implementation.  (*See* Doc. No. 486-1 at 32-37 (identifying the following vision statement for the Person-Centered Planning topic area of the *Olmstead* Plan: "People with disabilities will decide for themselves where they will live, learn, work, and conduct their lives.").)  The *Olmstead* Plan is not about and should not be construed as forcing the closure of certain facilities or forcing integration where it is

13

neither appropriate nor desirable.  (*See id.* at 6 ("[The *Olmstead*] Plan is about choice, not about closure.").)  Rather, it is about increasing available choices so that each individual can make meaningful decisions about how to live, work, and interact with the community.

The Court urges the State to remain vigilant to the public's fears and concerns.  Individual choice must remain a guiding factor in the delivery of community services and supports.  The State must continue to assess its goals and priorities to ensure that they align with the goals and priorities of individuals with disabilities.  It must also allocate its resources and funding according to the informed choices of those whom the *Olmstead* Plan is meant to serve.  To fully effectuate its worthy aims, the State and the OIO must utilize the safeguards built into the revised *Olmstead* Plan to ensure that individual choices are honored and respected.

The Court applauds the parties for their collaboration in developing this landmark *Olmstead* Plan.  Simply put, this revision of the *Olmstead* Plan is unlike any other version submitted to the Court.  The Court fully expects the State to act on its promises to ensure that the *Olmstead* Plan will truly put the promise of *Olmstead* into practice across the state.

## ORDER

Based on the files, records, and proceedings herein, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1. The Court **APPROVES** the State's *Olmstead* Plan (Doc. No. [486-1]).

2. The Court reserves ruling on the approval of the *Olmstead* Plan's implementation plan because corresponding workplans are not yet submitted to the Court.

14

(*See* Doc. No. 486-1 at 16.)  Once these workplans are submitted, the Court will review and approve the implementation plan based on the recommendations and input of Magistrate Judge Becky R. Thorson.

       3.      The Court reserves the right to exercise its continuing jurisdiction with respect to the revised *Olmstead* Plan to ensure that compliance with the Settlement Agreement is verified going forward.  This paragraph contemplates that the Court will continue to carry out its oversight responsibility to oversee the State's efforts in following through on the significant commitments it has made.

Dated:  September 29, 2015       s/Donovan W. Frank
                                                DONOVAN W. FRANK
                                                United States District Judge