# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James and Lorie Jensen, as parents, guardians, and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians, and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian, and next friend of Jason R. Jacobs; and others similarly situated,

Civil No. 09-1775 (DWF/BRT)

Plaintiffs,

v.

**ORDER**

Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and the State of Minnesota,

Defendants.

Shamus P. O'Meara, Esq., and Mark R. Azman, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Nathan A. Brennaman, Deputy Attorney General, Scott H. Ikeda, Aaron Winter, and Anthony R. Noss, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

---

## INTRODUCTION

Before the Court is Defendants' *Jensen Settlement Agreement Comprehensive Plan of Action (CPA) – Ninth Compliance Update Report*, *Reporting Period: May 1 – September 30, 2015*. (Doc. No. 531 ("Gap Report").)  The Court has thoroughly reviewed the Gap Report and issues this Order in response.

## BACKGROUND

On December 5, 2011, the Court approved the parties' Stipulated Class Action Settlement Agreement ("*Jensen* Settlement Agreement") and reserved jurisdiction over this matter "to enforce compliance with the provisions of the Agreement."  (Doc. No. 136 at 2.)  The *Jensen* Settlement Agreement provided that the Court would retain jurisdiction for two years "or as the Court deems just and equitable."  (Doc. No. 136-1 at 39.)  The Court has since extended its jurisdiction on three occasions, most recently extending its jurisdiction to December 4, 2019.  (*See* Doc. Nos. 223, 340, 544, 545.)  The Court is hopeful that substantial compliance with the *Jensen* Settlement Agreement will be achieved by this date.

On May 28, 2015, this matter came before the Court for a Status Conference. (Doc. No. 456.)  Following this Status Conference, the parties participated in mediation meetings with Magistrate Judge Becky R. Thorson between June 2015 and October 2015 on issues identified by the parties that related to the *Jensen* Settlement Agreement.  On

June 18, 2015, the Court stayed the parties' and the Court Monitor's reporting obligations to the Court to allow the parties to focus on the mediation proceedings. (Doc. No. 462 at 2.) On July 9, 2015, the Court extended the stay of the reporting requirements to August 10, 2015 due to continued mediation. (Doc. No. 472 at 2.) Following mediation on the identified *Jensen* Settlement Agreement issues, the Court directed the Defendants to submit a "Gap Report" to report on Defendants' compliance with the *Jensen* Settlement Agreement for the period between May and September 2015. While this report was being prepared, a new Department of Human Services ("DHS") Commissioner, Emily Johnson Piper, was appointed to replace former DHS Commissioner Lucinda Jesson. Given this administrative transition, the Court provided Defendants with additional time to prepare and submit the Gap Report to the Court. On February 2, 2016, the Defendants submitted the Gap Report currently before the Court for consideration. (Gap Report.)[1]

The 113-page Gap Report restates the agreed compliance Evaluation Criteria ("ECs") with DHS's report on the "state of compliance" for each.[2] Defendants state that they have "met criteria" for many, but not for all, ECs. For some items, actions already

---

[1]    On February 22, 2016, the Court issued a separate Order addressing the schedule for the Defendants' ongoing compliance reporting requirements with respect to the *Jensen* Settlement Agreement and the Comprehensive Plan of Action. (Doc. No. 545.) The same day, the Court also issued an Order addressing the schedule for the Defendants to submit periodic reports on the *Olmstead* Plan's implementation. (Doc. No. 544.)

[2]    The ECs were developed by the Court Monitor and the parties and approved by the Court as part of the Comprehensive Plan of Action ("CPA"). (Doc. Nos. 283, 284.) The CPA "serve[s] as both a roadmap to compliance and as a measuring stick for compliance." (Doc. No. 271 at 4.)

taken are stated.  For other items, actions in process or intended for future development are stated.  Generally, no specific deadlines or time lines for contemplated actions are provided.  Various source materials and underlying documentation are referenced.  Forty additional pages of affidavits are provided to identify the individuals who attest to facts stated in the Gap Report.

As the Gap Report explains in detail, DHS has developed a new internal structure to oversee compliance with the *Jensen* Settlement Agreement.  (*Id.* at 5-7.)  The Court is hopeful that this new structure will improve DHS's compliance efforts and ultimately improve the lives of individuals with disabilities throughout the state.  The *Jensen* Implementation Office ("JIO"),[3] an entity within DHS, was created "to improve compliance and quality oversight of the *Jensen* Settlement Agreement."  (*Id.* at 5.)  In October 2015, the JIO changed its focus to "compliance monitoring and measurement." (*Id.*)  Specifically, the JIO will now focus on the following:  "developing a Department Wide Quality Assurance Plan, a *Jensen* Implementation Office specific Quality Assurance Plan, expanded *Jensen* Internal Reviewer responsibilities, and starting the process for contracting with Independent Subject Matter Experts."  (*Id.* at 5-6.)  The JIO will also meet regularly with DHS staff and the *Jensen* Settlement Agreement consultants, Roberta Opheim and Dr. Colleen Wieck to discuss quality improvement and verification.  (*Id.* at 6.)

---

[3]     The Court is aware that DHS has changed the name of the JIO to the Jensen/Olmstead Quality Assurance and Compliance Office since submitting the Gap Report to the Court.  (*See* Doc. No. 549.)  For this Order, the Court will refer to the JIO by its former name for consistency with the Gap Report.

In conjunction with the JIO, DHS will utilize internal and external verification mechanisms to address compliance. The *Jensen* Internal Reviewer, Dr. Daniel Baker, "will conduct internal investigations and reviews to ensure compliance with the *Jensen* Settlement Agreement" and related areas such as Minnesota's *Olmstead* Plan and the positive supports rule. (*See id.* at 6, 28-29.) In addition, DHS is establishing a "pool" of Independent Subject Matter Experts ("SMEs") "to provide independent and objective assurance, advisory, and investigative services to the Department in relation to the *Jensen* Settlement Agreement." (*Id.* at 6.) The SMEs will offer specialized skills and assistance in a variety of areas to aid DHS in achieving compliance. (*Id.*)[4] Finally, DHS has instituted a Department Quality Assurance Committee as part of its effort "to provide an agency-wide structure to monitor the quality of programs and services provided to people with disabilities." (*Id.*) This committee will "identify opportunities for improvement, . . . facilitate development of work plans, and track[] progress." (*Id.*)

DHS has indicated that the JIO, the *Jensen* Internal Reviewer, the SMEs, and the Quality Assurance Committee "work together, and in conjunction with the Olmstead Implementation Office, to monitor and improve the quality of programs and services and

---

[4]     According to the Gap Report, the JIO will manage the contracts for the SMEs. (Gap Report at 6.) However, in a recent letter submission to the Court, DHS explained that "[t]he selected SMEs will be independent contractors, and will be expected to provide independent and objective investigative services and to form their opinions and recommendations based on their professional judgment and obligations." (Doc. No. 549 at 1-2.) In addition, in another letter submission to the Court, DHS has proposed utilizing the SMEs to fulfill the External Reviewer function required under the *Jensen* Settlement Agreement. (Doc. No. 550 at 2.) According to this proposal, "Plaintiffs' Counsel and the Department, in consultation with the Consultants, will jointly approve the selected External Reviewer." (*Id.*) The Court will issue a separate order regarding DHS's proposal on the External Reviewer role.

to ensure compliance with the Settlement Agreement." (Doc. No. 549 at 2.) The Court appreciates DHS's efforts to develop and implement new measures to ensure compliance with the *Jensen* Settlement Agreement. When the Court no longer exercises jurisdiction over the *Jensen* Settlement Agreement, quality oversight measures such as these will ensure that *Jensen*'s legacy is not left an empty promise.

The Gap Report was presented in a new format intended to improve the quality and efficiency of reporting obligations. While the new format presents significant improvements, the reporting format lacks sufficiently complete information regarding DHS's verification of its internal findings. In some cases, the report information has not been verified. For example, in reporting on licensure of sites, programs, and services governed by the CPA, DHS reports that it has met criteria and states that "[t]he *Jensen* Implementation Office *will verify* licenses are timely and appropriate by reviewing the DHS Licensing Lookup web page and storing a copy of the licenses in the *Jensen* SharePoint site." (Gap Report at 62 (emphasis added).) Not only does this promise of future verification leave the Court with insufficient information to confirm DHS's current state of compliance, such a statement also lacks the detail necessary to allow the Court to evaluate the results of DHS's internal verification efforts. As described in greater detail below, the Court has selected several examples where verification is needed. If such information is provided to the Court, it would more fully support those sections of the Gap Report.

As for future reports, while affidavits from appropriate DHS employees may be helpful to track the accountability of DHS employees, Defendants are not required to file

them in the future with the Court.  Instead, future Compliance Update Reports must include verification information directly in the report.  Verification information should be included in the body of the report, in a separate table, or both, connecting the report information to the verification steps.  Providing verification in the report itself will hopefully eliminate the need for the Court or the Court Monitor to independently evaluate the report content.

Given DHS's important updated organizational structure created to address, supervise, and sustain compliance and the Court's desire to ensure that these measures will be successfully utilized to achieve their stated purposes, the Court finds that it is appropriate to propose specific follow-up by DHS (utilizing their new verification mechanisms) regarding certain items discussed in the Gap Report, rather than assign this follow-up to the Court Monitor.  If the follow-up by DHS does not sufficiently clarify and support DHS's compliance, the Court may request that the Court Monitor follow up on these items.  The items that the Court has identified for additional follow-up are not an exhaustive list of the areas in which DHS could improve its compliance efforts.  Rather, they are representative areas in which the Court seeks additional verification of DHS's activities to ensure compliance with the *Jensen* Settlement Agreement and the CPA.

The Court views the Gap Report as a positive improvement on past reports and also sees this time as an opportunity to continue forward progress in achieving substantial compliance with the *Jensen* Settlement Agreement, the Comprehensive Plan of Action, and this Court's Orders.  In response to the Gap Report, the Court's requirements

regarding DHS's verification, compliance, and future Compliance Update Reports,[5] and

parameters on the current role of the Court Monitor are stated in the Order below.

## ORDER

Based upon the presentations and submissions before the Court, and in particular

the *Jensen Settlement Agreement Comprehensive Plan of Action (CPA) – Ninth*

*Compliance Update Report, Reporting Period: May 1 – September 30, 2015* (Doc.

No. 531), the Court having reviewed the history of the case, and the Court being

otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1.     **Defendants' Verification Obligations**.  (See attached Exhibit A for a

summary of the verification obligations discussed below.)

a.     DHS shall complete the verification outlined below and

report to the Court on its efforts no later than May 31, 2016.

b.     **Restraint Reporting (EC 28-30)**.  In EC 28-30, the CPA

describes the use of Form 31032 (or its successor) whenever use is made of

manual restraint.  (Doc. No. 283 at 10.)  The ECs explain that the form will

be "fully completed whenever use was made of manual restraint," "timely

completed by the end of the shift," and will "indicate[] that no prohibited

restraint was used."  (*Id.*)

---

[5]     As outlined below, the Court orders DHS to implement a number of changes to its
subsequent reports to fully meet the Court's reporting requirements.  Such changes must
be reflected in the next *Jensen* Settlement Agreement Comprehensive Plan of Action
Compliance Update Report submitted to the Court in August 2016.

i.      DHS explains that the current form relevant to these ECs is DHS-3654 which is used "for reporting restraint use, 911 calls, and client requests for PRN medications." (Gap Report at 25.)  For all of these ECs, DHS reports that "There were no instances of manual restraint use at Minnesota Life Bridge[6] during this reporting period."  (*Id.* at 25-26.)

ii.      The Court concludes that additional detail from DHS is needed to clarify whether any of the reported 911 calls at the facilities involved the use of prohibited restraints such as handcuffs or chemical restraint.  The Court recommends that the JIO appoint an Independent SME to investigate the 911 calls reported on the DHS-3654 forms referenced in the Gap Report in order to verify whether improper restraints were used.  If results reveal a widespread use of such restraints in response to 911 calls at the facilities, the Court proposes that the Quality Assurance Committee address this issue on a systemic level to prevent further

---

[6]      Minnesota Life Bridge is a transitional adult foster care home that serves individuals with disabilities in three separate sites located throughout Minnesota.  (*See* Gap Report at 8.)  Minnesota Life Bridge was established under the *Jensen* Settlement Agreement and the CPA as a successor to the former Minnesota Extended Treatment Options ("METO") program which was closed as part of the *Jensen* Settlement Agreement following allegations of unlawful restraint and seclusion at the facility.  (*See id.* at 5, 8.)

incidents of improper restraint.  Such efforts may require

investigation into the policies and practices of local police

departments responding to 911 crisis calls.  DHS shall report

the results of this investigation to the Court.

c.      **Staff Training (EC 54-57)**.  The CPA states in EC 54,

"Facility treatment staff received training in positive behavioral supports,

person-centered approaches, therapeutic interventions, personal safety

techniques, crisis intervention and post crisis evaluation."  (Doc. No. 283 at

19.)  EC 55 provides that such training shall be "consistent with applicable

best practices" and "competency-based."  (*Id.* at 20.)  ECs 56 and 57

provide specific requirements regarding training in Therapeutic

Interventions, Personal Safety Techniques, and Medically Monitoring

Restraint.  (*Id.* at 20-21.)

i.      DHS reports that it has "met the requirements"

for all of these ECs, excluding EC 57 which relates to

incidents of manual restraints because there were no uses of

manual restraints this reporting period.  (Gap Report at

39-41.)  Specifically, DHS reports that "the [JIO] has verified

that Facility staff have received all required training."  (*Id.* at

39.)  DHS states that Minnesota Life Bridge will monitor

attendance at training sessions and is organizing all of its

historical training records for data entry into a DHS learning

management system database.  (*Id.* at 39-40.)  DHS also states that training for Minnesota Life Bridge staff is "consistent with applicable best practices" and "competency-based."  (*Id.* at 40.)  DHS reports that the JIO "has verified that all new hires for successor facilities have completed the required training."  (*Id.*)

     ii.     The Court concludes that further verification is necessary to ensure DHS is in compliance with the ECs relating to staff training.  To aid the Court in evaluating Defendants' compliance with the *Jensen* Settlement Agreement and the CPA, the Court proposes that the JIO appoint an Independent SME to evaluate and provide feedback to DHS on its staff training curriculum.  This proposed evaluation would focus on the requirements in EC 55 providing that training must be both "consistent with applicable best practices" and "competency-based."  In addition, the Court recommends that the SME assess whether training is appropriately standardized across divisions throughout DHS.  The Court also suggests that the SME consult with the Quality Assurance Committee as appropriate. DHS shall report the results of this investigation and provide a summary report about its training to the Court.

d.    **Community Support Services ("CSS") (EC 67-72)**.  The

CPA states in EC 67, "The expansion of community services under this

provision allows for the provision of assessment, triage, and care

coordination to assure persons with developmental disabilities receive the

appropriate level of care at the right time, in the right place, and in the most

integrated setting in accordance with the U.S. Supreme Court decision in

*Olmstead v. L.C.*, 572 U.S. 582 (1999)."  (Doc. No. 283 at 23.)  ECs 68-72

explain how DHS will achieve this goal through long-term monitoring of

seventy-five "individuals with clinical and situational complexities," CSS

mobile wrap-around response teams, timely crisis interventions, and

partnership with Community Crisis Intervention Services.  (*Id.* at 24-25.)

i.    DHS reports that it has met the requirements of

these ECs.  (Gap Report at 45-49.)  It reports that CSS

implemented a Statewide Referral Data Tracking system in

April 2015.  (*Id.* at 45.)  In addition, it reports that it launched

a Single Point of Entry project to respond to requests from

individuals with disabilities in crisis in February 2015.  (*Id.* at

45-46, 71-73.)  The Single Point of Entry pilot project

"focuses on coordinating [DHS] efforts for . . . persons with

developmental or intellectual disabilities in crisis and at risk

of losing their current placement."  (*Id.* at 45-46.)  DHS

explains that CSS will "document their actions and efforts,

and the impact on people's [sic] stability." (*Id.* at 46.)  DHS

provides numeric data on the number of individuals who

received services from CSS, including those receiving

long-term monitoring.  (*Id.* at 46-47.)  And DHS reports that

the JIO is working with CSS to develop tracking systems to

facilitate monthly reports on unduplicated counts of people

being served through long-term monitoring.  (*Id.*)  It also

provides data on the average response times for crisis

services.  (*Id.* at 48.)  DHS explains that CSS and the JIO will

continue to monitor crisis responses through a new electronic

tracking form.  (*Id.*)

ii.      In conjunction with DHS's efforts reported in

the Gap Report, DHS shall provide a follow-up report to the

Court detailing outcomes related to these ECs.  The Court

recommends that DHS utilize the *Jensen* Internal Reviewer

and the Quality Assurance Committee to accomplish this task.

The Court suggests that the *Jensen* Internal Reviewer conduct

an internal investigation to verify the results reported in the

Gap Report.  In addition, the Court proposes that the *Jensen*

Internal Reviewer develop a substantive performance report

to elaborate on DHS's compliance with these ECs related to

CSS and crisis interventions.  Specifically, the Court seeks

further information regarding the services provided to the seventy-five individuals targeted for long-term monitoring. The Court also seeks further information on the staffing and administration of the Single Point of Entry project.  The Court suggests that the Quality Assurance Committee provide input on its role in overseeing the Single Point of Entry, if any, offer recommendations on system-wide challenges that may impede compliance with these ECs, and make recommendations to address any impediments.

e.      **Staff Qualifications (EC 78, 89)**.  The CPA states in EC 78, under the "Expansion of Community Support Services" section, "Staff conducting the Functional Behavioral Assessment or writing or reviewing Behavior Plans shall do so under the supervision of a Behavior Analyst who has the requisite educational background, experience, and credentials. . . ."  (Doc. No. 283 at 27.)  In EC 89, under the "Closure of MSHS-Cambridge and Replacement with Community Homes and Services" section, the CPA states, "Staff hired for new positions as well as to fill vacancies, will only be staff who have experience in community based, crisis, behavioral and person-centered services and whose qualifications are consistent with the Settlement Agreement and currently accepted professional standards."  (*Id.* at 29.)

i.      Under EC 78, DHS reports that the CSS

Supervisor responsible for reviewing behavior plans is

currently in the process of obtaining appropriate certification.

(Gap Report at 51-52.)  Under EC 89, DHS reports that it has

"met criteria."  (*Id.* at 59.)

ii.      To aid the Court in evaluating Defendants'

compliance with the *Jensen* Settlement Agreement and the

CPA, DHS shall investigate and report to the Court on

whether the staff qualifications required by ECs 78 and 89 are

being met.  The Court proposes that DHS utilize the *Jensen*

Internal Reviewer to conduct this investigation.  To properly

verify the representations made in the Gap Report, the

investigation shall be based on more than DHS's own

assertions that it is in compliance.

f.      **Evaluation Tools (*See* EC 98, 47, 48, 49, 50, 51, 52)**

i.      DHS reports that the Successful Life Project[7] utilizes

the Positive Behavior Support-System Evaluation Tool to evaluate

the life situations of class members.  (*Id.* at 64.)  In addition, DHS

reports that "[t]he [JIO] completed desk audits of the transition plans

---

[7]      The Successful Life Project supports individuals with disabilities who are
members of the "therapeutic follow-up group" established by the CPA.  This group
includes "members at risk of losing their homes, at risk of transfer to settings that are
more restrictive, and those transitioning to new homes."  (Gap Report at 63.)

for the three people who transitioned from Minnesota Life Bridge during this reporting period." (*Id.* at 70.)  For these audits, reviewers used a tool adapted from the Person-Centered Positive Behavior Support Plan Report Scoring Criteria & Checklist developed by the Kansas Institute for Positive Behavior Support.  (*Id.*)  The transition plans were scored at 94%, 95% and 94% in these desk audits.  (*Id.*)

    ii.    The Court concludes that more information is needed to evaluate DHS's use of these evaluation tools to achieve compliance.  First, because detailed results are not reported, the Court cannot assess the extent to which these individuals' lives are improved by DHS's efforts.  Second, utilizing two different evaluation tools to assess the outcomes for individuals being served by DHS in varying settings inhibits meaningful comparison and assessment.  To aid the Court in evaluating Defendants' compliance with the *Jensen* Settlement Agreement and the CPA, DHS shall compile, verify, and report on the results of the assessments conducted with these evaluation tools.  DHS shall also investigate whether a uniform evaluation tool can be utilized to evaluate individual outcomes across DHS's service spectrum and report to the Court on its findings.  The Court recommends that the *Jensen* Internal Reviewer complete this investigation.  The Court also suggests that the *Jensen* Internal Reviewer appoint an Independent

SME for this task, if necessary, and rely on DHS's Quality

Assurance Committee to the extent agency-wide consultation is

needed.

2. **Changes to Subsequent Compliance Update Reports**

a.    As directed by the Court under a prior Order (Doc. No. 545 at

3), the next deadline for DHS to submit a *Jensen* Settlement Agreement

Compliance Update Report is August 31, 2016.[8]  To improve subsequent

Compliance Update Reports, DHS shall implement the following changes:

i.    DHS shall report the steps it takes internally to

verify the contents of reports submitted to the Court.

Specifically, DHS must provide detail regarding which

specific representations were verified, who completed the

verification, and how the verification was completed.  Such

information shall be included within the Compliance Update

Report and shall be reported for each separate section of the

report.

ii.    All data included in reports to the Court must be

confirmed as reliable and valid.  All statements made in the

reports must be accurate, complete, timely, and verified.

---

[8]    The Court's February 22, 2016 Order governs the schedule for DHS to submit exception, semi-annual, and annual CPA reports.  (Doc. No. 545.)  A detailed reporting schedule is included as Exhibit A to the February 22, 2016 Order.  (Doc. No. 545-1.)

iii.      Affidavits of DHS employees verifying the

accuracy of representations made to the Court may be

appropriate for DHS to internally document the work;

however, DHS is not required to submit the affidavits to the

Court.  Instead, the report itself must show that the

information was verified.  If verification is included, it is

more likely the Court will not have to task the Court Monitor

with conducting further verification of the report content.

iv.      DHS's Compliance Update Reports shall be

consistent with best practices for such reporting.  To the

extent necessary, the Court recommends that DHS consult

with the *Jensen* Settlement Agreement consultants and other

experts familiar with such practices.

b.      The Court may request further or different information in

response to future Compliance Update Reports.

3.      **Court Monitoring**. (See attached Exhibit B for a summary of the

verification duties discussed below.)

a.      The Court Monitor was appointed by the Court on July 17,

2012.  (Doc. No. 159.)  Over the years, the Court has assigned various

duties to the Court Monitor in order to promote compliance with the *Jensen*

Settlement Agreement.  Many of these duties evolved through the

agreement and cooperation of the parties.  The Court will consider

modifying aspects of the Court Monitor's role if DHS's new internal and external verification mechanisms are demonstrated to appropriately (internally and externally, through independent review) audit compliance with the *Jensen* Settlement Agreement and the CPA.

b.      For purposes of this Gap Report and absent further Order of the Court, the Court Monitor's work will focus on gathering information and verifying DHS's representations with respect to the ECs and issues identified below.

c.      **Mobile Teams (EC 93)**.  The CPA states in EC 93, "DHS will provide augmentative service supports, consultation, mobile teams, and training to those supporting the person."  (Doc. No. 283 at 30.)

    i.      DHS states that it has "met criteria" for this EC but also states that it is not providing "separate, distinct mobile teams," but rather is relying on "current staff as needed."  (Gap Report at 61.)  DHS explains how mobile supports have been provided to individuals in a variety of settings, both individuals receiving services at DHS facilities and individuals residing in community settings.  (*Id.*)

    ii.      To aid the Court in evaluating Defendants' compliance with the *Jensen* Settlement Agreement and the CPA, DHS shall identify a designated point person (or persons if necessary) for the Court Monitor on this topic

19

within seven (7) days of this Order.  The Court Monitor will request information from the designated point person about the deployment of mobile teams in response to crisis situations at DHS facilities and in community settings.  DHS may provide additional information it believes is relevant to the evaluation.  For a representative sampling of these deployments, the Court Monitor shall review the information provided to verify that efforts reported with respect to mobile teams are accurate and complete.  The Court Monitor shall also verify whether the data relied upon by Defendants with respect to the deployment of mobile teams is reliable and valid.  The representative sampling for the Court Monitor's work shall be determined by agreement of the Court Monitor, the designated DHS point person, the consultants, and Plaintiff's counsel within fourteen (14) days of this Order.  If the Court requires further investigation, another Order will issue.

   iii.  As part of its disclosures, DHS shall provide the Court Monitor with Bulletin # 14-76-01, Transition of Minnesota Specialty Health System (MSHS)-Cambridge to Minnesota Life Bridge: Admission and Discharge Processes,

Transition Planning and Community Mobile Support Services

issued April 29, 2014 within seven (7) days of this Order.

   d.   **Successful Life Project (EC 98)**.  The CPA states in EC 98,

"DHS will maintain therapeutic follow-up of Class Members, and clients

discharged from METO/MSHS-Cambridge since May 1, 2011, by

professional staff to provide a safety network, as needed, to help prevent re-

institutionalization and other transfers to more restrictive settings, and to

maintain the most integrated setting for those individuals."  (Doc. No. 283

at 30.)

   i.   DHS does not state that it has "met criteria" for

this EC, but reports on the "Successful Life Project,"

describing how this project is utilized "to support members of

the therapeutic follow-up group."  (Gap Report at 63.)  DHS

has completed 263 initial assessments through this project as

part of Phase I and Phase II is underway.  (*Id.* at 63-64.)  DHS

describes its process for assessment, including the use of the

Positive Behavior Support-System Evaluation Tool.  (*Id.*)  In

addition, DHS discusses the Successful Life Project Priority

Tracking lists which DHS uses to determine the priority of

individuals receiving Phase II assessments.  (*Id.* at 64.)  DHS

reports on one specific individual who was reported to the

State as a perpetrator of rape.  (*Id.* at 65.)  Finally, DHS

describes the current staffing of the Successful Life Project.
(*Id.*)

      ii.      Based upon the information in the Report, the
Court is unable to evaluate outcomes for individuals in the
therapeutic follow-up group.  While DHS describes the
Successful Life Project in some detail, it has not provided
sufficient information regarding the outcomes of the project.
To aid the Court in evaluating Defendants' compliance with
the *Jensen* Settlement Agreement and the CPA, DHS shall
identify a designated point person (or persons if necessary)
for the Court Monitor on this topic within seven (7) days of
this Order.  The Court Monitor will request information from
the designated point person to verify the accuracy and
completeness of DHS's representations with regard to the
Successful Life Project and to evaluate the results of the
project to determine whether the Successful Life Project is
achieving the goals of "prevent[ing] re-institutionalization
and other transfers to more restrictive settings, and . . .
maintain[ing] the most integrated setting for those
individuals."  (Doc. No. 283 at 30.)  DHS may provide
additional information it believes is relevant to the evaluation.
In particular, the Court Monitor will verify the accuracy and

completeness of DHS's statements, and the reliability and
validity of the data DHS relies on by reviewing the
circumstances of a representative sampling of individuals in
the therapeutic follow-up group.  The representative sampling
for the Court Monitor's work shall be determined by
agreement of the Court Monitor, the designated DHS point
person, the consultants, and Plaintiff's counsel within
fourteen (14) days of this Order.  If the Court requires further
investigation, another Order will issue.

      iii.      As part of its disclosures, DHS shall provide the
Court Monitor with Bulletin #15-76-01, Successful Life
Project and the Community-based Services Manual
referenced in the Gap Report within seven (7) days of this
Order.  (*See* Gap Report at 63.)

      e.      The Court shall continue to communicate with the Court
Monitor while these duties are being completed.  The Court Monitor must
complete his verification efforts relating to Mobile Teams and the
Successful Life Project no later than May 1, 2016.  Once these tasks are
completed, the Court Monitor will notify the Court that the work has
concluded.  The Court will then consult with the Court Monitor regarding
his next steps and clarify whether any formal reporting is needed in
connection with these verification efforts.

f.    **Other Duties**.  All other Court Monitor duties directed under prior Orders, including periodic reporting requirements, are stayed at this time.[9]  (*See* Doc. Nos. 159, 168, 205, 211, 212, 223, 224, 248, 257, 258, 265, 284, 292, 297, 308, 309, 323, 340, 368, 379.)  Absent further order of the Court, the Court Monitor's work shall focus exclusively on the duties identified above.  The Court reserves the right to direct the Court Monitor to investigate and verify other issues that may arise in the future.  In particular, the Court Monitor may be assigned further duties after DHS has fulfilled its own verification obligations as directed in this Order.  The Court may issue subsequent orders on the scope of the Court Monitor's role following the completion of the verification duties outlined in this order.  If, at any time, a party or consultant wishes to request that further duties be assigned to the Court Monitor, the party or consultant may submit a request directly to the Court.

4.    **Other Reporting Requirements**

a.    **Internal Reviewer**

i.    According to the Gap Report, "[t]he *Jensen* Implementation Office e-mails the monthly Internal Reviewer reports to the Court Monitor, the Plaintiffs' Counsel, and the Office of Ombudsman for Mental Health and Developmental

---

[9]    The Court Monitor's billing and payment process is not stayed, and the Court requires the Court Monitor and all parties to follow its prior orders with respect to this process.  (*See* Doc. Nos. 160, 286, 546.)

Disabilities and the Minnesota Governor's Office for

Developmental Disabilities." (Gap Report at 29.) Such

reporting is consistent with the Court's prior order stating that

"[t]he Internal Reviewer . . . shall continue to issue his reports

to the Court Monitor." (*See* Doc. No. 340 at 11.) Going

forward, a copy of these reports shall also be submitted to the

Court.

b.      **Independent Subject-Matter Experts and External**

**Reviewer**

i.      The Court has received and reviewed two letter

submissions from DHS regarding the Independent SMEs and,

in particular, the role of the SMEs in completing the reporting

requirements of the External Reviewer required under the

*Jensen* Settlement Agreement. (Doc. Nos. 549, 550.) The

Court invites further submissions from the parties on these

issues after DHS has discussed its proposal with the

consultants and Plaintiff's counsel. The Court will address

DHS's proposal, and any modifications made to their

proposal, at a later time.

## CONCLUSION

As the Court explained in its February 22, 2016 Order governing reporting

requirements for the *Jensen* Settlement Agreement and CPA, the Court will convene

bi-annual status conferences with the parties and the consultants "to facilitate the Court's continued oversight of the Defendants' compliance with the CPA and the *Jensen* Settlement Agreement." (Doc. No. 545 at 5.) The first such conference will take place in June 2016. (*Id.*) By this time, the Court is hopeful that DHS will have completed the verification obligations outlined in detail above. Completing these additional steps will give DHS an opportunity to utilize its new organizational structure to facilitate internal and external compliance evaluation, and it will prepare DHS to thoroughly verify its compliance with the *Jensen* Settlement Agreement and the CPA on its own in future reports to the Court. Ultimately, these measures will be essential for ensuring that DHS's efforts make a real and positive impact for individuals with disabilities and their families.

The Court concludes by noting that it has continued to hear from concerned individuals and families who fear that the *Jensen* Settlement Agreement and the *Olmstead* Plan will decrease choices and negatively impact the lives of individuals with disabilities in this state. The Court is deeply concerned about the widespread public misconceptions about the purpose and intent of the *Jensen* Settlement Agreement. Along with utilizing its new organizational structure to improve its compliance and quality assurance efforts, the Court urges DHS to make it a top priority to educate and inform the public to correct these misconceptions. Only when such misconceptions and fears are eliminated will the Class members and individuals affected by this landmark settlement agreement be able to say that their lives have truly improved.

Dated: March 18, 2016            s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge