# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James and Lorie Jensen, as parents, guardians, and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians, and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian, and next friend of Jason R. Jacobs; and others similarly situated,

        Plaintiffs,

v.

Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and the State of Minnesota,

        Defendants.

Civil No. 09-1775 (DWF/BRT)

**ORDER**

---

Shamus P. O'Meara, Esq., and Mark R. Azman, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Scott H. Ikeda, Aaron Winter, Anthony R. Noss, and Michael N. Leonard Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

---

## INTRODUCTION

A Status Conference was held on April 16, 2019 to receive updates on the *Jensen* Stipulated Class Action Settlement Agreement (Doc. No. 136-1), the Second Amended Comprehensive Plan of Action (Doc. Nos. 283, 284), and the *Olmstead* Plan (Doc. Nos. 510, 521). (Doc. No.734.) As discussed below, the Court has determined that investigation and review is required on several compliance issues before the Court can equitably end its jurisdiction over this matter.

## BACKGROUND

Nearly ten years ago, on July 10, 2009, Plaintiffs filed a Complaint[1] against Defendants asserting multiple violations of federal and state law arising out of allegations of "abusive, inhumane, cruel, and improper use of seclusion and mechanical restraints routinely imposed upon [residents][2] of the Minnesota Extended Treatment Options program (METO)." (Doc. No. 1 at 2.) Following extensive negotiations, the parties entered into a Stipulated Class Action Settlement Agreement, which was approved by the Court on December 5, 2011. (*See* Doc. Nos. 104, 136.)

---

[1]     On July 30, 2009, Plaintiffs filed an Amended Complaint arising out of these same allegations. (*See* Doc. No. 3 at 3.)

[2]     The Court encourages use of the term "resident" as an alternative to "patient."

The Stipulated Class Action Settlement Agreement provided for the closure of the METO facility, established requirements regarding restraint and seclusion at successor facilities, and established requirements for the Department of Human Services ("DHS") to internally and externally monitor restraint use. (*See* Doc. No. 136-1 ("Settlement Agreement") at 6-13.) The Settlement Agreement also provided that the State shall exercise "best efforts" for appropriate discharge of residents to the most integrated setting through transition planning. (*Id.* at 13-14.) In addition, the Settlement Agreement imposed requirements relating to other practices at METO and its successor facilities. (*Id.* at 14-16.)

The Settlement Agreement also included "System Wide Improvements" which identified goals and objectives in the areas of long-term monitoring, crisis management, and training. (*Id.* at 16-21.) The Settlement Agreement further required the development of an *Olmstead* Plan within eighteen months of the Settlement Agreement's approval. (*Id.* at 18.) The Settlement Agreement also established requirements relating to other state facilities, the modernization of state administrative rules relating to positive behavioral supports ("Rule 40"), and the substitution of offensive terminology in DHS publications. (*Id.* at 19-21.)

When the Settlement Agreement was approved and adopted by this Court, the parties made promises and sweeping declarations that the settlement heralded widespread change for "hundreds of thousands of people in this state" and would "set the tone" nationally. (Doc. No. 146 at 13, 27.) The Plaintiffs stated that the Settlement Agreement's "unprecedented comprehensive positive changes" would benefit "not only

Class members, but all people with developmental disabilities in this state." (*Id.* at 8.)

Defendants concurred with the Plaintiffs, stating: "[The Settlement Agreement] will greatly improve the quality in care of the lives of a large number of persons with disabilities, not only in Minnesota, but [for] people that come through Minnesota . . . , [a]nd we think that this [A]greement will set the tone for other states, as well." (*Id.* at 27.)

Almost immediately after the Court approved and adopted the Settlement Agreement, concerns about compliance—and assessing compliance—arose. For example, the Settlement Agreement expressly required Defendants to select and engage an External Reviewer. Once selected, the External Reviewer would "issue [written reports] informing the Department whether the Facility is in substantial compliance with [the] Agreement." (Settlement Agreement § VII.B(4).) But several months after the Court's December 5, 2011 approval and adoption of the Settlement Agreement, the External Reviewer position remained unfilled. The Court informed the parties on May 4, 2012, that it was contemplating appointing a monitor to assist and advise the parties with respect to the implementation process. (Doc. No. 147 at 2.) Concerns about Defendants' failure to fill the External Reviewer position under the Settlement Agreement continued.

On July 17, 2012, the Court observed that there was "clearly a need for a process to investigate potentially conflicting information, provide a coherent and complete presentation, and make recommendations to the Court." (Doc. No. 159 at 9-10.) David Ferleger was suggested as a possible consultant or monitor. The Court was informed that Defendants had previously consulted with Mr. Ferleger to obtain his advice on fund

distribution. (*Id*. at 10.) The Court was also aware that Defendants had previously requested Mr. Ferleger's consultation regarding the *Olmstead* Plan under the Settlement Agreement. (*Id*.) Accordingly, based on his expertise and familiarity with the matter, the court appointed Mr. Ferleger as an independent advisor and compliance monitor ("Court Monitor") on July 17, 2012. (*Id*. at 13.) In assuming this role, Mr. Ferleger continued to work with the Defendants on the development of the *Olmstead* Plan. (*Id.* at 14 n.22.)

The External Reviewer function, required pursuant to the Settlement Agreement, was still not in place as of September 17, 2012. (Doc. No. 165 at 27.) The position remained unfilled throughout 2012 and into 2013. As a result, externally reviewed reports contemplated by the Settlement Agreement were not delivered. Finally, on April 25, 2013, the Court ordered that the role of the Court Monitor also subsume the External Reviewer function set forth in Section VII.B of the Settlement Agreement. (Doc. No. 212 at 6.) Importantly, Defendants' own report, dated February 2, 2016, notes that "the Court appointed the Court Monitor as the External Reviewer, with the consent of Plaintiffs and Defendants. DHS funds the costs of the external reviewer." (Doc. No. 531 at 32.)

Pursuant to its April 25, 2013 Order, the Court asked the Court Monitor to "independently investigate, verify, and report on compliance with the Settlement Agreement and the policies set forth therein on a quarterly basis." (Doc. No. 212 at 6.) On June 11, 2013, the Court Monitor submitted an external review which identified several areas of noncompliance, including the operation of one of DHS's facilities

without a license in violation of Minn. Stat. § 144.50, subd. 1(a). (Doc. No. 217 at 44- 45.)

On August 28, 2013, the Court extended its jurisdiction for an additional year to December 4, 2014. (Doc. No. 224.) The Court expressed specific concern "with the sluggish pace of implementation of the specific terms of the [] Agreement and the resulting noncompliance." (*Id.* at 10.) To facilitate compliance, the Court ordered Defendants to submit an implementation plan with specific actions, deadlines, and reporting requirements for the Court's review. (*Id.* at 3-4.) The Court contemplated three distinct plans: (1) a plan for the Settlement Agreement's then-existent provisions and the MSHS-Cambridge closure; (2) a plan for the Rule 40 modernization; and (3) the *Olmstead* Plan. (*Id.* at 4-6.) Defendants filed proposals on October 17 and October 30, 2013. (Doc. Nos. 235, 244.) The Court directed the Court Monitor to work in cooperation with the current DHS Commissioner to finalize the plans. (Doc. Nos. 237, 248.)

On October 7, 2013, Plaintiffs filed a motion for sanctions against Defendants for bad-faith conduct and lack of candor to the Court. (Doc. No. 230.) Plaintiffs argued that Defendants willfully and intentionally acted in substantial noncompliance with the Settlement Agreement. (Doc. No. 232 at 29.) On December 17, 2013, the Court found that Defendants violated the Settlement Agreement and granted Plaintiffs' request for sanctions. (Doc. No. 259 at 5.) Specifically, the Court found that "DHS consciously concealed and misled the Plaintiffs and the Court with regard to the lack of licensure, or if not consciously concealed and misled, was indifferent to both the violation and the

expectation of candor with all parties." (*Id.*) The Court reserved ruling on what sanctions were appropriate, however, until the Court Monitor submitted his next report on Defendants' current status of compliance and on Defendants' cooperation with the implementation plan required pursuant to its Order on August 28, 2013. (*Id.* at 5-6.)

On January 22, 2014, the Court ordered the parties to meet with the Court Monitor to "communicate and negotiate in good faith to once and for all establish a final implementation plan." (Doc. No. 266 at 5.) The parties met on February 3 and 4, 2014. (Doc. No. 271 at 3.) On February 13, 2014, the Court Monitor recommended adoption of a Comprehensive Plan of Action ("CPA").[3] (*Id.* at 2.) The CPA was designed to "serve as both a roadmap to compliance and as a measuring stick for compliance." (*Id.* at 4.)

The Court formally adopted and approved the CPA (Doc. No. 283 ("CPA")) on March 12, 2014.[4] (Doc. No. 284.) The combination of the Settlement Agreement and CPA is hereinafter referred to as the "Agreement." The Agreement includes 104 Evaluation Criteria ("EC") and accompanying Actions:

> The ECs set forth the outcomes to be achieved and are enforceable. The Actions under the ECs are not enforceable requirements. Compliance with an EC will be deemed to have been achieved if the EC's Actions are taken.

---

[3] The CPA covered only the first two parts of the Court's August 28, 2013 Order. (*See* Doc. No. 283 at 1.) Specifically, Part I covered elements of the Settlement Agreement and the closure and replacement of MSHS-Cambridge facility with community services. (*Id.*) Part II covered the Rule 40 modernization plan. (*Id.*) Part III, the *Olmstead* Plan was still being finalized pursuant to the Court's orders. (*Id.*)

[4] The Court formally adopted the "Second Amended Comprehensive Plan of Action" on March 12, 2014. (Doc. No. 284.) An earlier version of the Comprehensive Plan of Action was inadvertently filed at Doc. No. 280 and subsequently marked as a filing error. (*See* Doc. No. 280.)

However, the Departments of Human Services may undertake alternate actions to achieve satisfaction of the EC. The Actions may be modified pursuant to the modification process set forth in the Order of August 28, 2013.

> ECs are indicated by whole Arabic numbers (e.g., 1, 2) and, in the original, by blue shading. Actions are indicated by Arabic numbers with consecutive decimals (e.g., 1.1, 1.2, 1.3, 2.1, 2.2, 2.3).

(CPA at 1.) The Court ordered Defendants to file an initial update in thirty days regarding compliance with the Agreement, and to file subsequent updates ("Compliance Reports") on a bi-monthly schedule ("Compliance Reports"). (Doc. No. 284 at 3.) Defendants submitted their first and second Compliance Reports on April 11, 2014 and May 12, 2014, respectively.[5] (Doc. Nos. 289, 299.) They filed their third Compliance Report on July 15, 2014. (Doc. No. 328.) Each Compliance Report conceded areas of noncompliance.

On June 20, 2014, the Court Monitor submitted a report with additional findings of noncompliance.[6] (Doc. No. 327.) Defendants conceded the areas of noncompliance and stated that "DHS can and will do more." (Doc. No. 324 at 2.) In light of Defendants' ongoing noncompliance, Plaintiffs asked the Court to rule on the sanctions currently held in abeyance pursuant to the Court's December 17, 2013 Order. (Doc. No. 332 at 2.) In lieu of issuing contempt or other punitive sanctions, the Court extended its jurisdiction an additional two years to December 4, 2016, and increased the Court

---

[5] The first Compliance Report covered the time period of February 1 through March 31, 2014. (Doc. No. 289.) The second Compliance Report covered the time period of February 1 through April 30, 2014. (Doc. No. 299.)

[6] A modified version of the report appears at Doc. No. 327.

Monitor's responsibilities to: (1) oversee Defendants and ensure their accountability; and (2) expedite prompt and meaningful compliance. (Doc. No. 340 at 8-9, 14.)

On October 20, 2014, the Court Monitor filed a report with findings of noncompliance related to the use of restraint and seclusion and asked the Court to adopt specific recommendations. (Doc. No. 347 at 54-57.) One of his recommendations was to obtain additional external expertise to assist with person centered planning and implementation of positive supports. (Doc. No. 347 at 54-55.) Defendants filed a response arguing that the Court Monitor's report did not demonstrate lack of *substantial* compliance, and suggested that he assess overall progress in lieu of pointing out specific and particular problems. (Doc. No. 352 at 1-2.) Defendants also objected to the Court Monitor's recommendations. (*Id.* at 4-10.) The Court adopted the Court Monitor's recommendations on December 5, 2014, and reserved the right to impose monetary or other sanctions if Defendants failed to comply. (Doc. No. 368 at 10.) On January 5, 2015, the Court Monitor notified the Court that Defendants had complied with the December 5, 2014 Order by approving the appointment of external expert, Dr. Gary LaVigna. (Doc. No. 377.)

Defendants submitted their fourth and fifth Compliance Reports on September 15, 2014 and November 17, 2014, respectively. (Doc. Nos. 342, 360.) The Court Monitor submitted a report on November 25, 2014 indicating that certain items in the fourth and

fifth Compliance Reports could not be verified.[7]  (Doc. No. 374.)  Defendants objected to

the Court Monitor's findings on December 22, 2014.  (Doc. No. 372.)  Defendants filed

their sixth Compliance Report on February 13, 2015.  (Doc. No. 387.)  On February 18,

2015, the Court Monitor notified the Court that certain items in the sixth Compliance

Report appeared to be inaccurate.  (Doc. No. 388 at 1.)  Defendants objected to the Court

Monitor's findings on March 4, 2015.  (Doc. No. 393.)  Defendants filed their seventh

Compliance Report on March 16, 2015.  (Doc. No. 396.)  On April 14, 2015, the Court

Monitor submitted a report detailing multiple instances of inaccurate and unverified

information in Defendants' Compliance Reports.  (Doc. No. 414.)  Defendants agreed

that there were areas where they could improve their reporting; however, they disagreed

with the Court Monitor's assertion that they knowingly filed inaccurate or non-verifiable

information.  (Doc. No. 429 at 1.)  Defendants argued that the Court Monitor was holding

them to expectations beyond those imposed by the Agreement, and cited challenges with

reporting on a bi-monthly basis.  (*Id.* at 7.)  Plaintiffs once again asked the Court to

impose sanctions or other relief for Defendants' lack of compliance with the Agreement.

(Doc. No. 430 at 1.)  The Court held a Status Conference on May 28, 2015 to address the

issues impeding compliance with the Agreement.[8]  (Doc. No. 456.)

---

[7]     Although the Court Monitor's report was submitted on November 25, 2014, it was
not filed until December 24, 2014.

[8]     Prior to the Status Conference, Defendants filed their eighth Compliance Report
on May 15, 2015.  (Doc. No. 440.)

Following the Status Conference, the parties participated in mediation to address remaining issues.[9]  On June 18, 2015, the Court stayed the parties' and the Court Monitor's reporting obligations to the Court to allow the parties to focus on mediation. (Doc. No. 462 at 2.)  On July 9, 2015, the Court extended the stay of the reporting requirements to August 10, 2015 due to continued mediation.  (Doc. No. 472 at 2.) Following mediation on the identified issues, the Court directed the Defendants to submit a "Gap Report" to report on Defendants' compliance with the Agreement for the period between May and September 2015.

Defendants submitted the Gap Report on February 2, 2016.[10]  (Doc. No. 531 ("Gap Report").)  The Gap Report discussed new organizational structures that Defendants had put in place to improve compliance and quality oversight of the Settlement Agreement.  (*Id.* at 5-7.)  One of the organizational improvements touted was the development of "Independent Subjects Matter Experts" with expertise "in a variety of areas, to provide independent and objective assurance, advisory, and investigative services to the Department in relation to the Jensen Settlement Agreement."  (*Id.* at 6.) The Gap Report further specified that the "highly qualified and experienced subject matter experts, with specialized skills, [would] assist the Department in bringing

---

[9]     The parties participated in mediation meetings with Magistrate Judge Becky R. Thorson between June 2015 and October 2015.

[10]     The Gap Report was Defendants' ninth Compliance Report.  Due to the transition between DHS Commissioners Lucinda Jesson and Emily Johnson Piper while the Gap Report was being prepared, the Court granted Defendants extra time to submit it.

significant improvements to the care and treatment of individuals with developmental disabilities outlined in the Jensen Settlement Agreement." (*Id.*)

Around this time, the parties also jointly proposed modified reporting requirements with respect to the Agreement and the *Olmstead* Plan. (Doc. Nos. 537, 539.) On February 22, 2016, the Court issued orders establishing separate reporting schedules for the Agreement and the *Olmstead* Plan.[11] (Doc. Nos. 544, 545.) Both orders included the following provision extending the Court's jurisdiction:

> Based on all of the above and the current status of this matter, and pursuant to the Settlement Agreement § XVIII.B and the Court's September 3, 2014 Order (Doc. No. 340), the Court's jurisdiction is extended to December 4, 2019. The Court expressly reserves the authority and jurisdiction to order an additional extension of jurisdiction, depending upon the status of Defendants' compliance and absent stipulation of the parties.

(Doc. No. 544 at 8; Doc. No. 545 at 6.) The February 22, 2016 Order also invited each party to submit a proposal regarding how the Independent Subject Matter Experts could be utilized for external reporting. (Doc. No. 545 at 6 ¶ 16.) On March 14, 2016, Defendants filed a proposal stating:

> The [Subject Matter Experts] will be called upon by the Department to offer expert independent consultation services and problem-solving, and will be expected to provide written reports and documentation of recommendations related to individuals and systemic issues. An assignment may be generated from the Jensen/Olmstead Quality Assurance and Compliance Office (formerly the Jensen Implementation Office), the Jensen Internal Reviewer, the Department-wide Quality Assurance Team for People with Disabilities, or the Department's Compliance Office.

---

[11] The Court also established bi-annual status conferences to facilitate the Court's continued oversight of the Defendants compliance with the Agreement and the *Olmstead* Plan. (*See* Doc. Nos. 544, 545.)

(Doc. No. 549 at 1.)  Defendants filed a supplement to their original proposal explaining how the Subject Matter Experts could also be used to fulfill the External Reviewer function:

> With respect to the External Reviewer Function, it is the proposal of the Department that the Department will identify from the pool of [Subject Matter Experts] a proposed External Reviewer to perform the duties as set forth in the JSA and the Comprehensive Plan of Action (CPA).

(Doc. No. 550 at 2.)

On March 18, 2016, the Court issued an Order on its review of the Gap Report. (Doc. No. 551 ("Gap Report Order").)  Recognizing Defendants' commitment to new internal structures, including the pool of Independent Subject Matter Experts to provide independent and objective assurance, advisory, and investigative services, the Court stayed the bulk of the Court Monitor's duties, including his periodic reporting requirements.[12]  (Gap Report Order at 3, 24.)

The Court stated, "[g]iven DHS's important updated organizational structure created to address, supervise, and sustain compliance and the Court's desire to ensure that these measures will be successfully utilized to achieve their stated purposes, the Court finds that it is appropriate to propose specific follow-up by DHS (utilizing their new verification mechanisms) regarding certain items discussed in the Gap Report, rather than assign this follow-up to the Court Monitor."  (*Id*. at  7.)  The Court further observed that "[i]f the follow-up by DHS does not sufficiently clarify and support DHS's compliance,

---

[12]     The Court Monitor's duties were limited to gathering information and verifying representations in the Gap Report with respect to Mobile Teams and the Successful Life Project (ECs 93 and 98).  (Gap Report Order at 18-24.)

the Court may request that the Court Monitor follow up on these items." (*Id.*)  In this

order, the Court also stated the following regarding its jurisdiction:

> On December 5, 2011, the Court approved the parties' Stipulated Class
> Action Settlement Agreement . . . and reserved jurisdiction over this matter
> 'to enforce compliance with the provisions of the Agreement.'  The *Jensen*
> Settlement Agreement provided that the Court would retain jurisdiction for
> two years 'or as the Court deems just and equitable.'  The Court has since
> extended its jurisdiction on three occasions, most recently extending its
> jurisdiction to December 4, 2019.  The Court is hopeful that substantial
> compliance with the *Jensen* Settlement Agreement will be achieved by this
> date.

(*Id.* at 2 (citations omitted).)

Defendants filed their first Compliance Report pursuant to the updated reporting

schedule on March 31, 2016.  (Doc. No. 553-1.)  Defendants indicated compliance with

all ECs reported on.  (*Id.*)  The report reiterated Defendants' commitment to developing

the "pool of experts in a variety of areas, to provide independent and objective assurance,

advisory, and investigative services of the Department in relation to the Jensen

Settlement Agreement." (*Id.* at 6.)  On May 31, Defendants submitted additional

verification with respect to its Gap Report pursuant to the Court's March 18, 2016 Order.

(Doc. No. 572.)

The Court held a Status Conference on June 6, 2016.  (Doc. No. 576.)  During the

Status Conference, the Court asked DHS to provide an overview of its organizational

structure, including its process for ensuring accuracy and completeness of reporting, and

the External Reviewer Function.[13]  (Doc. No. 568 at 3-4.)  Plaintiffs and Consultants

were also invited to comment.  (*Id.*)  Prior to the conference, Defendants explained that

the Subject Matter Experts could "perform internal reviews for the Department of Human

Services (the "Department"), as well as the External Reviewer function contemplated by

the Jensen Settlement Agreement." (Doc. No. 550 at 1.)[14]

        After the Status Conference, it was clear that the parties were unable to agree on

whether or how to amend the External Reviewer function set forth in the Agreement;

therefore, the Court concluded that it was appropriate to continue the External Reviewer

function pursuant to the Agreement and prior orders of the Court.  (Doc. No. 578

("June 21, 2016 Order") at 3.)  Accordingly, the Court ordered that the Court Monitor

would continue to fill the External Reviewer role.  (*Id.*)  Observing that the Court

Monitor's duties, including his role as External Reviewer, were currently stayed, the

Court reserved the right to order that the Court Monitor's duties resume or to make

further modifications to the Court Monitor's duties at any time consistent with the

Court's discretion.  (*Id.* at 3-4.)  The Court encouraged the parties to collaborate with

---

[13]        Prior to the Status Conference, each party was directed to submit a proposal to amend the External Reviewer Function.  (Doc. No. 568 at 3.)

[14]        Defendants subsequently explained that a review "[could] be triggered internally by request of the Commissioner, Compliance Office, Department-wide Quality Assurance Leadership Team, Jensen Internal Reviewer, or QADC Services; and externally, by request of parties, including Plaintiff's Class Counsel and the Consultants." (*See, e.g.*, Doc. No. 589 at 10; 614-1 at 7; Summary Report at 13.)

each other and the Consultants to submit additional proposals or stipulations on the External Reviewer Function.  (*Id.* at 4.)

The June 21, 2016 Order also addressed Defendants' state of compliance with respect to its submission of verification updates on the Gap Report (Doc. No. 572). (June 21, 2016 Order at 4-7.)  The Court recommended that DHS establish a protocol to govern its compliance evaluation and verification efforts, including efforts involving Independent Subject Matter Experts or the Jensen Internal reviewer.  (*Id.* at 6-7.)

On August 25, 2016, the Court held an informal meeting with the parties to discuss the possibility of transitioning to a local Court Monitor.  (Doc. No. 593 at 3.)  The Court invited the parties to submit letters addressing their positions on a possible appointment.  The parties submitted letters on September 7, 2016, and September 12, 2016, respectively.  (Doc. Nos. 590, 591.)  In the interim, Defendants submitted their second Compliance Report pursuant to the updated reporting schedule.[15]  (Doc No. 589.) The parties did not agree on appointing a local Court Monitor.  (Doc No. 593 at 3.)  On September 21, 2016, the Court observed a need for continued monitoring of Defendants' compliance and reaffirmed David Ferleger's appointment as Court Monitor.  (Doc.

---

[15]     The Compliance Report was submitted on August 31, 2016.  (Doc. No. 589.) Defendants reported that they had secured contracts with eight Independent Subject Matter Experts with expertise in one or more of the following areas:  (1) persons with Intellectual and Developmental Disabilities ("IDD"), complex needs, or challenging behaviors; (2) pharmacological reviews of medication regimens of persons with IDD with complex medical needs or challenging behaviors; (3) positive behavior practices; and (4) qualitative and quantitative research design.  (*Id.* at 10.)  Defendants also stated that the process to engage the Independent Subject Matter Experts could be initiated internally or externally, discussed *infra.* (*Id.*)

No. 593 at 4.)  The Court advised that a subsequent Order would indicate the Court

Monitor's next steps regarding investigation of Defendants' compliance with the

Agreement.  (*Id.*)

On September 29, 2016, the Court lifted the stay on the Court Monitor's duties

and directed him to conduct a review of Defendants' recent reports to assess substantial

compliance with regard to all components of the Agreement.  (Doc. No.  595 at 2-3.)  The

Court Monitor submitted his findings to the Court on November 29, 2016.  (Doc.

No. 604.)  The Court Monitor found several areas of noncompliance[16] and multiple others

that were inconclusive.[17]  Defendants objected to the Court Monitor's findings on

December 12, 2016 and argued that continued court monitoring was inappropriate.  (Doc.

No. 606-2 at 6-8.)  Defendants' response also included several clarifications and areas

identified for improvement with respect to a number of ECs.  (*See* Doc. No. 606-2.)

On January 5, 2017, the Court held a Status Conference to discuss the Court

Monitor's findings and to follow up on Defendants' verification protocols.  (*See* Doc.

Nos. 608, 611.)  After the Status Conference, the Court ordered Defendants to

incorporate the improvements and clarifications it identified in its response to the Court

Monitor's findings and stayed the Court Monitor's duties pending Defendants'

submission of their next two Compliance Reports.  (Doc. No. 612 at 3.)  The Court

---

[16]     EC Nos.:  25, 26, 58, 69, and 93 were not in compliance.  (Doc. No. 604 at 10-12.)

[17]     EC Nos. 1-4, 6, 8-9, 27, 38-39, 47-57, 59-61, 63-68, 70-72, 75, 78, 81-85, 89-92, 94, 96, 98-99, and 104 were inconclusive.  (Doc. No. 604 at 10-12.)

reserved the right to reengage the Court Monitor to investigate or verify other issues that may arise. (*Id.*)

Defendants submitted their third and fourth Compliance Reports pursuant to the updated reporting schedule on February 24, 2017 and March 31, 2017 respectively. (Doc. Nos. 614-1, 621-1.) These reports removed conclusions as to whether each EC was met. (*See* Doc. Nos. 614-1, 621-1.) The February 24, 2017 Compliance Report indicated that Defendants had executed Independent Subject Matter Expert Master Contracts with eight individuals. (Doc. No. 614-1 at 6.) Defendants also explained the process to generate the need for an Independent Subject Matter Expert review:

> [I]dentification of the need for an Independent Subject Matter Expert Review can generate from internal or external sources: [1] Internally, by request of the Commissioner, Compliance Office, Department-wide Quality Assurance Leadership Team, *Jensen* Internal Reviewer, or JOQACO; and [2] Externally, by request of parties, including Plaintiffs' Class Counsel and the Consultants.

(*Id.* at 7.)

On April 28, 2017, Defendants filed an objection to the Court's ongoing jurisdiction over this matter and asked the Court to vacate orders that required them to act whether by reports or otherwise. (Doc. No. 631 at 1.) The Court overruled Defendants' objection on June 28, 2017. (Doc. No. 638.) Defendants appealed the Court's decision to the Eighth Circuit on July 26, 2017. (Doc. No. 639.) The Eighth Circuit subsequently affirmed this Court's jurisdiction on July 26, 2018. (Doc. No. 695.)

Before and after this Court's jurisdiction was affirmed, Defendants continued to submit the required Compliance Reports; however, these reports no longer drew conclusions as to whether each EC was satisfied. (*See* Doc. Nos. 643, 676, 683[18], 700.) The Court has repeatedly encouraged the parties to identify and develop a plan to address all remaining steps essential to successful implementation of the Agreement before the Court could terminate its jurisdiction. (*See e.g.*, Doc. Nos. 638, 652, 691,733.) However, to date, no such plan has been submitted to the Court.

On January 4, 2019, the Court issued an Order requesting a comprehensive Summary Report to evaluate Defendants' overall compliance with the Agreement in lieu of the scheduled reporting requirements.[19] (Doc. No. 707.) The Court explained, "the Court must evaluate Defendants' compliance to assess the impact of the *Jensen* lawsuit on the well-being of its class members and to determine whether the Court's jurisdiction may equitably end." (*Id.* at 6.) In order to accomplish this, the Court requested reporting in three areas: Internal Compliance Oversight Structure; Class Members' Update; and assessment of all Evaluation Criteria. (*Id.* at 7-11.) In light of the previous Compliance Reports that removed conclusions about whether each EC was met, the

---

[18]    In their March 31, 2018 Compliance Report, Defendants reported they had initiated the procedure for an Independent Subject Matter Expert review related to EC 90 and that they had successfully implemented the Subject Matter Expert's recommendations. (Doc. No. 683 at 48-49.)

[19]    In this Order, the Court referred to DHS's new internal structures, including Subject Matter Excerpts, to ensure that systems were in place to ensure that *Jensen's* legacy was not left an empty promise. (Doc. No. 707 at n.8.)

Court specifically asked Defendants to state whether each EC was met and to provide specific data supporting each conclusion. (*Id.* at 9-13.) It was the Court's intent that the Summary Report would serve as a tool to facilitate a thorough review of compliance that would help establish a road map for an equitable end to the Court's jurisdiction. The January 4, 2019 Order advised the parties to review the Summary Report to assess compliance and identify next steps at a Status Conference in April 2019. (*Id.* at 13.) Defendants timely submitted the Summary Report on March 19, 2019 and self-assessed all ECs as in compliance. (Doc. No. 710 ("Summary Report").)

The Court held the Status Conference on April 16, 2019. (Doc. No. 734.) While the Court reviewed a number of Defendants' Compliance Reports, a special focus was placed on the Summary Report.[20] (*See* Doc. No. 733.). In advance of the Status Conference, the Parties and the Consultants were invited to comment on Defendants' status of compliance.[21] The parties addressed the comments during the Status Conference; however, they failed to agree on the status of compliance or a plan to move forward. They disagreed over whether Defendants have complied with the Agreement. While Defendants contend that they have met the requirements for each EC and that the

---

[20] The Status Conference addressed overall compliance with the Agreement, progress towards *Olmstead* Plan goals, and the March 2019 Revision to the *Olmstead* Plan. (Doc. No. 733.)

[21] Each party also sent a letter to the Court with specific requests. (Doc. Nos. 730, 731.) Defendants requested the Court "to address the applicable legal standard the Court is using to determine the circumstances under which it will end its involvement in this matter, including what specific actions remain outstanding." (Doc. No. 731.) Plaintiffs cited several potential areas of noncompliance and asked the Court to re-involve the Court Monitor and hold an evidentiary hearing. (Doc. No. 730.)

Court should end its jurisdiction immediately, Plaintiffs strongly contest compliance and ask the Court to reengage the Court Monitor to investigate multiple violations of abusive conduct in state operated and licensed facilities. Plaintiffs also request an evidentiary hearing. The Consultants also have concerns with respect to Defendants' assessment of compliance. They found that Defendants' limited analysis and lack of external verification in their Summary Report make it difficult to conclude whether Defendants are truly in compliance.

The discussion below will first address compliance issues, taking into account Defendants' Summary Report and the Plaintiffs' and Consultants' responses to the Summary Report. The Court will then identify specific required actions. Next, the Court will address the *Olmstead* Plan, including the March 2019 proposed Revision. Finally, the Court will discuss next steps necessary to address remaining disputes.

## DISCUSSION

## I.  The *Jensen* Agreement[22]

### A.  Defendants' Summary Report and Responses

Defendants' Summary Report addressed each of the three areas required by the Court's January 4, 2019 Order on reporting (Doc. No. 707). First, Defendants discussed

---

[22]  The Court addresses the Agreement separately from the *Olmstead* Plan as not to confuse or conflate the separate and distinct requirements and remaining disputes.

DHS's Internal Compliance Oversight structure.[23]  (Summary Report at 8-13.)  The

Summary Report also included updates on individual class members. Finally, it provided

an internal self-assessment of all ECs.  (Doc. No. 710.)  Defendants concluded that they

are in full compliance with the Agreement.  (*Id*.)  They request an immediate end to the

Court's jurisdiction.

Plaintiffs filed a letter response to Defendants' Summary Report on April 10,

2019.  (Doc. No. 730.)  Plaintiffs vehemently contest Defendants' compliance with the

Agreement, citing multiple violations including allegations of abusive conduct in state

operated and licensed facilities.  (Doc. No. 730.)  Plaintiffs' counsel have consistently

highlighted the need for the elimination of restraints as fundamental to the settlement.  In

a letter filed prior to the April 16, 2019 Status Conference, Plaintiffs stated:

> The terms of the Jensen Settlement Agreement require the Department to
> "immediately and permanently discontinue" the use of mechanical restraints,
> medical restraints, and medications as a method of punishment, or in lieu of
> adequate staff training or behavior support plans, convenience, or as a form
> of behavior modification in the program that was the subject of the lawsuit.
> As noted, the Department also agreed more broadly in the Comprehensive
> Plan of Action to prohibit restraint and seclusion in all licensed facilities and
> settings, consistent with the above-noted legislative directive in Minnesota
> Statutes, section 245.8251.

(*Id.* at 13.)  Plaintiffs ground their noncompliance arguments in the Agreement, the

Positive Supports Rule, and previous Court Orders.  Focused on the lack of meaningful

---

[23]     Defendants cited their March 31, 2018 Compliance Report to reiterate that they
had initiated the procedure for an Independent Subject Matter Expert review related to
EC 90, and had successfully implemented the Subject Matter Expert's recommendations.
(Summary Report at 13.)

external review, Plaintiffs request that "the Court actively involve the Independent Court Monitor" and hold an evidentiary hearing on the use of prohibited restraints. (*Id.* at 3-4.)[24]

The Consultants[25] also expressed concern with Defendants' compliance assessment, particularly with respect to: (1) continued use of prohibited techniques, including restraints; (2) the number of treatment homes; (3) class member status; (4) person centered planning; (5) the Positive Support Rule; and (6) staff training. (Doc. Nos. 726, 727.) The Consultants also observed that Defendants' limited analysis and lack of external verification in their Summary Report made it difficult to conclude whether Defendants have complied. With respect to restraints, the Consultants noted that more information is needed about the use of mechanical restraints, emergency use of manual restraints, 911 calls, and PRN.[26] (Doc. Nos. 726, 727.) Dr. Colleen Wieck wrote, "Both EC5 and 6 are clear, '[t]he State/DHS immediately and permanently discontinues all the

---

[24]    As an example of prohibited restraints, Plaintiffs point to use of a mechanical restraint chair on a person with a developmental disability at Minnesota Security Hospital ("MSH"). (Doc. No. 730 at 6.) Plaintiffs argue that this example demonstrates failure to comply with at least Section V of the Settlement Agreement. (*Id.*) Plaintiffs also refer to provisions of the Settlement Agreement pertaining to the modernization of the Positive Supports Rule, previously known as Rule 40, to argue noncompliance with respect to Anoka Regional Treatment Center ("ARTC") and MSH. (*Id.* at 9-11.) Plaintiffs cite specifically to Section X of the Settlement Agreement and corresponding CPA ECs 99-104 with particular emphasis on EC 103. (*Id.* at 11.)

[25]    Dr. Colleen Wieck is the Executive Director of the Minnesota Governor's Council on Developmental Disabilities. Ms. Roberta Opheim is the Ombudsman for the Minnesota Office of Ombudsman for Mental Health and Developmental Disabilities.

[26]    PRN is the use of psychotropic medication on an as-needed basis.

prohibited restraints and techniques; and the State/DHS has not used any of the prohibited restraints and techniques.'" (Doc. No. 726 at 5.) Among their concerns, the Consultants raised questions about the lack of detail surrounding staff training. (*Id.* at 9.) Regarding treatment homes, the Consultants called attention to the length of stay and long waitlists, and encouraged use of a comprehensive needs analysis. (Doc. Nos. 726, 727.) Finally, the Consultants encouraged Defendants to create a public document summarizing the information in the 1,200 pages of reporting on class members. (*Id.*)

## B. Issues Requiring Further Investigation and Review

The Court has reviewed the Summary Report, letters, presentations offered at the April 16, 2019 Status Conference, and relevant historical materials of records and identifies several issues in need of further investigation and review as set forth below.

### 1. Use of Prohibited Techniques

Defendants state repeatedly in their Summary Report that "the Jensen Internal Reviewer has monitored the use of restraints at Minnesota Life Bridge . . . and has found that Minnesota Life Bridge has used no prohibited restraints or techniques" or "has used restraints only on an emergency basis." (Doc. No. 710 at 179-82.) Defendants, however, appear to be verifying this information via "sampling " and without more comprehensive verification. Defendants provide little detail regarding the total number of reports, the basis of any emergency, an assessment of any trends, or an explanation on how Defendants quantify known use of prohibited restraint or techniques by a third party. Thus, the Court cannot conclude whether Defendants have complied with the obligations set forth in the Agreement.

The Court finds that external review is required. As discussed above, David Ferleger, who was initially appointed as Court Monitor, assumed the role of External Reviewer pursuant to the consent of both sides. Thus, the Court could direct the Court Monitor to perform this work, as requested by Plaintiffs. However, Defendants have objected to the ongoing involvement of Mr. Ferleger. While the Court does not concede that Defendants' objection has any merit,[27] the Court will allow Defendants the option to demonstrate that they have indeed developed the external review mechanisms "to provide independent and objective assurance, advisory, and investigative services to the Department in relation to the Jensen Settlement Agreement."[28] (Gap Report at 6.)

The Independent Subject Matter Experts were developed by DHS to bring "significant improvements to the care and treatment of persons with developmental disabilities, as outlined in the Settlement Agreement" through a master contract program. (*See, e.g.*, Doc. Nos. 589 at 10; 614-1 at 6; 683 at 48-49; Summary Report at 13.) The Independent Subject Matter Experts have a minimum of five years' experience in one or more specified Specialty Services Areas. (Doc. Nos. 589 at 10; 614-1 at 6.) One of the four specific areas identified includes positive behavior practices. (Doc. Nos. 589 at 10;

---

[27] As noted above, David Ferleger was initially appointed as Court Monitor, at least in part, because Defendants failed to engage an External Reviewer to meet reporting requirements.

[28] This approach also avoids any potential litigation regarding the role and deployment of David Ferleger at this time for the external investigation and review required by this Order. However, the Court reserves the right to deploy Mr. Ferleger in the future.

614-1 at 6.)  Accordingly, the Court will require Defendants to engage Subject Matter Expert(s) to conduct an external review of Defendants' compliance regarding prohibited restraints.[29]

The Court will continue to stay the Court Monitor's duties for a limited time, provided that Defendants timely engage a qualified Subject Matter Expert "to provide independent and objective assurance, advisory, and investigative services to the Department in relation to the Jensen Settlement Agreement" regarding the use of restraints no later than August 1, 2019.  (*See* Gap Report at 6.)  Specifically, Defendants must identify and assign a Subject Matter Expert to review and report on ECs 5-40.  The Subject Matter Expert must complete an initial report prior to October 15, 2019, unless a different date is adopted by the Court.  Defendants will have ten days to respond to the initial Subject Matter Expert report.  The Subject Matter Expert will submit a final report within ten days after receipt of Defendants' response, or within ten days of submission of the initial report, if Defendants do not make a response.  Defendants will share the final reports with Plaintiffs' Class Counsel, the Consultants, and the Court.  (Doc. 589 at 11 (describing Subject Matter Expert review process).)  To begin, the Subject Matter Expert

---

[29]    The Court understands that Dr. Gary LaVigna has the requisite expertise to assume this role.  Dr. LaVigna co-founded and is the Clinical Director for the Institute for Applied Behavior Analysis which provides behavior management services, supported employment, supported living, and supported educational services to individuals with developmental disabilities.  The Court understands that Dr. LaVigna was designated as a Subject Matter Expert.  Accordingly, the Court requires Defendants to reach out to Dr. LaVigna first to serve as the Subject Matter Expert.

will limit their review and report to the Stratton Lake, Donnelly, and Bromberg's Lake Facilities.[30]

### 2. Scope of the Settlement Agreement and CPA Relating to Prohibited Restraints

Plaintiffs have raised ongoing concerns surrounding the treatment of persons with developmental disabilities at Minnesota Security Hospital and Anoka Metro Regional Treatment Center. As one example, Plaintiffs claim ongoing "use of mechanical restraints on people with developmental disabilities at Minnesota Security Hospital, including use of restraint chairs on vulnerable citizens with disabilities" as violations of the Settlement Agreement and CPA. (Doc. No. 730 at 3.) Plaintiffs point to Part V of the Settlement Agreement, which states:

### V. PROHIBITED TECHNIQUES

A. Except as provided in subpart V.B., below, the State and DHS shall immediately and permanently discontinue the use of mechanical restraint (including metal law enforcement-type handcuffs and leg hobbles, cable tie cuffs, PlastiCuffs, FlexiCuffs, soft cuffs, posey cuffs, and any other mechanical means to restrain), manual restraint, prone restraint, chemical restraint, seclusion, and the use of painful techniques to induce changes in behavior through punishment of residents with developmental disabilities. Medical restraint, and psychotropic and/or neuroleptic medications shall not be administered to residents for punishment, in lieu of adequate and appropriate habilitation, skills training and behavior supports plans, for the convenience of staff and/or as a form of behavior modification.

(Settlement Agreement § V.A.) Plaintiffs argue that Defendants agreed that the

---

[30]     The Court reserves the right to expand the review pursuant to briefing and subsequent determination on the scope of the Agreement's provisions with respect to which Facilities are subject to ECs 5-40 as discussed in Section I(B)(2) of this Order.

Settlement Agreement precludes the use of prohibited restraints at the Minnesota Security Hospital and elsewhere. (Doc. No. 730 at 9.)[31] Citing the Court's directive letter to the Court Monitor (Doc. No. 220), Plaintiffs argue that "Anoka Regional Treatment Center and Minnesota Security Hospital are within the scope of the changes in restraint and seclusion policy and practice" contemplated by the Settlement Agreement. (Doc. Nos. 730 at 10, 220 at 1.) Plaintiffs further argue that the Positive Supports Rule provisions at CPA ECs 99-104 bar prohibitive techniques beyond Stratton Lake, Donnelly, and Bromberg's Lake. The Consultants also raised multiple concerns about obligations in the Settlement Agreement and CPA regarding the Positive Supports Rule. (Doc. Nos. 726 at 7; 727 at 4-5.)

Defendants appear to disagree that the ECs pertaining to prohibited techniques obligate the Defendants beyond the Facility or Facilities defined in the CPA. Consistent with this position, Defendants have limited their reporting on Facilities to Stratton Lake, Donnelly, and Bromberg's Lake. (Summary Report at 178.) In a footnote, Defendants state, "[t]he CPA defines 'Facility' as MSHS-Cambridge, the MSOCS East Central home, and the treatment homes established under the CPA. MSHS-Cambridge was

---

[31]     Plaintiffs cite a 2013 Court Monitor report to argue that "[t]he Settlement Agreement did more than forbid non-emergency restraints and seclusion at Cambridge. Referencing the 1987 rule which permitted aversive treatment such as restraints and seclusion, the State of Minnesota declared that 'its goal is to utilize the Rule 40 Committee' process to 'extend the application of the provisions in this Agreement to all state operated locations serving people with developmental disabilities with severe behavioral problems or other conditions that would qualify for admission to METO, its Cambridge, Minnesota successor, or the two new adult foster care transitional homes." (Doc. No. 236 at 4.)

closed on August 29, 2014 . . . Since approximately 2014, MSOCS East Central has been and remains an adult foster care home.  Minnesota Life Bridge homes are the successor treatment homes established under the CPA and are the current 'Facility.'"  (*Id.* at n.190.) Based on this position, Defendants have not included the use of prohibited restraints at the Minnesota Security Hospital and Anoka Regional Treatment Center or any other locations in their Summary Report.[32]

Defendants also assert full compliance with the Agreement's provisions regarding the Positive Supports Rule (sometimes referred to as Rule 40), to "prohibit procedures that cause pain, whether physical, emotional or psychological, and establish a plan to prohibit use of seclusion and restraints for programs and services licensed or certified by

---

[32]     Defendants also appear to disagree that the Agreement's term regarding the development of the Positive Supports Rule (Rule 40) raises any compliance issue beyond "Facilities," as they define them:

> In accordance with Recital 7 of the JSA, it is a <u>goal</u> (*sic*) of the Department to 'utilize the Rule 40 Committee . . . process . . . to extend the provisions of the JSA to all state operated locations,' which include operations such as the Minnesota Security Hospital (MSH), Minnesota Sex Offender Program (MSOP), and Minnesota State Operated Community Services (MSOCS). Some members of the Rule 40 Advisory Committee, however, acknowledged that 'sometimes, albeit rarely, situations arise where temporary use of mechanical restraints for self-injurious behavior should be permitted,' and the Committee was unable to reach consensus on any recommendation regarding the temporary use of mechanical restraint for self-injurious behavior.  These statements notwithstanding, and as noted above, the obligations of [EC 5] apply only to the [CPA definition of] 'Facility'.

(Summary Report at n.191 (internal citations omitted).)

the department." (Rule 40 Advisory Committee Recommendations on Best Practices and Modernization of Rule 40 (Final Version- July 2013) at 1; *see also* CPA at 31 (referencing same quote) at 31.) In sum, Defendants claim that ECs 99-104 relating to the Positive Supports Rules have been met. (Summary Report at 123, 175-176, 222-225.) Defendants state that "[t]he Positive Supports Rule is consistent with and incorporates, to the extent possible, the Rule 40 Advisory Committee's recommendations." (*Id*. at 224.) They reference their ongoing work regarding the development of updated goals to the *Olmstead* Plan and claim that "no unresolved issues have been presented to the court for resolution," concluding that "[f]rom the Department's perspective, the Rule 40 Advisory Committee recommendations have been addressed and nothing further is required under this EC." (Summary Report at 123-24.)

The dispute about scope on the use of prohibited restraints must be resolved before the Court can confirm whether compliance must be further investigated and reviewed by a Subject Matter Expert or the Court Monitor. Accordingly, the parties must meet and confer no later than August 1, 2019, to discuss their positions on whether provisions of the Agreement on prohibited techniques include the Minnesota Security Hospital and Anoka Regional Treatment Center (or beyond). The parties must also meet and confer to determine whether there are disputes relating to the ECs regarding the Positive Supports Rule for the Court to decide.[33] If the parties are unable to enter into a Stipulation, they must inform the Court no later than August 15, 2019 of their separate views and propose

---

[33]     The Court notes that issues were still pending as of February 2, 2016. (Doc. No. 531 at 68-69.)

a process for the Court to consider the dispute consistent with the applicable enforcement proceedings set forth in the Settlement Agreement or other procedures permitted pursuant to the Agreement. Following the parties' submission, the Court will set a hearing and issue a briefing schedule. Once any disputes regarding scope are resolved, the need for further external investigation and review will be determined.

### 3. The Staff Training

The Court also concludes that external investigation and review is necessary to ensure that Defendants have complied with certain ECs relating to staff training. Accordingly, the Court requires Defendants to assign an Independent Subject Matter Expert to review:

**EC 54:** The CPA states, "Facility treatment staff received training in positive behavioral supports, person-centered approaches, therapeutic interventions, personal safety techniques, crisis intervention and post crisis evaluation." (CPA 19.)

While the Summary Report indicates that training is offered, it fails to show that all Facility treatment staff actually received the training.

**EC 55:** The CPA states, "Facility staff training is consistent with applicable best practices, including but not limited to the Association of Positive Behavior Supports, Standards of Practice for Positive Behavior Supports (http://apbs.org). Staff training programs will be competency-based with staff demonstrating current competency in both knowledge and skills." (CPA at 20.)

Although the Summary Report provides a detailed description of the training curriculum provided to staff and the process to determine staff competency, it provides

no documentation or verification that staff has actually achieved competency.  (Summary Report at 143-146.)

**EC 56:**  The CPA states, "Facility staff receive the specified number of hours of training:  Therapeutic interventions (8 hours); Personal safety techniques (8 hours); Medically monitoring restraint (1 hour)."  (*Id.* at 20.)

Again, the Summary Report indicates that training is offered; however, the Summary Report fails to provide actual documentation that each Facility treatment staff member completed the required hours in the required areas.[34]  (Summary Report at 146- 147.)

The Subject Matter Expert must assess overall compliance with ECs 54-56, including but not limited to verifying that each staff member has actually received and achieved competency in all areas of required training.[35]  The Subject Matter Expert must complete an initial report prior to October 15, 2019, unless a different date is adopted by the Court.  Defendants will have ten days to respond to the initial Subject Matter Expert report.  The Subject Matter Expert will submit a final report within ten days after receipt

---

[34]     The Summary Report indicates less than 100% of staff completed the required number of hours in each training area.  (Summary Report at 147.)  It could be that less than 100% completion relates to the reporting period, however, the Court requires additional verification to properly conclude whether this EC has been met.

[35]     This is not the first time the Court has encouraged Defendants to appoint an Independent Subject Matter Expert to address this issue.  (*See* Gap Report Order at 11.)  After insufficient verification in the Gap Report, the Court recommended that an Independent Subject Matter Expert "provide feedback to DHS on its staff training curriculum," and to assess whether training is appropriately standardized across divisions throughout DHS."  (*Id.*)  While Defendants did not appoint a Subject Matter at that time, the Court now directs them to do so.

of Defendants' response, or within ten days of submission of the initial report, if Defendants do not make a response.  Defendants will share the final reports with Plaintiffs' Class Counsel, the Consultants, and the Court.  (*See* Doc. 589 at 11 (describing Subject Matter Expert review process).)

### 4.    Treatment Homes

The Court also finds that additional verification and review is necessary regarding the number of treatment homes needed to satisfy the Agreement.  The Consultants have repeatedly raised concerns that the current number of homes may be insufficient.  (Doc. Nos. 726 at 6; 727 at 4.)  They cite Diversion Minutes and referral lists which illustrate lengthy wait lists.  (Doc. Nos. 726 at 6, 727 at 4.)  The Court notes that EC 88 specifically discusses an assessment of need.[36]  (CPA at 29.)  Further, EC 93 states that "DHS will create stronger diversion supports through appropriate staffing and comprehensive data analysis."  (*Id*. at 30.)  Accordingly, the Court requires Defendants to supplement their Summary Report to present their assessment and analysis on the treatment homes no later than October 15, 2019.  The Court encourages, but does not

---

[36]    EC 88 states, "MSHS-Cambridge will be closed.  There will be community treatment homes dispersed geographically.  Any need for additional community treatment homes beyond four will be determined based on a *specific assessment of the need* based on client needs with regard to such criteria as those at risk for institutionalization or re-institutionalization, behavioral or other challenges, multiple hospitalizations or other transfers within the system, serious reported injuries, repeated failed placements, or other challenges identified in previous monitoring or interventions."  (CPA at 29 (emphasis added).)

require, the Defendants to engage a Subject Matter Expert to assist with the assessment and analysis.

## II. *Olmstead* Plan

The Court approved the *Olmstead* Plan on September 29, 2015. (Doc. No. 510.) The Court declined to approve several previous versions, finding that they failed to comply with the standards and requirements set forth in the Agreement or *Olmstead v. L.C.*, 527 U.S. 581 (1999).[37] The *Olmstead* Plan includes significant and strategic goals, as well as specific and realistic strategies for achieving each goal and clear indication of the agencies responsible for ensuring that the goals are met.[38] (Doc. No. 510.)

On February 22, 2016, the Court ordered Defendants to submit quarterly and annual status reports on *Olmstead* Plan implementation and progress towards measurable goals. (Doc. No. 544 at 4.) The Court further directed that all potential amendments to the *Olmstead* Plan should be identified and included in each annual report on or before December 31, and that adopted amendments must be reported to the Court on or before February 28, or in the case of a leap year, February 29.[39] (*Id.* at 6.) The Court also

---

[37] For a complete procedural history, see the Court's May 6, 2015 Order. (Doc. No. 435 at 2-4.)

[38] The evolving implementation of the *Olmstead* Plan does not moot Defendants' requirements under the Agreement or any future claim. *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 994 (D. Minn. 2016.) "A defendant's 'announcement of an intention to change or adoption of a plan to work toward lawful behavior' is generally insufficient" to moot a case." *Id.* (citing *See Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 n.3 (9th Cir. 2009).)

[39] On April 5, 2017, the Court adjusted the deadline to report adopted amendments to March 31. (Doc. No. 626.)

reserved the right to request further or other information upon receipt of each report.  (*Id.* at 7.)

Defendants have timely submitted multiple reports and proposed revisions.  (*See, e.g.*, Doc. Nos. 547, 569, 571, 588, 602, 609, 616, 636, 649, 671, 673, 680, 681, 688, 698, 705, 706, 708, 725.)

### A.     *Olmstead* **Plan March 2019 Proposed Revision**

The Court requires additional information before it can determine whether the goals set forth in the March 2019 Revision to the *Olmstead* Plan (Doc. No. 725), are acceptable under the Agreement's requirements.  Plaintiffs and the Consultants have raised concerns about the adoption and implementation of the Positive Supports Rule (formally called Rule 40) as set forth in the Agreement.  Accordingly, the Court must determine whether the Agreement provisions relating to *Olmstead* require incorporation of additional or modified goals relating to prohibited restraints.

As set forth in the Agreement, EC 103 states:

Within thirty (30) days of the promulgation of the Adopted Rule, Plaintiffs'
Class Counsel, the Court Monitor, the Ombudsman for Mental Health and
Developmental Disabilities, or the Executive Director of the Governor's
Council on Developmental Disabilities may suggest to the Department of
Human Services and/or to the Olmstead Implementation Office that there
are elements in the Rule 40 Advisory Committee Recommendations on
Best Practices and Modernization of Rule 40 (Final Version July 2013)
which have not been addressed, or have not adequately or properly been
addressed in the Adopted Rule.  *In that event, those elements shall be
considered within the process for modifications of the Olmstead Plan.*  The
State shall address these suggestions through Olmstead Plan sub-cabinet and
the Olmstead Implementation Office.  Unresolved issues may be presented
to the Court for resolution by any of the above, and will be resolved by the
Court.

(CPA at 33 (emphasis added).)  Thus, EC 103 is interwoven with the goal-setting process under the *Olmstead* Plan to require that certain "elements shall be considered within the process for modification of the *Olmstead* Plan." (*Id.*)  EC 103 also provides that "[u]nresolved issues may be presented to the Court for resolution by any of the above." (*Id.*)  Therefore, the Court must determine whether there are issues to be resolved by the Court with respect to unaddressed elements in the Adopted Rule.  The parties must meet and confer no later than August 1, 2019 to determine whether there are issues to be resolved before the Court considers the *Olmstead* Plan March 2019 Revision.  If the parties are unable to enter into a Stipulation, they must file a Joint Statement no later than August 15, 2019 to inform the Court of their separate views and propose a briefing schedule.  The Court will set a hearing and issue a briefing schedule.

## III.  Extended Jurisdiction and Next Steps

### A.    Extended Jurisdiction

The Court's jurisdiction over this matter was scheduled to end on December 4, 2019.  However, as set forth above, the Court requires additional information to determine whether issues of noncompliance remain.  Pursuant to the Settlement Agreement § XVII.B, and the Eighth Circuit's ruling that this Court may extend its jurisdiction as it deems "just and equitable," the Court's jurisdiction is extended to September 15, 2020.[40]  (Settlement Agreement § XVII.B; Doc. No. 695 at 12.)  The Court expressly reserves the authority and jurisdiction to order an additional extension of

---

[40]    Pursuant to ongoing reporting requirements, this date will allow the Court to review Defendants' August 31 Compliance Report and *Olmstead* Quarterly Report.

jurisdiction, depending upon the status of Defendants' compliance and absent stipulation of the parties. Until the Court's jurisdiction ends, all reporting requirements remain unchanged.

## B.  Additional Requests Denied

Plaintiffs' request for an evidentiary hearing is denied pending receipt of the Independent Subject Expert's initial report and final report above. If Plaintiffs believe the Defendants have not complied with other terms of the Agreement that are not identified for follow-up pursuant to this Order, they must initiate an enforcement proceeding under the terms of the Settlement Agreement. Until an enforcement proceeding is initiated, it is premature for this Court to address the meaning of "substantial compliance." Accordingly, Defendants' request that the Court "address the applicable legal standard the Court is using to determine the circumstances under which it will end its involvement in this matter, including what specific actions remain outstanding" (Doc. No. 731 at 2) is denied. Defendants' request to end reporting requirements is also denied.

## C.  Leadership Conference

As discussed above, this Court has extended its jurisdiction over this matter until September 15, 2020. Absent stipulation of the parties, it reserves the authority and jurisdiction to order an additional extension of jurisdiction if necessary. The Court has repeatedly encouraged the parties to identify and develop a plan to address all remaining steps essential to successful implementation of the Agreement before the Court terminates its jurisdiction over this matter. (*See e.g.*, Doc. Nos. 638, 652, 691,733.) The parties have not engaged on their own. Accordingly, the Court will hold a Leadership

Conference for a round-table discussion to attempt to bring the parties and their leadership together to discuss and develop a plan for a just and equitable way to end this Court's jurisdiction.

## CONCLUSION

After years of litigation, the time is now for those invested in the equitable treatment of persons with developmental disabilities to work together and develop a plan to ensure that the *Jensen* lawsuit is not left an empty promise.[41]

## ORDER

Based upon the presentations and submissions before the Court, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1.      **Jurisdiction:**  The Court's jurisdiction is extended to September 15, 2020. The Court expressly reserves the authority and jurisdiction to order an additional extension of jurisdiction, depending upon the status of Defendants' compliance and absence stipulation of the parties.

2.      **Use of Prohibited Techniques:**  Defendants must identify and assign a Subject Matter Expert to review and report on ECs 5-40 by August 1, 2019.  Defendants must first reach out to Dr. Gary LaVigna.  The Subject Matter Expert must complete an initial report prior to October 15, 2019, unless a different date is adopted by the Court. Defendants will have ten days to respond to the initial Subject Matter Expert report.  The

---

[41] Unfortunately, the equitable treatment of persons with developmental disabilities in the State of Minnesota is not confined to the *Jensen* lawsuit.  The Court hopes that State leadership may develop a comprehensive solution to the global issues that exist.

Subject Matter Expert will submit a final report within ten days after receipt of Defendants' response, or within ten days of submission of the initial report, if Defendants do not make a response. Defendants will share the final reports with Plaintiffs' Class Counsel, the Consultants, and the Court.

3. **Scope of the Settlement Agreement and CPA Relating to Prohibited Restraints:** The parties must meet and confer no later than August 1, 2019 to discuss their positions on whether provisions of the Agreement on prohibited techniques include the Minnesota Security Hospital and Anoka Regional Treatment Center (or beyond). The parties must also meet and confer to determine whether there are disputes relating to the ECs regarding the Positive Supports Rule for the Court to decide. If the parties are unable to enter into a Stipulation, they must file a Joint Statement to inform the Court of their respective positions no later than August 15, 2019 and propose a process for the Court to resolve the dispute consistent with the enforcement proceedings set forth in the Settlement Agreement or other procedure permitted pursuant to the Agreement. The Court will set a hearing and issue a briefing schedule. Following the Stipulation or the Court's determination on scope, the external review of prohibited restraints may be amended.

4. **Staff Training:** Defendants must identify and assign a Subject Matter Expert to review and report on ECs 54-56 no later than August 1, 2019. The Subject Matter Expert must assess overall compliance with ECs 54-56, included but not limited to verifying that each staff member has actually received and achieved competency in all areas of required training. The Subject Matter Expert must complete an initial report

prior to October 15, 2019, unless a different date is adopted by the Court. Defendants will have ten days to respond to the initial Subject Matter Expert report. The Subject Matter Expert must submit a final report within ten days after receipt of Defendants' response, or within ten days of submission of the initial report, if Defendants do not make a response. Defendants must share the final reports with Plaintiffs' Class Counsel, the Consultants, and the Court.

5.     **Treatment Homes:** As set forth above, Defendants must supplement their Summary Report no later than October 15, 2019 to present their assessment and analysis on the need for and current availability of treatment homes.

6.     **Positive Support Rule:** The parties must meet and confer no later than August 1, 2019 to determine whether there are issues related to the Positive Support Rule that must be resolved before the Court considers the *Olmstead* Plan March 2019 Revision. If the parties are unable to enter into a Stipulation, they must inform the Court no later than August 15, 2019 of their separate positions and propose a process for the Court to resolve the dispute consistent with the enforcement proceedings set forth in the Settlement Agreement or other procedure permitted pursuant to the Agreement. The Court will set a hearing and issue a briefing schedule.

7.     **Reporting Requirements:** All reporting requirements remain unchanged.

8.     **Requests:** Plaintiffs' request for an evidentiary hearing is **DENIED** pending receipt of the Independent Subject Expert's initial report and final report. Defendants' request that the Court "address the applicable legal standard the Court is

using to determine the circumstances under which it will end its involvement in this matter, including what specific actions remain outstanding is also **DENIED** as premature.

9. **Leadership Conference:** As set forth above, the Court will require the parties to participate in a roundtable meeting to develop a plan to address all remaining steps essential to successful implementation of the Agreement before the Court terminates its jurisdiction over this matter. In addition to counsel of record for the parties and the Consultants, the Court urges the following individuals to be present and to participate in the conference: Commissioner Tony Lourey; Deputy Commissioner for Policy Claire Wilson, Minnesota Housing Commissioner Jennifer Ho; Minnesota Attorney General Keith Ellison; and DHS Attorney Ricardo Figueroa. The Court also invites Governor Walz to attend. The conference will take place in the 7th Floor Conference Room, Warren E. Burger Federal Building and United States Courthouse, 316 North Robert Street, St. Paul, Minnesota on a date to be determined.


Date: June 17, 2019                     s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge