## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James and Lorie Jensen, as parents, guardians, and next friends of Bradley J. Jensen; James Brinker and Darren Allen, as parents, guardians, and next friends of Thomas M. Allbrink; Elizabeth Jacobs, as parent, guardian, and next friend of Jason R. Jacobs; and others similarly situated,

Civil No. 09-1775 (DWF/BRT)

                        Plaintiffs,

v.                                                                    **ORDER**

Minnesota Department of Human Services, an agency of the State of Minnesota; Director, Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Clinical Director, the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Douglas Bratvold, individually and as Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; Scott TenNapel, individually and as Clinical Director of the Minnesota Extended Treatment Options, a program of the Minnesota Department of Human Services, an agency of the State of Minnesota; and the State of Minnesota,

                        Defendants.

_____

Shamus P. O'Meara, Esq., and Mark R. Azman, Esq., O'Meara Leer Wagner & Kohl, PA, counsel for Plaintiffs.

Scott H. Ikeda, Aaron Winter, Anthony R. Noss, and Michael N. Leonard Assistant Attorneys General, Minnesota Attorney General's Office, counsel for State Defendants.

_____

## INTRODUCTION

This matter is before the Court upon Dr. Gary LaVigna's external review of the Forensic Mental Health Program and Anoka Metro Regional Treatment Center (Doc. No. 853 ("External Review")) and the parties' responses to the External Review (Doc. Nos. 863 (Pl. Resp."), 865 ("Def. Resp.")).[1]  This Order also addresses Defendants' overall compliance with the Stipulated Class Action Settlement Agreement (Doc. No. 136-1 ("Settlement Agreement")) and the Court's jurisdiction over the matter.[2]

## BACKGROUND

The factual background for the above-entitled matter is clearly and precisely set forth in the Court's June 2019 Order and is incorporated by reference here.  (*See* Doc. No. 737 ("June 2019 Order").)  The Court notes particular facts relevant to this Order below.[3]

In brief, this case commenced over a decade ago when Plaintiffs filed a Complaint against Defendants asserting multiple violations of federal and state law arising out of allegations of "abusive, inhumane, cruel, and improper use of seclusion and mechanical

---

[1]    The Court also received and considered the Consultants' response to the External Review.  (Doc. No. 862.)

[2]    On March 12, 2014, the Court formally adopted and approved a Comprehensive Plan of Action ("CPA") consisting of 104 evaluation criteria ("Evaluation Criteria") and accompanying actions designed to help direct and measure compliance.  (Doc. Nos. 283, 284 ("CPA").)  The combination of the Settlement Agreement and CPA is hereinafter referred to as the "Agreement."

[3]    The Court also supplements the facts as needed.

restraints routinely imposed upon [residents][4] of the Minnesota Extended Treatment

Options program (METO)."[5]  (Doc. No. 1 at 2.)  Following extensive negotiations, the

parties entered into a Stipulated Class Action Settlement Agreement, which was approved

by the Court on December 5, 2011.  (*See* Doc. Nos. 104, 136.)

When the Settlement Agreement was approved and adopted by this Court, the

parties made promises and sweeping declarations that the settlement heralded widespread

change for "hundreds of thousands of people in this state" and would "set the tone"

nationally.  (Doc. No. 146 ("Settlement Hrn'g") at 13, 27.)  Plaintiffs stated that the

Settlement Agreement's "unprecedented comprehensive positive changes" would benefit

"not only Class members, but all people with developmental disabilities in this state."

(*Id.* at 8.)  Defendants concurred with Plaintiffs, stating: "[The Settlement Agreement]

will greatly improve the quality in care of the lives of a large number of persons with

disabilities, not only in Minnesota, but [for] people that come through Minnesota . . . ,

[a]nd we think that this [A]greement will set the tone for other states, as well."  (*Id.* at

27.)

The Court's jurisdiction over this matter was originally scheduled to conclude on

December 4, 2013.  (*See* Settlement Agreement § XVIII.B ("The Court shall retain

jurisdiction over this matter for two (2) years from its approval of this [Settlement

---

[4]     The Court encourages use of the term "resident" as an alternative to "patient."

[5]     Plaintiffs filed an initial Complaint on July 10, 2009.  (Doc. No. 1.)  On July 30, 2009, Plaintiffs filed an Amended Complaint arising out of these same allegations.  (*See* Doc. No. 3 at 3.)

Agreement] for the purposes of receiving reports and information required by this [Settlement Agreement], or resolving disputes between the parties to this [Settlement Agreement], or as the Court deems just and equitable").) Due to Defendant's ongoing failure to meet basic objectives and continued noncompliance with the Agreement, the Court was forced to extend its jurisdiction multiple times.[6] (Doc. Nos. 224, 340, 544, 545, 737.) The Court's jurisdiction is currently scheduled to end on October 24, 2020.[7] (Doc. No. 851.)

In expectation that the Court's jurisdiction would end on December 4, 2019 (Doc. No. 545 at 6), the Court issued an Order requesting a comprehensive Summary Report to evaluate Defendants' overall compliance with the Agreement. (Doc. No. 707.) The Court explained, "the Court must evaluate Defendants' compliance to assess the impact of the *Jensen* lawsuit on the well-being of its class members and to determine whether the Court's jurisdiction may equitably end." (*Id.* at 6.) To accomplish this, the Court requested reporting in three areas: Internal Compliance Oversight Structure; Class

---

[6]    Defendants filed an objection to the Court's ongoing jurisdiction over this matter on April 28, 2017. (Doc. No. 631.) The Court overruled Defendants' objection on June 28, 2017. (Doc. No. 638.) Defendants appealed the Court's decision to the Eighth Circuit on July 26, 2017. (Doc. No. 639.) The Eighth Circuit affirmed this Court's jurisdiction on July 26, 2018, holding that this Court may extend its jurisdiction as it deems "just and equitable." (Doc. No. 695 at 12.)

[7]    Pursuant to the Court's June 2019 Order, jurisdiction was scheduled to end on September 15, 2020. (June 2019 Order.) Due to reporting and scheduling delays in part related to the COVID-19 pandemic, the Court deemed it just and equitable to extend its jurisdiction until October 24, 2020 to provide sufficient time for the parties to respond to final compliance reports and for the Court to appropriately assess whether its jurisdiction may finally come to an end. (Doc. No. 851.)

Members' Update; and assessment of all Evaluation Criteria.  (*Id.* at 7-11.)  The Court specifically asked Defendants to state whether each Evaluation Criterium in the Agreement was met and to provide specific data supporting each conclusion.  (*Id.* at 9-13.)  The Court advised that it would discuss the Summary Report at a Biannual Reporting Conference on April 16, 2019 ("Conference").  (*Id.*)  It was the Court's intent that the Summary Report would serve as a tool to facilitate a thorough review of compliance that would help establish a road map for an equitable end to the Court's jurisdiction.

Defendants timely submitted the Summary Report on March 19, 2019 and self-assessed as compliant with all Evaluation Criteria.  (Doc. No. 710 ("Summary Report").)  Accordingly, they asked that the Court end its jurisdiction over the mater.  (Doc. No. 740 ("Conference") at 10, 11, 154.)  Plaintiffs contested Defendants' compliance.  (Doc. No. 730.)  They argued that there were remaining areas of concern and that the Court needed additional information to determine whether its jurisdiction should be extended. (Status Conference at 13, 14, 119, 123-126, 157.)  Plaintiffs asked the Court to reengage the Court Monitor to investigate alleged violations of abusive conduct in state operated and licensed facilities.[8]

---

[8]   On July 17, 2012, the Court appointed David Ferleger ("Ferleger") as an independent advisor and compliance monitor ("Court Monitor").  (Doc. No. 159 at 9-10, 13.)  Ferleger submitted multiple reports; however, his duties were ultimately stayed after Defendants developed sufficient internal monitoring structures in March 2016.  (Doc. No. 551 at 3, 24.)  Notwithstanding, the Court reserved the right to reengage Ferleger if necessary.  (*Id.* at 7; *see also* Doc. No. 578 at 3-4.)  The Court lifted the stay and reengaged Ferleger in September 2016.  (Doc. No. 595 at 2-3.)  The Court subsequently

After a thorough review of the Summary Report and upon completion of the Conference, the Court determined that it needed additional information to properly determine whether its jurisdiction could come to a just and equitable end.[9] (June 2019 Order at 36, 38.)  Accordingly, it extended its jurisdiction until September 15, 2020.  (*Id*.) While the Court declined to reengage the Court Monitor, it ordered Defendants to identify and assign a Subject Matter Expert[10] to review and report on Evaluation Criteria related to the use of Prohibited Techniques and staff training so that the Court could properly determine whether those Evaluation Criteria had been met.[11]  (*Id.* at 38-40.)  The Court also ordered Defendants to supplement their Summary Report with an assessment and analysis on the need for and current availability of treatment homes.[12]  (*Id.* at 40.) Finally, the Court directed the parties to meet and confer to discuss their positions on:

stayed his duties again in January 2017; however, it reserved the right to reengage Ferleger to investigate or verify other issues that may arise.  (Doc. No. 612 at 3.)

[9]      On July 15, 2019, Defendants filed a motion to alter or amend the June 2019 Order on the grounds that the Court manifestly erred when the Court extended its jurisdiction.  (Doc. No. 743 at 17.)  The Court denied Defendant's motion on August 28, 2019.  (Doc. No. 757.)

[10]      As part of an initiative to create internal organizational structures to improve quality and oversight of the Agreement, Defendants developed a pool of Subject Matter Experts to provide independent and objective advisory and investigative services.  (*See* June 2019 Order at 11; *see also* Doc. Nos. 589 at 10; 614-1 at 6; 683 at 48-49; Summary Report at 13.)

[11]      Defendants engaged Dr. Gary LaVigna as their Subject Matter Expert on each issue.  (*See* Doc. Nos. 775-1, 775-5.)  He determined that Defendants were in full compliance with all related Evaluation Criteria.  (*Id.*)

[12]      Defendants timely submitted a supplemental report, re-asserting that it was in full compliance with the Evaluation Criteria related to treatment home.  (Doc. No. 774.)

(1) the scope of the Agreement related to prohibited restraints, specifically addressing

whether provisions of the Agreement on Prohibited Techniques included the Forensic

Mental Health Program ("FMHP") (formerly the Minnesota Security Hospital), and

Anoka Metro Regional Treatment Center ("AMRTC"); and (2) whether there were

unresolved issues related to the Positive Supports Rule.[13]  (*Id.* at 39-40.)

On December 18, 2019, the Court issued an order in response to the parties'

positions regarding the scope of Agreement with respect to prohibited restraints and

compliance with the Positive Supports Rule.[14]  (Doc. No. 779 ("December 2019 Order").)

The Court found that because the Agreement's definition of Facilities does not include

FMHP or AMRTC, those locations are not subject to the Agreement's strict prohibition

on the use of restraint in all but extreme emergency situations.  (*Id.* at 11-12.)

Notwithstanding, the Court found that a separate provision of the Agreement requires

Defendants to ensure that their use of restraint at FMHP and AMRTC reflects current

best practices.  (*Id.* at 12-14.)  Recognizing the very real danger that inappropriate use of

restraint poses to some of society's most vulnerable citizens, the Court ordered

Defendants to conduct an external review of their use of restraint at FMHP and AMRTC

---

[13]     The parties submitted briefing on these issues in August 2019.  (Doc. Nos. 753, 759.)

[14]     In light of Defendants' supplemental report related to treatment homes, and LaVigna's findings that Defendants were in compliance with all Evaluation Criteria related to the use of Prohibited Techniques in Facilities and staff training, the December 2019 Order addressed the only remaining issues.

to properly determine whether such use reflects current best practices and satisfies

Defendants' obligations under the Agreement.  (*Id.* at 15-16.)

The December 2019 Order imposed three obligations on Defendants:  (1) to jointly

agree with Plaintiffs on an external reviewer, or to nominate two individuals Defendants

would like to perform the external review if an agreement could not be reached; (2) to

engage the external reviewer "to address the extent to which Defendants' use of

mechanical restraint at [FMHP] and [AMRTC] reflects current best practices, specifically

quantifying the type, frequency, and duration of mechanical restraint at each location, and

identifying whether Positive Supports were attempted prior to use;" and (3) to submit a

final report prior to March 2020 unless a different date was adopted by the Court.[15]

(December 2019 Order at 16-17.)

The parties were unable to agree on an external reviewer.  Per the Court's

direction, each party nominated two individuals via email.  The Court reviewed the

nominations and directed Defendants to select between LaVigna and Ferleger.[16]  (Doc.

No. 795.)  On February 7, 2020, Defendants notified the Court via email that while they

objected to both LaVigna and Ferleger as unqualified, they selected LaVigna to conduct

---

[15]    On January 10, 2020, Defendants filed a Notice of Appeal of the Court's
December 2019 Order.  (Doc. No. 783.)  On the same day, Defendants filed a Motion to
Stay pending appeal.  (Doc. No. 784.)  The Court denied Defendant's motion to stay on
February 4, 2020 (Doc. No. 794) and the Eighth Circuit denied their appeal on April 7,
2020.  (Doc. No. 832.)

[16]    The Court found that it was economically prudent and in the interest of efficiency
to engage an external reviewer already familiar with this matter.

the external review.[17]  On February 13, 2020, the Court ordered Defendants to engage

LaVigna to conduct an external review of FMHP and AMRTC to determine whether

Defendants' use of mechanical restraint at those locations reflects current best practices.[18]

(Engagement Order at 3.)  The Court also ordered that prior to the external review,

LaVigna meet with one or both of the Court Consultants for additional context and

background, and that the Court Consultants serve as a resource throughout the review.[19]

(*Id.*)

LaVigna conducted the external review and timely submitted a final report on

June 30, 2020.[20]  (Doc. No. 853 ("Report").)  In short, LaVigna found strong evidence

---

[17]    The Court acknowledged Defendants' objection to LaVigna; however, it found that LaVigna had the requisite experience and education to properly determine whether Defendants' use of mechanical restraint at FMHP and AMRTC reflected current best practices.  (Doc. No. 798("Engagement Order") at 2.)

[18]    In accordance with its December 2019 Order, the Court specifically directed that LaVigna "address the extent to which Defendants' use of mechanical restraint at the Forensic Mental Health Program and Anoka Metro Regional Treatment Center reflects current best practices, specifically quantifying the type, frequency, and duration of mechanical restraint at each location, and identifying whether Positive Supports were attempted prior to use."  (Engagement Order at 3; *see also* December 2019 Order at 17.)

[19]    Defendants appealed the Engagement Order on February 25, 2020.  (Doc. No. 804.)  The Eighth Circuit denied Defendants' appeal on April 7, 2020.  (Doc. No. 832.)

[20]    LaVigna's external review of FMHP was based on:  (1) interviews and conference calls; (2) an electronic review of documents including a list of the 12 residents with whom mechanical restraint and other restrictive practices were used in 2019, various related documents and policies, the resumes of staff responsible for developing behavior support plans and carrying out functional behavior assessments, incident reports detailing de-escalation strategies, descriptions of general programs and services provided to residents, and applicable State and Court documents; (3) a physical records review of

that Defendants' use of restrictive procedures at both FMHP and AMRTC reflects current best practices.  (*See id*. at 4, 14, 17, 19.)  With respect to FMHP, LaVigna stated, "[t]he frequency of behaviors of concern and use of restrictive procedures [at FMHP in 2019] was remarkably low" and observed that "the extremely low rates of behavioral incidents exhibited by the 12 [persons] for whom restrictive procedures were needed provides very strong evidence that best practices are being followed at an extremely high level."  (*Id.* at 4.)  LaVigna specified that he "did not see any evidence that punishment or other aversive procedures [were] used proactively," and found that "[c]urrent FMHP Positive Support Transition Plans include best practices procedures."  (*Id.* 14, 17.)  Moreover, he declared that "a celebration should be scheduled in recognition of [the] impressively effective application of best practices that were employed."[21]  (*Id.* at 18.)

With respect to AMRTC, LaVigna "was not able to identify a single resident of [AMRTC] identified as having a developmental disability with whom mechanical or physical restraint or any other restrictive procedure had been used for the entire year of

---

various documents related to the 12 residents with whom mechanical restraint and other restrictive practices were used in 2019, and Positive Support Rule training materials. (Report at 1-3.)  His review of AMRTC was based on:  (1) conferences calls; (2) telephone interviews; and (3) email exchanges with a number of individuals responsible for or knowledgeable about past and current practices at the facility.  (*Id.* at 19.)  LaVigna did not physically visit either FMHP or AMRTC, nor did he meet with any individual in person.

[21]    LaVigna's Report includes a number of recommendations largely related to the content of Positive Behavioral Support Plans to further reduce the frequency of behavioral incidents that may result in restrictive procedures.  (*See* Report at 8-18.)  None of the recommendations are based on a conclusion that Defendants' use of restraint fails to reflect current best practices.  (*See id.*)

2019 or since then." (*Id.* at 19.)  He recommended that AMRTC "be recognized and commended for this." (*Id.*)

Both Plaintiffs and the Court Consultants filed a response to the Report, each expressing a number of concerns. (*See* Doc. Nos. 860 ("Consultants' Resp."), 863 ("Pl. Resp.").)  These concerns include that the Report does not:  (1) specifically discuss restraint chair use; (2) state whether LaVigna reviewed reports related to previous violations of Minn. Rule 9544; (3) include the criteria LaVigna used to determine the quality of person-centered planning or evidence that he tied his review back to the Agreement; (4) contain individual, incident-level judgments about each use of mechanical restraint during the subject time period; or (5) provide LaVigna's opinion on whether using mechanical restrains violates the PSR and its express prohibition against using restraints. (*See* Consultants' Resp. at 2; Pl. Resp. at 1, 5.)  Moreover, Plaintiffs express concern that LaVigna "never visited" FMHP or AMRTC and assert that "onsite observation and inspection of the actual conditions at [FMHP and AMRTC] should be a fundamental part of the review." (Pl. Resp. At 5.)  Both the Plaintiffs and Court Consultants suggest that LaVigna update his Report with the missing information. (Consultants Resp. at 2; Pl. Resp. at 5.)

Defendants also filed a response to the Report.[22]  (Doc. No. 865 ("Def. Resp.").) They dismiss all concerns related to the Report on the grounds that "the Court's written

---

[22]     Defendants' response also addressed the concerns raised by Plaintiffs and Court Consultants.  (Def. Resp. at 7.)

instructions to Dr. LaVigna do not require Dr. LaVigna to use a particular methodology,

review particular documents, or address [the issues raised by Plaintiffs and Court

Consultants]." (*Id.* at 7.) Defendants assert that "[t]he record is clear and unrebutted that

Defendants' use of mechanical restraint at FMHP and AMRTC reflects current best

practices, and that Defendants have complied with the [Agreement].[23] (Doc. No. 865

at 8.) Accordingly, they ask the Court to end its jurisdiction over this matter. (*Id.* at 8.)

## DISCUSSION

### I.   Legal Standard

The Settlement Agreement provides the following regarding the Court's

jurisdiction:

> The Court shall retain jurisdiction over this matter for two (2) years from its
> approval of this Agreement for the purposes of receiving reports and

---

[23]   Defendants independently retained a second individual, Dr. Allen Baker
("Baker"), "to conduct his own review of whether restraint use at FMHP and AMRTC
reflects current best practices." (Doc. No. 865 at 3; *see also* Doc. No. 867 ("Allen
Decl.").) Baker's review included: (1) a review of professional literature on the standard
of care applicable to the use of restraint and seclusion in forensic settings; (2) an in-
person inspection of both FMHP and AMRTC; and (3) interviews with staff and direct
observation of staff/patient interactions at FMHP and observation of seclusion rooms and
all restraint devices. (Allen Decl. ¶ 3.) It also involved a review of various documents
including (1) incident reports that resulted in seclusion or restraint, the Behavior Incident
Report Form for each incident, and the Intervention Data Form for each patient of
concern; (2) spreadsheets containing data regarding total incidents of target behaviors and
the use of seclusion and restraint for each of the 12 patients of concern throughout 2019;
(3) the Person-Centered Master Treatment Plans for each of the 12 identified patients;
and (4) numerous policies, procedures, fidelity measures, and training documents. (*Id.*)
Like LaVigna, Baker also concluded that Defendants' use of restraint at FMHP and
AMRTC reflects current best practices. (*Id.* at ¶ 12b (asserting that FMHP and AMRTC
"exceed the description of standard of care by all published scholarly articles and
published governmental publications").)

information required by this Agreement, or resolving disputes between the parties to this Agreement, or as the Court deems just and equitable.

(Agreement § XVIII.B.)  This section continues with the following provision regarding Plaintiffs' right to extend reporting requirements:

> Should Plaintiffs believe a pattern and practice of substantial non-compliance with Attachment A exists, the State and Plaintiffs shall meet and confer in an effort to resolve any such concerns.  The meet and confer shall be held no later than sixty (60) days prior to the two year anniversary of the Court's approval.  Should Plaintiffs continue to believe a pattern and practice of substantial non-compliance with Attachment A exists, Plaintiffs may, within thirty (30) days thereafter, file a motion with the Court to extend the reporting requirements to the Court under this Agreement for an additional one (1) year.

(*Id.*)  The Agreement also provides that "This Agreement shall terminate at the same time as the court's jurisdiction ends under paragraph B above . . . ." (*Id.* § XVIII.E.)

On July 26, 2018, the Eighth Circuit clarified the Settlement Agreement's jurisdictional provision to mean that this Court may extend its jurisdiction beyond the initial two years as it deems "just and equitable."  (Doc. No. 695 at 12.)

As discussed above, the Court anticipated that its jurisdiction over this matter would end on December 4, 2019.  To properly determine whether Defendants were in full compliance with the Agreement, the Court ordered Defendants to submit a final Summary Report with data to support each conclusion that an Evaluation Criterium had been met.  Upon careful review of the Summary Report, and after a status conference with the parties, the Court found that it required additional information to properly determine whether its jurisdiction may equitably end.  (*See generally*, June 2019 Order.)  Defendants have now provided all of the additional information the Court required.

13

After more than 9 years of monitoring the Agreement, the Court now finds that Defendants have substantially complied with all requirements, and that the Court's jurisdiction over this matter may at last come to an end.[24]

The Court recognizes Plaintiffs' and the Court Consultants' concerns with the most recent Report, and acknowledges that aspects of the external review were imperfect.[25]  Notwithstanding, the Court finds that the Report properly complied with the Court's directive to "address the extent to which Defendants' use of mechanical restraint at the Forensic Mental Health Program and Anoka Metro Regional Treatment Center reflects current best practices, specifically quantifying the type, frequency, and duration of mechanical restraint at each location, and identifying whether Positive Supports were attempted prior to use."  (*See* Engagement Order at 3; *see also* December 2019 Order at 17.)  Moreover, the Court finds sufficient evidence to support the Report's conclusions that Defendants' use of mechanical restraint at FMHP and AMRTC reflects current best practices.

---

[24]     While the Court finds that Defendants have achieved substantial compliance, the Court notes that they have satisfied the requirements at the most basic level, falling far short of the ideals they espoused when they declared their commitment to the Settlement Agreement.  (*See* Settlement Hrn'g at 27 ("[The Settlement Agreement] will greatly improve the quality in care of the lives of a large number of persons with disabilities, not only in Minnesota, but [for] people that come through Minnesota . . . , [a]nd we think that this [Settlement] [A]greement will set the tone for other states, as well.").)

[25]     The Court agrees that a more thorough review would have included in-person visits to FMHP and AMRTC, and that the Report could have provided additional detail and clarification in some areas.

## CONCLUSION

In light of the Report, all required briefing and supplemental reporting pursuant to the Court's June 2019 Order, and upon careful review of Defendants' semi-annual and annual reporting, the Court finds no legal basis to continue its jurisdiction over this matter. The Court's jurisdiction shall end, as scheduled, on October 24, 2020. Consequently, the Status Conference scheduled for September 24, 2020 is cancelled.

The termination of the Court's jurisdiction over this matter, though, should in no way imply that the Court feels that justice has been served. At some point, the purpose of the Agreement was lost—overcome by litigation tactics to end this Court's jurisdiction at the expense of making meaningful lasting improvements in the lives of people with disabilities.[26] At best, these actions fall short of the ideals Defendants initially espoused;

---

[26]   As early as 2013, the Court noted a marked difference in Defendants' priorities and foretold the impact it would have on the individuals the Agreement was intended to serve. (*See* Doc. No. 205 at 6-7 ("Sadly, however, careful scrutiny of the progress or, more accurately stated, the lack of progress that has been made since the hearing on December 1, 2011, establishes that that same passion, spirit, and the good intentions behind that passion, care, and concern for those individuals with developmental disabilities, has been absent for most of the last 16 months… Time will tell if individuals with developmental disabilities will truly benefit from the Settlement Agreement."); *see also* Doc. Nos. 211 at 10-11 ("It is obvious by this Order and Memorandum that the Court continues to be extremely concerned that a large number of individuals with developmental disabilities, their families, and loved ones will soon be before this Court proclaiming that nothing has significantly changed since December 1, 2011. The Court remains hopeful that the parties are still willing to carry out the intent of the Settlement Agreement, which was to benefit a large number of individuals with disabilities in a truly meaningful and significant way."); 223 at 15 ("The Court continues to be extremely concerned with the lack of progress in carrying out not only the provisions of the Settlement Agreement that were announced in the courtroom on December 1, 2011, but,

at worst, they are an embarrassment to the State of Minnesota as a whole and a manifest injustice against the persons the Agreement was intended to serve.  Had Defendants directed their litigious energy into implementing the Agreement, they may have established a national model.  Sadly, they did not.

The Court has repeatedly encouraged the parties to identify and develop a plan to ensure that the improvements Defendants *have* made are not lost upon termination of the Court's jurisdiction.  (*See, e.g.*, Doc. Nos. 638, 652, 737, 820.)

---

frankly speaking, as the Court has noted before, large number of individuals with developmental disabilities, their families, friends, and loved ones have either lost faith in the Court and the parties involved in this case or will lose faith and trust in the immediate future if, for whatever reasons, the parties do not carry out the intent of the provisions of the Settlement Agreement which were truly intended, as everyone knows, to benefit individuals with disabilities in a truly sincere, meaningful, and significant way.”); 368 at 9 (“The Court sadly observes, as it has in numerous prior orders, that a meaningful survey of individuals with disabilities and their families would likely challenge the notion that any true improvement in the quality of care, treatment, and lives of Minnesota citizens with disabilities has occurred since the Court approved the Settlement Agreement more than three years ago.”).

Despite the Court's portentous warnings, Defendants repeatedly delayed, objected to, or fought their responsibilities pursuant to the Agreement.  (*See e.g.* Doc. Nos. 211 at 3-5 (describing failure to disclose information); 217 at 12-14, 44-47 (describing areas of noncompliance including operation of MSHS-Cambridge without license for 10 months); 224 at 10 (“The Court continues to be extremely concerned with the sluggish pace of implementation of the specific terms of the Settlement Agreement and the resulting noncompliance.”) 259 at 5 (“DHS consciously concealed and misled the Plaintiffs and the Court with regard to the lack of licensure, or if not consciously concealed and misled, was indifferent to both the violation and the expectation of candor with all parties.”); 340 at 8-10, 14 (“Extending the term of the Court's jurisdiction is clearly necessary based on the significant delays in implementation as well as the non-compliance with the Settlement Agreement.”); 368 at 10 (approving Court Monitor's recommendations based on noncompliance); 593 at 4 (reaffirming Ferleger as Court Monitor due to continuing issues of noncompliance).)

While the Court had hoped that this plan would be created prior to the end of its jurisdiction, the Court continues to encourage the parties to develop a way to ensure that the Agreement does not become an entirely empty promise.  Justice requires no less.  If not, the Court fears that it is not a matter of if, but when, future lawsuits will arise.

## ORDER

Based upon the presentations and submissions before the Court, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

1.    **Compliance**:  Defendants have substantially complied with all requirements pursuant to this lawsuit.

2.    **Jurisdiction**:  The Court's jurisdiction over this matter shall end on October 24, 2020.

3.    **Status Conference**:  The Status Conference scheduled for September 24, 2020 is cancelled.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 4, 2020                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge