# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James and Lorie Jensen, as parents, guardians,
and next friends of Bradley J. Jensen; James
Brinker and Darren Allen, as parents,
guardians, and next friends of Thomas M.
Allbrink; Elizabeth Jacobs, as parent, guardian,
and next friend of Jason R. Jacobs; and others
similarly situated,

          Plaintiffs,

v.

Minnesota Department of Human Services,
an agency of the State of Minnesota; Director,
Minnesota Extended Treatment Options, a
program of the Minnesota Department of
Human Services, an agency of the State of
Minnesota; Clinical Director, the Minnesota
Extended Treatment Options, a program of
the Minnesota Department of Human Services,
an agency of the State of Minnesota; Douglas
Bratvold, individually and as Director of the
Minnesota Extended Treatment Options, a
program of the Minnesota Department of Human
Services, an agency of the State of Minnesota;
Scott TenNapel, individually and as Clinical
Director of the Minnesota Extended Treatment
Options, a program of the Minnesota Department
of Human Services, an agency of the State of
Minnesota; and the State of Minnesota,

          Defendants.

Civil No. 09–1775 (DWF/BRT)

**MEMORANDUM AND ORDER**

---

Shamus P. O'Meara, O'Meara Leer Wagner & Kohl, P.A., counsel for Plaintiffs.

Scott H. Ikeda, Aaron Winter, and Michael N. Leonard, Minnesota Attorney General's
Office, counsel for State Defendants.

---

This matter is before the Court upon Plaintiffs' Motion for Appointment of Independent Reviewer and Sanctions Against Defendants.  (Doc. No. 881 ("Motion").)  For the reasons discussed below, the Motion is respectfully denied.

## BACKGROUND

The factual and procedural background for the above-entitled matter is clearly and precisely set forth in the Court's June 2019 and September 2020 Orders and is incorporated by reference here.  (Doc. Nos. 737 ("June 2019 Order")[1]; 879 ("September 2020 Order").[2])

In brief, this case commenced over a decade ago when Plaintiffs filed suit asserting multiple violations of federal and state law arising out of "abusive, inhumane, cruel, and improper use of seclusion and mechanical restraints routinely imposed upon [residents][3] of the Minnesota Extended Treatment Options program (METO)."[4]  (Doc. No. 1 at 2.)  Following extensive negotiations, the parties entered into a Stipulated Class Action Settlement Agreement (Doc. No. 136-1 ("Settlement Agreement")) which was

---

[1]     Also available at 2019 WL 2499595 (D. Minn. June 17, 2019).

[2]     Also available at 2020 WL 5350269 (D. Minn. Sept. 4, 2020).

[3]     The Court encourages use of the term "resident" as an alternative to "patient."

[4]     Plaintiffs filed an initial Complaint on July 10, 2009.  (Doc. No. 1.)  On July 30, 2009, Plaintiffs filed an Amended Complaint arising out of these same allegations.  (*See* Doc. No. 3 at 3.)

approved by the Court at a hearing on December 1 then formally approved by the Court

via written order on December 5, 2011.[5]  (*See* Doc. Nos. 104, 135, 136.)

While the Court's jurisdiction over this matter was originally scheduled to

conclude on December 4, 2013, the Court extended its jurisdiction multiple times due to

Defendants' ongoing noncompliance with the Agreement.[6]  (*See* Settlement

Agreement § XVIII.B (establishing the Court's jurisdiction over the matter for a period of

two years); *see also* Doc. Nos. 224, 340, 544, 545, 737 (extending jurisdiction due to

noncompliance).)  On September 4, 2020, the Court found that Defendants had at last

substantially complied with all requirements of the Agreement and ended its jurisdiction

over this matter effective October 24, 2020.[7]  (September 2020 Order.)

---

[5]     On March 12, 2014, the Court formally adopted and approved a Comprehensive
Plan of Action ("CPA") consisting of 104 evaluation criteria ("Evaluation Criteria") and
accompanying actions designed to help direct and measure compliance with the
Settlement Agreement.  (Doc. Nos. 283, 284 ("CPA").)  The combination of the
Settlement Agreement and CPA is hereinafter referred to as the "Agreement."

[6]     Defendants filed an objection to the Court's ongoing jurisdiction over this matter
on April 28, 2017.  (Doc. No. 631.)  The Court overruled Defendants' objection on
June 28, 2017.  (Doc. No. 638.)  Defendants appealed the Court's decision to the Eighth
Circuit on July 26, 2017.  (Doc. No. 639.)  The Eighth Circuit affirmed this Court's
jurisdiction on July 26, 2018, holding that this Court may extend its jurisdiction as it
deems "just and equitable."  (Doc. No. 695 at 12.)

[7]     Pursuant to the Court's June 2019 Order, jurisdiction was scheduled to end on
September 15, 2020.  (June 2019 Order.)  Due to reporting and scheduling delays in part
related to the COVID-19 pandemic, the Court deemed it just and equitable to extend its
jurisdiction until October 24, 2020 to provide sufficient time for the parties to respond to
final compliance reports and for the Court to appropriately assess whether its jurisdiction
may finally come to an end.  (Doc. No. 851.)

Plaintiffs now move for sanctions on the grounds that Defendants' decade-long noncompliance "severely delayed the administration of justice, endangered vulnerable citizens and caused the needless expenditure of several thousand hours by the Court, consultants and Plaintiffs to address DHS non-compliant conduct."  (Doc. No. 884 at 2.) Specifically, Plaintiffs ask that the Court sanction Defendants in the amount of $500,000 as follows:

- $100,000 to the Court's *Cy Pres* fund to be used to facilitate access to justice and improve the lives of people with developmental disabilities and their families;

- $100,000 to third party organizations selected by the Court [and] unaffiliated . . . with DHS to promote the state-wide changes in the Agreement including the Minnesota Olmstead Plan, Positive Supports Rule and Best Practices regarding the use of restraint and seclusion;

- $100,000 to the Minnesota Governor's Council on Developmental Disabilities for its executive director's work in this matter over 10 years as a court consultant dealing with unprecedented ongoing non-compliance and delay caused by DHS, and for DHS lead counsel's contemptuous statements about the Court and Court consultants;

- $100,000 to the Office of the Ombudsman for Mental Health and Developmental Disabilities for the Ombudsman's work over 10 years as a court consultant dealing with unprecedented ongoing non-compliance and delay caused by DHS, and for DHS lead counsel's contemptuous statements about the Court and Court consultants;

- $100,000 Plaintiffs' counsel for thousands of hours spent addressing unprecedented ongoing DHS non-compliance and delay over 10 years.

(*Id.* at 14.)

Plaintiffs also ask that the Court appoint an independent reviewer to "provide ongoing quarterly reports on the status of DHS compliance with its ongoing obligations

under the Agreement with copies of the reports provided to the DHS, the Ombudsman for

Mental Health and Developmental Disabilities and the Minnesota Disability Law Center,

paid for by money previously deposited into Court by DHS, to be replenished by DHS on

an annual basis." (*Id.* at 2.)  Finally, to ensure compliance with any sanctions or

directives the Court may order, Plaintiffs ask that the Court extend its jurisdiction over

this matter until December 31, 2020, or as the Court deems just and equitable.  (*Id.* at 14.)

## DISCUSSION

### I.    Plaintiff's Reply Brief

Before the Court can address the substance of the Motion, the parties first raise a

procedural dispute.  Plaintiffs filed their Motion, supporting memorandum, and a

declaration on September 22, 2020.  (Doc. Nos. 881, 883, 884.)  The next day, on

September 23, Plaintiffs filed a hearing notice for October 7.  (Doc. No. 885.)

Defendants responded on September 29, 2020 with their opposition memorandum and

three supporting declarations.  (Doc. Nos. 889–92.)  The following day, September 30,

2020, Plaintiffs submitted a reply brief to Defendants' memorandum.  (Doc. No. 893.)

On October 5, 2020, Plaintiffs emailed asking the Court to accept their reply brief.

Plaintiffs, citing D. Minn. LR 7.1(b)(4)(B)(ii), indicated they filed their motion papers on

September 22 and 23 "in an effort to have the motion heard prior to the expiration of the

Court's jurisdiction on October 24, 2020."  Defendants contend Plaintiffs' reply brief was

improperly filed and should be disregarded and stricken by the Court.

Plaintiffs' filing timeline comports with the standard timeline for non-dispositive

motions.  D. Minn. LR 7.1(b)(1) (requiring filing of the motion and supporting

documents at least 14 days prior to the hearing).  Reply memoranda for non-dispositive motions are not permitted without the Court's prior permission.  *Id.* 7.1(b)(3).  But these filing rules do not apply to post-trial or post-judgment motions.  *Id.* 7.1(b)(4)(B)(ii).  Instead, post-trial and post-judgment motions require contacting the Court to obtain a briefing schedule.  *Id.* 7.1(e).

Plaintiffs first argued their motion is governed by the non-dispositive briefing schedule. Under that ruleset, however, Plaintiffs' reply memorandum is impermissible; they never received Court permission prior to filing.  Plaintiffs' responsive argument, that their motion is actually governed by the post-judgment motion ruleset, runs afoul for a different reason: while Plaintiffs obtained a hearing date, they never obtained a briefing schedule or communicated that briefing schedule to Defendants.  Thus, under either Local Rule 7.1(b) or 7.1(e), Plaintiffs have improperly filed a reply brief.

Defendants ask for the reply brief to be stricken.  Plaintiffs have violated the Local Rules in their improper filing of a reply brief, but there is no prejudice to Defendants. The filing is sparse on legal argument, largely just citing and quoting documents in the record, that can be referred to and cited whether or not the parties explicitly point them out.  Most importantly, Defendants presented a fulsome defense at the motions hearing to the entirety of Plaintiffs' arguments.  By having an opportunity to address any arguments or citations raised in the reply brief, the taint of the improper filing has been purged. Thus, striking Plaintiffs' reply memorandum is unnecessary and the Court has considered it in deciding the instant Motion.

**II.     Sanctions**

While Plaintiffs' Motion cites a panoply of authority under which they seek

sanctions, (Doc. No. 881) (citing the September 2020 Order, *Chambers v. NASCO, Inc.*,

501 U.S. 32, 44–45 (1991), "the Federal Rules of Civil Procedure," 28 U.S.C. § 1927,

and "all Orders, files, records and proceedings herein"), their supporting memorandum

only discusses two, (Doc. No. 884 at 15–17) (*Chambers* and 28 U.S.C. § 1927).  The

Court discusses these two in turn.

**1.     The Court's Inherent Authority**

Plaintiffs rely primarily upon the "inherent power of the Court" to sanction

Defendants for conduct abusing the judicial process.  (Doc. No. 884 at 15–16.)  "[I]t is

firmly established that the power to punish for contempts is inherent in all courts."

*Chambers*, 501 U.S. at 44 (quotation omitted).

> This power reaches both conduct before the court and that beyond the
> court's confines, for "[t]he underlying concern that gave rise to the
> contempt power was not . . . merely the disruption of court proceedings.
> Rather, it was disobedience to the orders of the Judiciary, regardless of
> whether such disobedience interfered with the conduct of trial."

*Id.* at 44 (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798

(1987)).  The *Chambers* court warned that the potency of inherent power "must be

exercised with restraint and discretion."  *Id.* at 44.  A federal court may:  (1) award

attorney's fees to a party whose litigation efforts directly benefit others; (2) as a sanction

for willful disobedience of a court order; or (3) as a sanction for a party who has acted in

bad faith, vexatiously, wantonly, or for oppressive reasons.  *Id.* at 45–46.  Plaintiffs rely

upon a combination of the second and third prongs to impose the sanctions sought.  (Doc.

No. 884 at 15 ("Under such egregious circumstances, with an unprecedented lengthy record of defiance, the Court is authorized to sanction DHS for its conduct."); *id.* at 3 ("Plaintiffs also respectfully request the Court sanction DHS for its unprecedented decade long conduct of non-compliance and delay seeking to avoid its obligations under the Agreement, which severely delayed the administration of justice, endangered vulnerable citizens and caused the needless expenditure of several thousand hours by the Court, consultants and Plaintiffs to address DHS non-compliant conduct.").)

As described above, the Court's jurisdiction over this matter was originally scheduled to conclude on December 4, 2013, but jurisdiction was extended multiple times due to Defendants' noncompliance with the Agreement. Plaintiffs moved for sanctions on October 7, 2013. (Doc. No. 230.) The Court found Defendants in violation of the Agreement and concluded the "violation is anything but a trivial or unimportant matter" and that "DHS consciously concealed and misled the Plaintiffs and the Court with regard to the lack of licensure [of the MSHS–Cambridge facility], or if not consciously concealed and misled, was indifferent to both the violation and the expectation of candor with all parties, including the Court . . . ." (Doc. No. 259 at 5.) But the Court "need[ed] additional information . . . to decide what sanction, including any financial sanction, if any, would be appropriate under the circumstances." (*Id.* at 5–6.) The Court thus withheld making a final decision pending a report from the Court Monitor. (*Id.* at 6.) After receiving the Court Monitor's report, the Court expanded the Court Monitor's responsibilities and extended jurisdiction for "at least two additional years." (Doc. No. 340 ("September 2014 Order") at 9.) The Court also left open Plaintiffs' ability to

file a motion to "recover attorney fees that have been incurred directly related to the non-compliance of the DHS as well as to evaluate an increased role for the Minnesota Governor's Council on Developmental Disabilities as well as the Office of the Ombudsman for Mental Health and Developmental Disabilities." (*Id.* at 10–11.)

Approximately 13 months after the Court extended jurisdiction as a partial resolution of Plaintiffs' sanction motion, the parties submitted a joint motion for negotiated attorney's fees. (Doc. No. 525.) The parties negotiated a resolution to the question of attorney's fees left open by the September 2014 Order. Defendants agreed to pay Plaintiffs' counsel $50,000 "for attorney time incurred through" November 12, 2015. (Doc. No. 525 at 2, 6.) Plaintiffs agreed to "not make any further request or claim for reimbursement of attorneys' fees, costs, and disbursements, through the final disposition of the Settlement Agreement or [this case]." (*Id.* at 2.) The parties carved out an exception: fees may be awarded from November 20, 2015 onward "due to proven intentional and willful misconduct which constitutes substantial non-compliance with the Settlement Agreement." (*Id.* at 2–3; Doc. No. 526.)

Weakening Plaintiffs' request for sanctions is the above-discussed reality that the Court has already decided requests for sanctions. As Plaintiffs themselves state, "[i]n lieu of sanctions and contempt findings, and using remarkable restraint, the Court ordered that jurisdiction be extended, independent court monitoring, reviews undertaken, comprehensive action and work plans developed, meetings, reports and a lengthy list of additional items." (Doc. No. 884 at 4–5.) The Court sanctioned Defendants by extending jurisdiction in order to ensure compliance with the Agreement. The Court's

9

consideration of Defendants' conduct in this litigation was inherent in imposing such a sanction.  Then, the parties themselves resolved the issue of monetary sanctions and that resolution was adopted by the Court on November 20, 2015.  These previous orders are the law of the case and the Court will not permit re-litigation of matters already settled. *Gander Mountain Co. v. Cabela's Inc.*, 540 F.3d 827, 830 (8th Cir. 2008) ("The law-of-the-case doctrine has been described as a means to prevent the relitigation of a settled issue in a case.  The doctrine requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy.").  Accordingly, the Court will not disturb its sanctions findings or the parties' attorney's fees resolution for any matters occurring prior to November 20, 2015.  Moreover, the Court finds that the carve-out exception does not apply.  While the Court previously observed that Defendants prioritized litigation tactics over making meaningful lasting improvements in the lives of people with disabilities, Plaintiffs have failed to show that the Defendants acted intentionally and willfully in opposition to compliance since that finding.

Plaintiffs largely cite to the Court's lamentations regarding the course of this litigation as a basis for the Court to impose sanctions.  Undoubtedly, the Court has been troubled due to the failures of Defendants—government actors and public servants—in implementing the Agreement to protect vulnerable Minnesotans such that it required extensive monitoring and extension of the Court's jurisdiction for nine additional years.  Notwithstanding these previous failures, the Court found Defendants finally to be in substantial compliance with all requirements of the Agreement and that jurisdiction must

10

end.  (September 2020 Order at 14.)  The finding that Defendants are in substantial

compliance with the Agreement is the law of the case and Plaintiffs may not seek to

extend jurisdiction as a sanction.

Plaintiffs point to some post-November 2015 conduct as grounds for sanctions.

Plaintiffs cite to a February 27, 2020 letter to the Court from Plaintiffs' counsel.  (Doc.

No. 884 at 10 (citing Doc. No. 812).)  In that letter, Plaintiffs' counsel recounts:

> In a recent disturbing example, we are advised a lead attorney at DHS told
> the consultants they should tell the Court to release its jurisdiction and then
> DHS will begin to work with and listen to them; the consultants are merely
> doing the bidding of the Court; DHS will challenge every order because the
> Court cannot tell it what to do; the Governor supports all of this; and that
> the same lawyer attributed similar statements to lawyers at the Minnesota
> Attorney General's Office.

(Doc. No. 812 at 1.)  Plaintiffs also cite to a March 4, 2020 email their counsel sent to

Defendants' counsel, stating:

> We remain deeply concerned about reported disparaging statements made
> by DHS lead counsel Rick Figueroa including that Figueroa told the
> consultants they should tell the Court to release its jurisdiction and then
> DHS will begin to work with and listen to them; the consultants are merely
> doing the bidding of the Court; DHS will challenge every order because the
> Court cannot tell it what to do; the Governor supports all of this; that
> Figureoa [sic] attributed similar statements to lawyers at the Minnesota
> Attorney General's Office; and that no matter what the Court orders DHS
> will instruct Dr. LaVigna to tell DHS what the consultants say to
> him. . . . We are further advise[d] from multiple sources that additional
> disparaging statements have been made by DHS counsel to elected officials
> at the Minnesota Legislature, and to the consultants, about the Court and
> our office.

(8th Cir. No. 20-1126, Doc. Entry ID 4896079 at 5.)  Plaintiffs argue that this

information, coupled with "multiple DHS motions, appeals and letters opposing its

routine obligations, including appeals of routine orders for the external review of St.

Peter and Anoka ordered by the Court," (Doc. No. 884 at 11), buttresses their argument that Defendants have engaged in sanctionable conduct. The conduct Plaintiffs contest, however, is Defendants' appeal. The Eighth Circuit already rejected Plaintiffs' motion for attorney's fees on appeal. (8th Cir. No. 20-1126, Doc. Entry ID 4911221.) Plaintiffs cite to no authority under which this Court can sanction behavior that occurs in the appellate court, let alone where that appellate court has already rejected a request for fees regarding that same conduct. *See Webster v. Sowders*, 846 F.2d 1032, 1040 (6th Cir. 1988) ("We recognize that in the course of a lawsuit, the proceedings often take place in both the trial and appellate courts, and that some motions or other actions, such as the motion to stay the pay orders pending appeal, may have impacts at both levels. Nevertheless, the sanction statutes, the rules, and the case law provide for fairly clear separation between conduct on appeal sanctionable by the appellate court and conduct in the trial court sanctionable by the trial court."); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 409 (1990).

Even assuming these comments from Mr. Figueroa are true, Plaintiffs have failed to make any showing how the comments can be considered "intentional and willful misconduct which constitutes substantial non-compliance with the Settlement Agreement." Mr. Figueroa is not acting as counsel of record for Defendants in this federal matter. It is gravely concerning that a government attorney would show such disregard for the orders of this Court and their duties to the Minnesota public, but the requested imposition of $500,000 of sanctions requires more than suggestion that improper conduct is afoot. The Court cannot find intentional and willful conduct based

12

on Plaintiffs' counsel's own letters and emails describing conversations removed from their source.  At the very least, the Court has no affidavits from the Court consultants who heard these statements.  Again, the standard applicable by reason of the parties' settlement of the fees question is not simply conduct unbefitting government counsel and officers of the court, but rather conduct that is non-compliant with the Agreement.  As this Court has already concluded, Defendants are in substantial compliance with the Agreement and Mr. Figueroa's statements do not unravel that conclusion.

Plaintiffs also assert that "DHS obstructionist tactics can surely be expected to continue after the Court's jurisdiction has concluded."  (Doc. No. 884 at 13.)  Speculation of future non-compliance cannot serve as the basis for awarding sanctions.  Sanctions, by their very nature, are retrospective; they punish "conduct before the court," such as disobedience of court orders.  *Chambers*, 501 U.S. at 44.  While Plaintiffs may have reason to be wary of Defendants' continued compliance with the Agreement, there is no authority for the Court to sanction a party for conduct that has not yet, or may never, come to be.  Defendants have brought themselves into compliance with the Agreement and the Court cannot impose sanctions and endless review based on Defendants' repeated past failures.  At some point, Defendants have to be trusted, like all litigants that settle a dispute, that they will abide by the parties' Agreement.  But Plaintiffs are not without recourse should this trust be betrayed.  Just as Plaintiffs brought suit here, they could initiate yet another lawsuit to protect their rights should Plaintiffs' concerns ring true.

Any sanction imposed pursuant to the Court's inherent authority must be compensatory rather than punitive.  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct.

1178, 1186 (2017).  This means that fee awards "may go no further than to redress the wronged party for losses sustained; it may not impose an additional amount as punishment for the sanctioned party's misbehavior."  *Id.* (quotation omitted).  Plaintiffs seek a sanction of $500,000 but have provided no evidence showing the expenses and costs this would compensate.  While Plaintiffs have undoubtedly expended resources in ensuring Defendants complied with the Agreement, the only specific activity discussed is defending against Defendants' appeals, which is conduct unreachable by this Court. Plaintiffs have offered no supporting evidence that the $500,000 is justified or appropriate.  Moreover, the sanction awards to non-parties appears to be purely punitive in nature, rather than compensatory.[8]

Ultimately, the exercise of the Court's inherent authority to sanction is discretionary.  In the Court's discretion, further sanctions do nothing to move the parties forward to more productive ends.

### 2.     Section 1927

Plaintiffs also cite 28 U.S.C. § 1927 as grounds for imposing costs and attorneys' fees against Defendants' attorneys.  (Doc. No. 884 at 16–17.)  Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and

---

[8]     Arguably, Plaintiffs seek to recover costs for the Minnesota Governor's Council on Developmental Disabilities and Office of the Ombudsman for Mental Health and Developmental Disabilities for the work they have completed over the past ten years, (Doc. No. 884 at 2.)  Like Plaintiffs' request for fees, they offer no support justifying the requested amount.  More importantly, Plaintiffs offer no caselaw indicating that a sanction award may be apportioned to two government entities against another government entity.

vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  Sanctions under § 1927 may be imposed irrespective of "winners and losers, or between plaintiffs and defendants.  The statute is indifferent to the equities of a dispute and to the values advanced by the substantive law.  It is concerned only with limiting the abuse of court processes."  *Roadway Express v. Piper*, 447 U.S. 752, 762 (1980).  The "statute permits sanctions when an attorney's conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."  *Clark v. Utd. Parcel Serv., Inc.*, 460 F.3d 1004, 1011 (8th Cir. 2006) (cleaned up); *see Vallejo v. Amgen, Inc.*, 903 F.3d 733, 750 (8th Cir. 2018) ("Attorneys are entitled to advocate zealously for their clients, but they must do so in accordance with the law, the court rules, and the orders of the court.").

Nothing in the plain language in Section 1927 prevents the imposition of monetary sanctions against a government attorney.  *See Gavin v. U.S. Sec. and Exch. Comm'n*, No. 04-4522, 2007 U.S. Dist. LEXIS 62252, at *47 (D. Minn. Aug. 23, 2007) (Magnuson, J.) (citing *Pac. Fisheries, Inc. v. IRS*, No. 04-2436, 2006 U.S. Dist. LEXIS 35288, 2006 WL 1635706, at *5 (W.D. Wash. Jun. 1, 2006)).  But the plain language of Section 1927 limits any sanction to the "costs, expenses, and attorneys' fees" resulting from the sanctionable conduct.  So even assuming that Defendants' counsel "unreasonably and vexatiously" multiplied these proceedings, Section 1927 provides no authority for the Court to appoint an independent reviewer to continue monitoring DHS's compliance with the Agreement nor does it authorize the Court to extend jurisdiction to ensure compliance

with orders of the Court.  As such, any non-monetary sanction requested by Plaintiffs
pursuant to 28 U.S.C. § 1927 is denied.

Turning to the monetary request, Plaintiffs request $500,000 to be distributed
among five separate recipients:  (1) a *cy pres* fund; (2) yet-to-be-identified third-party
organizations; (3) Minnesota Governor's Council on Developmental Disabilities;
(4) Office of the Ombudsmen for Mental Health and Developmental Disabilities; and
(5) Plaintiffs' counsel.  Again, assuming that Defendants' counsel "unreasonably and
vexatiously" multiplied these proceedings, Section 1927 limits monetary sanctions to
those that "satisfy . . . the excess costs, expenses, and attorneys' fees reasonably
incurred" from the sanctionable conduct.  Here, $400,000 of the $500,000 in monetary
sanctions requested does not account for attorney's fees incurred by Plaintiffs' counsel,
but rather is earmarked for other parties.  As such, Section 1927 provides no authority for
this sanction and the request must be denied.

Turning to the $100,000 requested by Plaintiffs' counsel, the Court finds the
request lacking for the same reasons described above.  Plaintiffs and Defendants
negotiated for a particular standard for any post-November 2015 requests for attorney's
fees.  The Court finds Plaintiffs have failed to demonstrate sanctions are warranted under
either the parties' bargained-for standard or the standard found in Section 1927:
Defendants' appeal is not within the purview of this Court; the statements of Mr.
Figueroa, if true, did not multiply the proceedings in this case unreasonably and
vexatiously; and Plaintiffs have not demonstrated that the $100,000 requested was

16

reasonably incurred.  Accordingly, the Court finds sanctions under Section 1927 are inappropriate.

## CONCLUSION

Ultimately, the imposition of sanctions by the Court is discretionary.  The Court has not been shy about its frustrations with how this lawsuit digressed from a forward-looking and hopeful settlement to years of protracted feet-dragging in implementing that very same settlement.  As Defendants' counsel[9] stated on December 1, 2011, when the Court approved the Settlement Agreement:

> [T]his has been particularly gratifying that we are working on not only a very important case, but we are working on a case where we are able to make a difference in people's lives.  We are not just for once talking about money.  We are not just talking about [the] Government taking a position and refusing to budge, you know, under the typical stereotype. . . . [T]his is an important settlement.  It will make a huge difference for people in a positive manner. . . . [I]t will greatly improve the quality in care of the lives of a large number of persons with disabilities, not only in Minnesota, but we have people that come through Minnesota.  And it will impact them, as well.  And we think that this agreement will set the tone for other states, as well.

(Doc. No. 146 at 27).  At some point, the betterment of Minnesota's most vulnerable population was left at the wayside.  Imposing the sanctions requested does nothing to move to a more productive future.  However, it remains the Court's sincere hope that rather than new and additional lawsuits which the Court has suggested are likely to occur, that everyone could come together and do what they said they would do—and they all

---

[9]     Steven H. Alpert and P. Kenneth Kohnstamm were counsel for the State Defendants as Assistant Attorneys General, Minnesota Attorney General's Office on December 1, 2011.

sincerely believed they would do—on December 1, 2011.  If that could occur as counsel

stated on December 1, 2011 "it will make a huge difference for people in a positive

manner . . . and set the tone for other states, as well."  (*Id.*)  Justice then and justice now

requires no less.

## ORDER

Based upon the presentations and submissions before the Court, and the Court

being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that

Plaintiffs' Motion for Sanctions and Appointment of Independent Reviewer (Doc.

No. [881]) is respectfully **DENIED**.


Dated:  October 22, 2020                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge